**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN,
NORTHERN DIVISION**

| | | |
|---|---|---|
| HURON MOUNTAIN CLUB | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:12-cv-00197 |
| | ) | **(ORAL ARGUMENT REQUESTED)** |
| UNITED STATES ARMY CORPS OF | ) | |
| ENGINEERS, LIEUTENANT COLONEL | ) | |
| MICHAEL C. DEROSIER, District Commander, | ) | |
| Detroit District, U.S. Army Corps of Engineers, | ) | |
| UNITED STATES DEPARTMENT OF THE | ) | |
| INTERIOR, KEN SALAZAR, Secretary of the | ) | |
| United States Department of the Interior, | ) | |
| UNITED STATES FISH AND WILDLIFE | ) | |
| SERVICE, DANIEL M. ASHE, Director of the | ) | |
| United States Fish and Wildlife Service, and | ) | |
| KENNECOTT EAGLE MINERALS COMPANY | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ORAL ARGUMENT REQUESTED)

Frederick W. Addison, III
Nolan C. Knight
Steven A. Harr
Munsch Hardt Kopf & Harr, P.C.
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201

**COUNSEL FOR PLAINTIFF HURON
MOUNTAIN CLUB**

Defendant Kennecott Eagle Minerals Company ("Kennecott") is engaging in conduct that falls squarely within the jurisdiction of the federal agencies and representatives who are the other Defendants in this lawsuit (the "Federal Defendants").  Kennecott's conduct is illegal in the absence of "permits" issued pursuant to the Rivers and Harbors Appropriations Act and Federal Water Pollution Control Act, as well as pre-permit evaluations the Federal Defendants *must* conduct pursuant to the National Environmental Policy Act, Endangered Species Act, and National Historic Preservation Act.

Kennecott never has applied for the required permits.  In turn, the Federal Defendants have failed to demand Kennecott apply for the permits, and they consequently never have engaged in the mandatory pre-permit evaluations Kennecott's conduct compels.

On the continuum of judicial review of agency oversight and approval of regulated conduct—at one extreme, federal courts have issued injunctive relief when federal agencies issue "permits" after attempting (but failing) to conduct pre-permit evaluations that were adequate under laws such as the National Environmental Policy Act, Endangered Species Act, and National Historic Preservation Act.  *See, e.g., Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011).  The facts of this case represent the opposite extreme.

Kennecott has not even applied for the required permits, and the Federal Defendants have not conducted *any* of the mandatory evaluations.  The need for injunctive relief under these facts

is not even close.  Plaintiff Huron Mountain Club ("HMC," or the "Club") therefore moves for a temporary restraining order, preliminary injunction, and other appropriate equitable relief.[1]

## I.  FACTUAL BACKGROUND

### A.  The Huron Mountain Club

Plaintiff Huron Mountain Club ("HMC," or the "Club") is a not-for-profit entity formed more than 100 years ago as a retreat and wildlife preserve.  *See* Appendix in Support of Plaintiff's Application and Motion for Temporary Restraining Order and Preliminary Injunction, Exhibit ("Ex.") A, ¶ 7; Ex. B, ¶ 4;  Ex. B(2) (Preamble); Ex. C, ¶ 11.  HMC owns approximately 19,000 acres of land within the Huron Mountains, including an eleven-mile stretch of the Salmon Trout River, which runs through HMC's property and empties into Lake Superior at the northeast corner of HMC's property.  *See* Ex. A, ¶¶ 8, 9; Ex. B, ¶ 11; Ex. C, ¶ 15.

The Salmon Trout River is a direct tributary to Lake Superior; frequent focus of federally, state, and joint-funded scientific research; is considered a "world-class" trout stream; otherwise is a popular fishing and boating destination; and historically was used for commercial activities such as transportation of timber extracted from the surrounding forests, which was

---

[1] HMC incorporates the relief requested in its accompanying Application and Motion for Temporary Restraining Order and Preliminary Injunction, including, *inter alia*:  (1) mandatory injunctive relief to compel the Federal Defendants' "unlawfully withheld" actions pursuant to 28 U.S.C. § 2202; the Administrative Procedures Act, 5 U.S.C. § 702—or, in the alternative, the Mandamus and Venue Act, 28 U.S.C. § 1361; (2) a prohibition of Kennecott's illegal and unauthorized subsurface construction activities pursuant to this Court's authority under the All Writs Act (28 U.S.C. § 1651), or inherent powers, *see Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946); and (3) an award of HMC's litigation fees and costs to the extent recoverable under substantive or applicable law.

floated downstream and processed at sawmills bordering Lake Superior.  *See* Ex. A, ¶¶  7, 9, 10, 13; Ex. B, ¶¶ 17-19; Ex. C, ¶¶ 7, 10.

HMC's property is approximately 3.3 miles downstream on the Salmon Trout River, from a nickel and copper mine Kennecott currently is constructing.  *See* Ex. A, ¶ 10; Ex. D, p. 129.  The mine hereinafter will be referred to as the "Eagle Mine."

### B.    The Eagle Mine

Through operation of the Eagle Mine, Kennecott intends to extract approximately 4,000,000 metric tons of a "sulfide" ore body and rock located directly underneath the headwaters of the Salmon Trout River, including adjacent wetlands.  *See* Ex. A, ¶ 10; Ex. B, ¶ 5; Exhibit C, ¶ 9; Ex. E, p. 10; Ex. F; Ex. G.  An acknowledged, and expected, consequence of sulfide mining is that when sulfide ore is exposed to air and water, the ore produces sulfuric acid that leaches toxic metals from the ore and releases the toxins.  *See* Ex. H, pp. 2141-2142.  This phenomenon commonly is known as "acid rock drainage" or "acid mine drainage."  *Id*.

In total, Kennecott projects the operational life of the Eagle Mine will be approximately eleven years.  *See* Ex. E, p. 10.   The facilities Kennecott has constructed, and intends to construct, to facilitate these operations can be categorized as "surface facilities" and "subsurface facilities."  *Id*. at 10-11.

### 1.    <u>The Eagle Mine Surface Facilities</u>

Kennecott's surface facilities span approximately ninety-two acres and include, *inter alia*:  (1) a compressor plant, (2) a generator plant, (3) a propane storage and mine heater, (4) a loading dock and warehouse, (4) a fuel storage area, (5) septic system, (6) office buildings, (7) parking areas, (8) an assay lab, (9) a maintenance shop, (10) a truck wash and scales, (11) storage buildings, (12) a 110-ton fly ash silo, (13) a 110-ton cement silo, (14) a treated water

infiltration system that will act as a "drainfield" for the disposal of treated wastewater from mining operations, (15) a soil stockpile area, (16) an aggregate storage area, (17) a construction staging area, (18) a crusher ram, (19) a crusher conveyor and crushed ore storage area, and (20) holding ponds and waste water treatment facilities that will collect, treat, and discharge wastewater. *See* Ex. E, pp. 9-11.

A fleet of forty, 56-ton ore trucks otherwise will transport crushed ore daily from the subsurface facilities to the surface of the Eagle Mine, then to another facility located in Marquette County for further processing. *See* Ex. E, p. 21; Ex. I, p. 5433. The surface facilities also will include a "Mine Ventilation Air Raise," which is an exhaust stack that will extend 65 feet above ground to emit exhaust containing toxic, metallic dust from underground mining operations. *See* Ex. E, p. 21; Ex. J, pp. 1169-1170, 1263-1264.

To construct the "subsurface facilities" (discussed below), Kennecott will need to excavate approximately 378,914 tons of sulfide waste rock, which must be brought to the surface and stored in a six-acre "Temporary Development Rock Storage Area" at the site. *See* Ex. E, p. 21. That waste rock eventually will be re-deposited subsurface, along with additional pollutants such as fly ash, lime, and "Portland" cement, to fill voids created during excavation and mining operations. *See* Ex. E, p. 98; Ex. N, p. 2577.

The state of Michigan administers various "permitting" programs that were triggered when Kennecott began constructing the surface facilities at the Eagle Mine. For instance, Part 632 of Michigan's Natural Resources and Environmental Protection Act, M.C.L. 324.63205, requires persons to obtain a "section 632" permit to "engage in the mining of nonferrous metallic minerals."

4

State proceedings do not, and indeed cannot for reasons discussed below, supplant the discrete *federal* laws and regulations at issue in this litigation. A relevant state permit Kennecott obtained actually mandates as much by admonishing: "Compliance with the provisions of [state mining law] *does not* relieve the permittee of the obligation to comply . . . with all other applicable . . . federal . . . statutes, regulations, or ordinances." Ex. O, p. 2 (emphasis added).

The state regulatory process nonetheless is of consequence, because state administrative proceedings were conducted before Kennecott began construction of its surface facilities, and during those proceedings, consultants retained by Kennecott and independently retained by the state provided information regarding the Eagle Mine's overall construction and operation. That information includes sworn testimony and documents, which provide conclusive evidence subsurface construction activities Kennecott recently has begun are subject to the federal laws and regulations at issue in this lawsuit.

### 2. Subsurface, "Permit-dependent" Facilities

Within the past several months, Kennecott has begun excavation and construction of the subsurface portion of the Eagle Mine, *see* Ex. K, p. 10, and these activities trigger the obligations at issue in this lawsuit. The "portal," or opening, to the Eagle Mine's subsurface mineshaft is the threshold that has transitioned Kennecott's construction work from private conduct subject primarily to the above-referenced state-based regulation and limited federal involvement, to activity that demands extensive federal oversight and approval.

The portal is the entrance to the tunnel that will descend approximately a half-mile subsurface into Kennecott's mineshaft. *See* Ex. K, p. 10; Ex. L. p. 598. The portal's opening is located near the base of a more than 1,000 year old, sacred, Native-American worship site known as "Eagle Rock." *See* Ex. B, ¶ 16; Ex. C, ¶ 17; Ex. M.

5

To supplement the portion of the portal that already has been constructed, Kennecott intends to blast an opening at the base of Eagle Rock.  *See* Ex. B, ¶ 16; Ex. C, ¶ 17; Ex. M. Kennecott otherwise has cordoned off access to Eagle Rock and will continue to do so during the life of the Eagle Mine operations.  *See* Ex. E, p. 17.

Kennecott's actual mineshaft "tunnel" will span at least one mile subsurface.  *See* Ex. N, p. 2742.  The circumference of the tunnel will be approximately 15' x 15'.  *Id.* at 2741.  Whereas the portal opening, at ground surface, is located near the surface waters of the Salmon Trout River, the subsurface tunnel actually will intersect and run parallel directly underneath the Salmon Trout River or adjacent wetlands, which are the River's headwaters and therefore within the River's ordinary high water mark.  *See* Exhibit F; Ex. G, p. 63.  Kennecott otherwise will conduct excavation and mining to access ore, essentially all of which is located directly underneath the River and wetlands.  *Id.  See also* Ex. C, ¶ 9.

Kennecott proposes to use the "longhole stope" method of mining, which involves the removal of ore in vertical sections from the bottom of the ore body upward.  *See* Ex. E, pp. 38-39.  A series of primary voids, called "stopes," which will be approximately 33 feet wide, 98 feet high, and 164 feet long, and separated by sections of intact rock, will be created by sequential blasting to create the voids.  *Id.*

Kennecott eventually will backfill these "primary" stopes with cemented fill, including imported aggregate.  *See* Ex. E, pp. 38-39, 98.  Explosives then will be used to remove the remaining rock, located between the backfilled primary stopes.  *Id.*

Some of these "secondary" stopes eventually will be backfilled with a mixture of limestone and "development rock," which is the waste rock that will be excavated during construction of the mine tunnel and stored at the surface during mine operations.  *See* Ex. E, pp.

38-39, 98.  Notwithstanding this general process, several miles of bored-out space, intentionally will not be backfilled by Kennecott, on the assumption those spaces will remain as open, empty voids—assuming they do not collapse.  *See* Ex. N, p. 2742.  The prudence of this assumption is questionable, because consultants hired by the state have acknowledged the possibility that a "structure" that will be known as the "crown pillar," intended to support the mine, may be susceptible to collapse.  *See* Ex. Q, pp. 791, 865-867, 873, 881-882, 899-900, 919, 921-922.

Even if this worst-possible case scenario never comes to pass, its possibility, and the very nature of Kennecott's construction and operations otherwise will cause adverse environmental impacts.  For instance, during excavation and construction of the subsurface facilities, and as a result of excavation and mining operations, Kennecott will drawdown water in a manner that will lower the water table of the Salmon Trout River, as well as wetlands and other water bodies within the Salmon Trout River watershed.  *See* Ex. P; Ex. Q, pp. 866, 881-882, 906; Ex. R, pp. 1041-1068.   It also will reduce the flow of the River and change its temperature and water chemistry, while reducing its reach.  *Id.*

Because the subsurface work Kennecott has begun is the activity that triggers the Rivers and Harbors Appropriations Act ("RHA"), 33 U.S.C. § 403, and Federal Water Pollution Control Act, commonly known as the "Clean Water Act" ("CWA"), 33 U.S.C. § 1344, permitting requirements discussed below, that work hereafter will be referred to as the "Permit-dependent work."

## II.     STANDARD FOR INJUNCTIVE RELIEF

HMC must demonstrate the following to obtain a temporary restraining order and preliminary injunction:  (1) a substantial likelihood of success on the merits; (2) a threat of irreparable harm; (3) the balance of harms favors injunctive relief; and (4) the public interest will

be served by the injunction. *See International Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010). "A district court must balance [these] four factors when considering a motion for a preliminary injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818 (6th Cir. 2012).

HMC satisfies each of the elements for the reasons discussed below.

## A. HMC Is Substantially Likely to Prevail on the Merits

There are two issues that will dictate whether HMC prevails: (1) whether HMC has "standing," and (2) whether the Federal Defendants and Kennecott have failed to comply with applicable provisions of the RHA; CWA; National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332; Endangered Species Act ("ESA"), 16 U.S.C. § 1531; and National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470a. The evidence conclusively supports HMC in both regards.

### 1. HMC has "associational" standing

HMC can represent its members' interests in this lawsuit by satisfying the following criteria for "associational" standing: (1) HMC's members individually would have standing; (2) the matters at issue must be germane to HMC's existence and purpose; and (3) although the members of HMC would be proper parties, their participation cannot be a necessity. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

### (a) HMC's members individually would have standing

Three HMC members are participating in this lawsuit on behalf of the Club: Dr. Mary O'Boyle, John R. Dykema, Jr., and Philip Power. *See* Ex. A; Ex. B; Ex. C. The members hereinafter will be referred to as the "HMC Representatives" or "Representatives."

Generally, the standing analysis requires persons like the Representatives to prove: (1) an "injury in fact," (2) a causal connection between the injury and Defendants' conduct; and (3)

8

it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). HMC notes, however, these conventional standing principles acquire a specialized analytical framework in cases of this kind, because HMC and the Representatives seek to vindicate congressionally mandated "procedural rights," which are being violated by Defendants' respective failures to comply with obligations under the RHA, CWA, NEPA, ESA, and NHPA. The standing analysis in cases of this kind has a unique operation:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right *without meeting all the normal standards for redressability and immediacy*. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare [an environmental evaluation], *even though he cannot establish with any certainty that the statement will cause the license to be withheld* or altered, and even though the dam will not be completed for many years.

504 U.S. at 573 n.7 (emphasis added). The Representatives satisfy standing under these unique (or even conventional) standing considerations.[2]

### (i)     Injury in Fact

The HMC Representatives are not asserting standalone claims, or purported private rights of action, under the RHA or CWA.[3]  Those statutes instead are germane because Kennecott's

---

[2] A more conventional example of the Representatives' standing interest is the potential diminution of certain Representatives' equitable ownership in HMC, which may result from Kennecott's unauthorized and unregulated Permit-dependent work in such close proximity to HMC's property.

ongoing construction without the required RHA and CWA permits, and the Federal Defendants corresponding failure to demand such permits, are usurping HMC's and the Representatives' rights to have the Federal Defendants conduct mandatory RHA, CWA, NEPA, ESA, and NHPA evaluations *before* allowing precisely the type of construction activities Kennecott is undertaking without submitting to the evaluations.

One of the injuries HMC and its Representatives complain of consequently is the ongoing infringement on their "procedural rights" to have the Federal Defendants conduct the necessary evaluations *before* allowing conduct that will adversely affect, and in some cases destroy, environmental and cultural resources of great importance to HMC and its members.  This is "injury in fact" that satisfies standing as a matter of law.

The United States Supreme Court has acknowledged as much by holding "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc.*, 528 U.S. at 181.  Consistent with these principles, the HMC Representatives recreate in areas at and around HMC's property, including, but not limited to, the Salmon Trout River and the virgin and old growth forest on and around the property.  *See* Ex. A, ¶¶ 6-7, 13; Ex. B, ¶¶ 6, 19; Ex. C, ¶¶ 7, 8, 10, 13, 18.  These recreational activities include, but are not limited to, hunting, swimming in, boating on and fishing in the

---

[3] No private right of action exists under the RHA, *see California v. Sierra Club*, 451 U.S. 287, 297-298 (1981), and the CWA provides citizen suit remedies for specifically enumerated violations.  *See* 33 U.S.C. § 1365.

Salmon Trout River and other water bodies within and beyond HMC's property, bird watching, photography, hiking, camping, and general repose at or around the property. *See* Ex. A, ¶¶ 6-7, 13; Ex. B, ¶¶ 6, 19; Ex. C, ¶¶ 7, 8, 10, 13, 18.

The HMC Representatives are concerned their use of HMC's property, the Salmon Trout River within and beyond the property, and other surrounding areas, will decrease and be diminished because of discharges, pollution, and emissions that will originate from the Eagle Mine's construction and proposed operation. *See* Ex. A, ¶¶ 4, 12, 14; Ex. B, ¶¶ 5, 13, ; Ex. C, ¶¶ 12, 16, 19. These concerns relate to water quality; the prospect of a catastrophic mine collapse that could destroy the Salmon Trout River and related waters; contamination of game, fish, waterfowl, and other wildlife; and potential diminution of HMC's property value. *Id.*

Representatives otherwise are concerned that valuable cultural resources, such as the ancient, Native-American worship site, "Eagle Rock," are being and will be desecrated and destroyed by Kennecott. *See* Ex. B, ¶¶ 14-16 ; Ex. C, ¶ 17. Representatives have visited Eagle Rock in the past because of its historical and cultural significance, intend to visit the site in the future but for its proposed control and future destruction by Kennecott, would like for the site to be preserved and protected so they can share the experience of this one-of-a-kind cultural treasure with others, and otherwise believe preservation of the site is invaluable for the historical and cultural character of the area. *See* Ex. B, ¶ 15.

In light of the foregoing, the Representatives are suffering a legally cognizable "injury in fact." *Cf. Lujan*, 504 U.S. at 563; *Sierra Club*, 645 F.3d at 986; *Defenders of Wildlife, Friends of Animals and Their Env't v. Hodel*, 851 F.2d 1035, 1040 (8th Cir. 1988); *Pit River Tribe v. U.S. Forest Service,* 469 F.3d 768, 778-79 (9th Cir. 2006).

11

### (ii)  *Causal Connection*

Kennecott's illegal construction of its subsurface facilities, and the Federal Defendants' corresponding failures to demand required permits and conduct *mandatory* evaluations under NEPA, the NHPA, and ESA, are the direct causes of HMC's and its members' procedural harms, as well as the adverse environmental impacts that currently are occurring without proper federal oversight or approvals.  The "causal" criteria consequently is satisfied.

### (iii)  *Redressability*

The inquiry under redressability is whether a finding in HMC's favor *could* vindicate HMC and its members' interests.  Undoubtedly, it *would*, and the Supreme Court's analysis in *Lujan* makes clear that the measure of redressability is not whether Kennecott ultimately will be prohibited outright from constructing the Eagle Mine—though, that should be the outcome when relevant laws and regulations are applied properly.  504 U.S. at 573 n.7.  Redressability instead is satisfied simply by the prospect the Federal Defendants will take the required actions (which thus far have been unlawfully withheld), and institute appropriate permitting proceedings and evaluations.  *Id.*

HMC's Representatives therefore have standing, as individuals, to bring this lawsuit.

### (b)  *This suit is germane to HMC's existence and purpose*

HMC's bylaws enshrine it, and its members', commitment to protect and preserve the natural resources within and otherwise surrounding HMC's property.  *See* Ex. B(2).  For instance, HMC's members have formed a "Land and Forest Committee," whose duties include advising HMC's Board of Directors (the "Board") regarding how the Club may consolidate or expand its lands and waters to enhance ecological integrity.  *See* Ex. B(2), ¶ 6.04(c).

In the 1930's or 1940's, the Club retained University of Wisconsin professor, and renowned author, scientist, ecologist, forester and environmentalist, Aldo Leopold, to advise it on how best to preserve the special environmental habitat that makes up the Club's property. *See* Ex. A, ¶ 8; Ex. D, p. 107. He recommended, and the Club instituted, dividing the property into three management areas: a protected area of approximately 10,000 acres; a managed area; and a residential area. *Id.; see also* Ex. B, ¶ 12. The Club generally has followed this management plan for over 60 years, *id.*; accordingly, all areas of HMC's property are separated into one of the following three categories: a "Preserved Area," a "Managed Area," and a "Residential Use Area." *See* Ex. B(2), ¶ 9.02.

The "Preserved Area" is subject to restrictions including, but not limited to, the following:

1. No natural resources of any kind shall be sold or otherwise commercially exploited. *Id.* at ¶ 9.02.

2. No timber or vegetation shall be cut or cleared except as necessary to maintain existing trails and roads, to provide modest quantities of dead timber for on-the-spot use as firewood, *to accomplish scientific research of a character and extent that are in harmony with retention of the wilderness character of the area*, or to deal with an emergency involving forest fire or danger to life or limb. *Id.*

3. Except with the express prior approval of HMC's Board, the water level of any lake or stream on *the property cannot be artificially altered*. *Id.*

The "Managed Area" is subject to similar restrictions including, but not limited to, the following:

1. Except in case of emergency involving forest fire or danger to life or limb, trees may be cut only (1) *for the purpose of fostering healthy regeneration of the forest with a view to preserving the Managed Area as a buffer area to protect the Preserved Area*; (2) *for scientific research that is consistent with preserving the Managed Area as a buffer to protect the Preserved Area*; (3) for clearing existing roads or trails; or (4) to provide firewood or building materials for necessary use on the Club property. *Id.* at ¶ 9.03.

13

2. Trees shall be cut only by the most careful selective methods, *except to improve wildlife habitat as recommended by HMC's Land and Forest Committee and approved by the Board*. Moreover, all cutting must take into consideration *conservation*, safety, and *aesthetic* considerations and must fully protect the shorelines of lakes and streams and areas that are of particular *scientific* or *scenic* interest on HMC's property. Ex. B(2), ¶ 9.03.

The Club's By-laws otherwise impose environmentally conscious protections, such as the following, on all areas of the property (including the "Residential Use Area"):

1. Except in case of emergency involving forest fire or danger to life or limb, and except as the Board may authorize on Pine River for direct transit to or from Lake Superior, no power driven craft shall be operated *on any inland lake or stream* in any part of Club property. *See id*. at ¶ 9.04.

2. Except in case of emergency involving forest fire or danger to life or limb, and except as authorized on the main Club road by the Board, no motorcycle, motor scooter, snowmobile or similar power-driven vehicle shall be operated on Club property. *Id*.

3. The use on Club property of power-driven craft and other prohibited vehicles may be authorized by the Board at specified times, by specified responsible individuals, *where necessary for the purpose of managing wildlife* or for the purpose of maintaining existing facilities or patrolling Club property. *Id*.

The eleven-mile stretch of Salmon Trout River that runs through the Club's property is within the Club's "Preserved Area." *See* Ex. B, ¶ 12. Consistent with the Club's commitment to scientific research and preservation, it otherwise has allowed more than 200 scientific studies at the property. *See* Ex. B, ¶ 8; Ex. D, p. 94. This suit consequently is germane to, indeed consistent with a core function of, HMC's existence and purpose.

(c)     *HMC's individual members are not "necessary" parties to this suit*

Although the HMC Representatives or other members would have been proper parties to this lawsuit, they are not *necessary* because their interests adequately are being represented by HMC. HMC therefore has associational standing to represent the Representatives and other members in this suit. *Cf.* 528 U.S. at 181.

14

**2.** **The Federal Defendants and Kennecott are violating the RHA, CWA, NEPA, NHPA, and ESA**

*(a)* *Defendants are violating RHA permitting mandates*

Section 403 of the RHA, 33 U.S.C. § 403, provides:

> it shall not be lawful to *excavate* or *fill*, or *in any manner to alter or modify* the course, location, *condition*, or *capacity* . . . of the channel of any *navigable water of the United States*, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army *prior to beginning the same*.

(emphasis added). Kennecott and the Corps are violating this proscription and mandate.

*(i)* *The "waters" at issue are "navigable" under the RHA*

"Navigable waters" of the United States include those, which "have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." *See* 33 C.F.R. § 329.4. The Salmon Trout River, in the past, has been used for commercial activities such as logging; currently is, and in the past has been, used for commercial and recreational activities such as boating and fishing; and otherwise is a direct tributary to Lake Superior. *See* Ex. A, ¶¶ 7, 10; Ex. B, ¶¶ 6, 11, 17-19; *See* Ex. C, ¶ 7. For these, among other reasons, the River is "navigable" within the meaning of the RHA. *See* 33 C.F.R. §§ 329.4, 329.7.

The River's "navigable" status, and the Corps' corresponding regulatory duties, "extend[s] laterally to the entire water surface and bed of [the] navigable waterbody, which includes all the land *and* waters *below the ordinary high water mark* . . . ." 33 C.F.R. § 329.11(a) (emphasis added). By operation of this standard, the wetlands bordering the Salmon Trout River at the site of the Eagle Mine are "navigable," because the wetlands are the headwaters that hydrologically feed the River or otherwise are hydrologically connected to the

15

River.  *See* Ex. C, ¶ 9; Ex. F; Ex. R, p. 1043, Ex. S, pp. 5486, 5587.  The River and wetlands consequently are within the Corps' RHA jurisdictional responsibilities.

*(ii)    Kennecott's activities require a "403 Permit"*

The Corps, through Defendant Derosier, is responsible for implementing section 403, by administering the "permitting" program under the section.  *See* 33 C.F.R. §§ 320.2(b), 322.3(c)(2), 325.8(b).  The Corps has promulgated regulations found at 33 C.F.R., Part 322, to identify specific activities that trigger the Corps' duty to issue permits under the section (hereinafter, "403 Permits") *before* a person can engage in regulated activities.

Under subpart 322.3(a), the Corps mandates that "[Department of the Army ("DA")] permits are required under [the RHA] for *structures* and/or *work* in or *affecting* navigable waters of the United States . . . ."  (emphasis added).  Subpart 322.2(b) then expansively defines "structures" to include all physical structures, "without limitation," and expansively defines "work," "without limitation," to include "excavation" "or other modification."

Excavation and tunneling "work" underneath a navigable water, construction of any "structure" underneath a navigable water, and any activities that otherwise affect the capacity of a navigable water are activities that require a 403 Permit.  Specifically, 33 C.F.R. § 322.3(a) provides:  "Structures or work" not physically *in* a "navigable water," nonetheless require a 403 permit, "if these structures or work *affect* the course, location, or condition of the waterbody in such a manner *as to impact on its navigable capacity*.  For purposes of a [403] permit, a *tunnel* or other *structure* or work <u>*under*</u> . . . a navigable water of the United States *is considered to have an impact on the navigable capacity of the waterbody*."  (emphasis added).

As discussed above, Kennecott is engaging in "tunneling" work underneath the Salmon Trout River and adjacent wetlands that fall below the River's ordinary high water mark, is

16

creating a mine "structure" underneath the Salmon Trout River and corresponding wetlands, will excavate and mine ore located directly underneath the Salmon Trout River and wetlands, and otherwise will alter the navigable capacity of the River and wetlands by drawing down the water table and changing flow. Kennecott nevertheless does not have, and has failed even to seek, a 403 Permit authorizing these regulated activities.

HMC consequently should prevail on the merits of its RHA claim.

(b)     *Defendants are violating CWA permitting mandates*

Under the CWA, the "Secretary of the Army, acting through the Chief of Engineers" is the federal officer charged with assessing whether to issue a "permit" "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a) (emphasis added). The Secretary of the Army in turn has delegated responsibility for administering the permitting program under 33 U.S.C. § 1344 (which is section 404 of the CWA), to respective District Engineers of the Corps, *see* 33 C.F.R. § 325.8(b); here, Defendant Derosier.

Such activities consequently are permissible only if a person obtains a "dredge and fill" permit authorized by section 404 of the CWA, which hereinafter will be referred to as a "404 Permit." Although CWA section 404 refers to discharges into "navigable waters of the United States," common practice is to refer to section 404 jurisdiction in terms of discharges affecting "waters of the United States." *See* 33 C.F.R. § 328.1

This variation in nomenclature reflects a distinction without a difference, *in this case*, because the Corps defines the scope of CWA jurisdiction in a manner that makes CWA jurisdiction coextensive with the RHA "navigable waters" at issue. For instance, the Corps' CWA regulations mirror RHA regulations by defining jurisdictional waters to include, *inter alia*:

17

1. "All waters which are currently used, or were used in the past, or may be susceptible to use in interstate . . . commerce . . . ." *See* 33 C.F.R. § 328.3(a)(1).

2. "All other waters such as intrastate lakes, rivers, streams . . ., wetlands, . . ., or natural ponds, the use, degradation or destruction of which could affect interstate . . . commerce. *See* 33 C.F.R. § 328.3(a)(3) (emphasis added).

3. "Tributaries" of interstate waters. *See* 33 C.F.R. § 328.3(a)(5).

4. "Wetlands adjacent to" jurisdictional waters. *See* 33 C.F.R. § 328.3(a)(7).

RHA and CWA jurisdiction consequently are coextensive for purposes of the Salmon Trout River and corresponding wetlands that will be alerted and otherwise adversely affected by Kennecott's excavation, mining, and eventual backfill activities. These waters fall within the Corps' section 404-permitting jurisdiction not only because they collectively are within the ordinary high water mark of the Salmon Trout River, but because under section 404, wetlands adjacent to a water of the United States are by law jurisdictional: "When adjacent wetlands [to non-tidal waters] are present, the jurisdiction extends beyond the ordinary high water mark to the limit of the adjacent wetlands." *See* 33 C.F.R. § 328.3(c)(2).

Kennecott's excavation (i.e. "dredge") and intent to redeposit backfill (i.e. "fill") activities consequently fall within the scope of section 404. Notwithstanding that Kennecott is engaging, and intends to engage in these activities, Kennecott does not have, and has failed even to seek, a 404 Permit authorizing the activities.

HMC consequently should prevail on the merits of its CWA claim.

### (c)  *Defendants are violating NEPA and the NHPA*

Both NEPA and the NHPA mandate responsible federal agencies must undertake appropriate evaluations *before* allowing a private party to engage in regulated conduct. Although the Corps is the responsible agency related to Kennecott's Permit-dependent work, the Corps has not fulfilled any of its responsibilities under NEPA or the NHPA.

18

(i)  *NEPA Violations*

 NEPA mandates that federal agencies must include in every recommendation for, or report on, "major federal actions" that will significantly affect the quality of the human environment, a detailed statement on:  (1) the environmental impact of the proposed action, (2) the adverse environmental effects which cannot be avoided should the proposal be implemented, (3) alternatives to the proposed action, (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (5) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented.  *See* 42 U.S.C. § 4332(C).

 The White House Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA (found at 40 C.F.R., Part 1500.1 - 1508.28), and those regulations unequivocally provide that they operate to "tell federal agencies what they *must* do to comply with the procedures and achieve the goals of NEPA."  40 C.F.R. § 1500.1(a) (emphasis). The regulations further specify that "major federal action" mandating a NEPA evaluation are those "actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.

 Federal permits, such as RHA and CWA permits the Corps is responsible for issuing, are "major federal action" that require compliance with NEPA, because such "actions" include those "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, *regulated*, or *approved* by federal agencies . . . ."  40 C.F.R. § 1508.18(a) (emphasis added).  Indeed, even if "it is unclear whether a federal action will significantly affect the quality of the environment, the agency [still] should prepare an [initial] environmental assessment . . ." within the meaning of NEPA.  *Sierra Club*, 645 F.3d at 991.

The Corps consequently is obligated to, but has failed, to complete a NEPA evaluation *before* Kennecott continues any further Permit-dependent work subject to the RHA or CWA. Lest there be any question on this issue, 40 C.F.R. § 1501.1(b) mandates: "NEPA procedures *must* insure that environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken." (emphasis added).

Here, Kennecott has participated in *only* state administrative proceedings, but those proceedings *cannot* supplant the NEPA process. As indicated above, Kennecott's relevant state permit disclaims any suggestion that it releases Kennecott from its obligation to comply with federal laws and regulations. Moreover, Congress expressly legislated that even in narrow circumstances when state-based actors are authorized to prepare environmental materials that correspond with NEPA, responsible federal agencies still must: (a) furnish guidance and participate in such preparation, (b) *independently* evaluate such material prior to approval and adoption, and (c) retain responsibility for the scope, objectivity, and content of the material and any other responsibilities under NEPA. *See* 42 U.S.C. § 4332(D). Here, the Corps has not played any role, at the state, federal, or any other level, with an evaluation mandated by NEPA.

### (ii)    NHPA Violations

The NHPA, like NEPA, requires responsible federal agencies to conduct the required evaluation *before* approving regulated conduct:

> the head of any Federal department or independent agency having authority to *license* any undertaking shall . . . *prior to the issuance of any license* . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in *or eligible for inclusion in the National Register*.

16 U.S.C. § 470f (emphasis added). Indeed, a NHPA evaluation can be incorporated into the NEPA process. *See* 36 C.F.R. §§ 800.2(a)(4), 800.3(b), 800.8.

20

The "National Register" is the "National Register of Historic Places," which is a listing maintained by the Interior Department identifying "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture. . . ." 16 U.S.C. § 470a(a)(1). Because NHPA evaluations apply to sites already listed in the National Register, as well as sites "eligible for inclusion," the inclusion criteria *must* be considered by a responsible agency to determine whether NHPA obligations apply.

The criteria operate as follows:

> The quality of significance in American *history*, architecture, *archeology*, engineering, and *culture* is present in districts, *sites*, buildings, *structures*, and *objects* that possess integrity of location, design, setting, materials, workmanship, feeling, and association and
>
> (a) that are associated with events that have made a significant contribution to the broad patterns of our history; or
>
> (b) *that are associated with the lives of persons significant in our past*; or
>
> (c) that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
>
> (d) *that have yielded, or may be likely to yield, information important in prehistory or history*.

36 C.F.R. § 60.4 (emphasis added).

Eagle Rock is "eligible" for listing in the "National Register," because it is a one-of-a-kind, naturally occurring geographic feature, which has been used as an religious and worship site by indigenous Native American tribes *for more than a millennium*. *Cf. Pit River Tribe,* 469 F.3d at 772, 774, 787; *Pueblo of Sandia v. United States,* 50 F.3d 856, 857, 860-862 (10th Cir. 1995). The Corps consequently cannot "license" any activity that will affect Eagle Rock without

first undertaking a proper NHPA evaluation. *See* 36 C.F.R. §§ 800.1(c), 800.2(a). It has not fulfilled this responsibility

HMC consequently should prevail on the merits of its NEPA and NHPA claims.

### (d)     Defendants are violating the ESA

The ESA requires a "procedural consultation" when any agency proposes an action that may affect an endangered species. *See* 16 U.S.C. § 1536; 50 C.F.R. § 402.12(b)(2); 50 C.F.R. § 402.14(a). As part of this process, an agency, such as the Corps, must consult with the FWS, if it has reason to believe an endangered species may be present in the area of a proposed action. *See* 16 U.S.C. § 1536(a)(3) and 1536(c)(1). For purposes of the consultation, the "action area" is the area that is affected directly or indirectly by the proposed agency action. *See* 50 C.F.R. § 402.02.

With respect to the Eagle Mine, the United States Environmental Protection Agency ("EPA") and FWS did engage in an ESA consultation related to narrow components of the Eagle Mine known as "underground injection wells." *See* Ex. T. For purposes of that limited consultation, the EPA assumed the "action area," which defined the scope of the ESA evaluation, was limited to only the surface facilities at the Eagle Mine. *See* Ex. U.

The FWS slightly expanded the "action area" during the consultation process, to include the underground portion of the injection wells, *id.*, but neither the EPA nor FWS conducted a consultation that accounts for the expansive Permit-dependent work subject to the *Corps'* 403 and 404 permitting jurisdiction, or indirect species impacts in and around the Salmon Trout River watershed related to Kennecott's Permit-dependent work and operation of the Eagle Mine. By way of example only, no consideration was given to the impacts subsurface construction activities will have on water drawdown, or alteration of the flow and temperature of the River, and how those impacts may affect covered species.

The prior, narrow ESA consultation between the *EPA* and FWS consequently was not sufficiently broad in scope to alleviate the *Corps'* obligation to consult with the FWS regarding the Permit-dependent work and Eagle Mine operations. HMC consequently should prevail on the merits of its ESA claim.

### B. HMC Is Being Irreparably Harmed

Courts consistently have held that federal agencies' failures to conduct required environmental and cultural evaluations *before* allowing a private party to engage in regulated conduct infringes upon plaintiffs' "procedural" rights, and that infringement is, in itself, "irreparable harm." *See, e.g., Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008); *Sierra Club*, 645 F.3d at 995; *Sierra Club v. Marsh*, 872 F.2d 497, 499-504 (1st Cir. 1989) (Breyer, J.); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124-25 (9th Cir. 2005).

HMC's procedural rights are not, however, the only interests jeopardized by Kennecott's unauthorized subsurface construction activities. No one can dispute that the construction will, by design, lead to environmental impacts that at minimum alter the ecology of the Salmon Trout River watershed (contrary to its natural state), by lowering the water table in the Salmon Trout River and adjacent wetlands; reducing the reach of the River and wetlands; reducing the flow of the River; altering the temperature of the River; excavating and re-depositing materials in the

subsurface portions of the River's bed, and potentially causing a catastrophic collapse of the River.[4]

If the Federal Defendants and Kennecott are not subject to an injunction and other appropriate equitable relief immediately; not only will HMC and its members be denied (irreversibly) their procedural rights under NEPA, the NHPA, and ESA; there will be no meaningful way to undo what Kennecott already, illegally, is doing.

## C. The Balance of Harms Weighs in Favor of Injunctive Relief

HMC seeks conventional injunctive relief against only the Federal Defendants. Accordingly, only their purported "harm" is relevant—but inconsequential, because federal agencies hardly can claim undue hardship in response to a directive to perform governmental functions expressly vested in them by Congress. As to equitable relief against Kennecott, the basis for that relief is the federal "All Writs Act" or this Court's "inherent powers." Equitable relief of this kind is discrete from conventional injunctive relief and not contingent upon conventional considerations such as balance of harms. *See, e.g., Burr v. Blair*, 470 F.3d 1019, 1031 n.32 (11th Cir. 2006); *Zenith Elecs. Corp. v. U.S.*, 884 F.2d 556, 562-63 (Fed. Cir. 1989). To the event this Court nonetheless considers any purported harm Kennecott may claim to suffer, that harm almost certainly will be limited to financial loss, and Courts routinely have held such

---

[4] The fact that Kennecott will degrade wetlands is particularly consequential, because of special legal protections afforded wetlands. *Cf. Nat. Wildlife Fed'n v. Whistler,* 27 F.3d 1341, 1344 (8th Cir. 1994) ("It would hardly be putting the case too strongly to say that the Clean Water Act and the applicable regulations do not contemplate that wetlands will be destroyed simply because it is more convenient than not to do so. . . . Moreover, if a [section 404] permit application does not concern a *water-dependent project*, the Corps *assumes* that practicable alternatives exist unless the applicant *'clearly demonstrated otherwise.'"*). *See also* 40 C.F.R. § 230.10.

loss do not outweigh permanent environmental damage and degradation caused by inadequate federal oversight. *See, e.g.*, *Sierra Club*, 645 F.3d at 997; *Tenn. Valley Auth. v. Hill,* 437 U.S. 153*,* 166 (1978).

### D. The Public Interest Will Be Served by Injunctive Relief

The public interest will be best served by injunctive relief, because at its core, this case implicates federal agencies obligations to fulfill their legitimate governmental functions in the interest of protecting the public welfare. *Cf.* 645 F.3d at 997 ("just as important as the public interest in potential economic gains is 'the public's confidence that its government agencies act independently, thoroughly, and transparently when reviewing permit applications."). Because HMC is seeking to enforce public interest statutes, injunctive relief is appropriate.

### III. THE COURT SHOULD IMPOSE A MODEST BOND, IF ANY

HMC is a not-for-profit corporation, and it asserts claims against Defendants pursuant to legislative enactments expressly intended to serve the public interest. Under such circumstances, courts have held onerous bond requirements would undermine the operation of the legislative enactments. *See, e.g., Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Utahans For Better Transp. v. U.S. Dept. of Transp.*, No. 01-4216, 01-4217, 01-4220, 2001 WL 1739458, at *5 (10th Cir. Nov. 16, 2001). Moreover, HMC seeks Rule 65-type relief against only the Federal Defendants; thus, the bond requirement contemplated under Rule 65 only should account for their theoretical loss, which should be virtually nothing, since they are not-for-profit governmental actors. None of Kennecott's arguable financial losses are relevant, because conventional injunctive principles (and the corresponding bond requirement) do not apply to the equitable relief HMC seeks against Kennecott. *See, e.g., Magidson v. Duggan*, 180 F.2d 473, 479 (8th Cir. 1950).

May 7, 2012

Respectfully submitted,

s/ Steven A. Harr
Frederick W. Addison, III *(admission pending)*
  TX Bar No. 00903350
E-mail: raddison@munsch.com
Nolan C. Knight *(admission pending)*
  TX Bar No. 24027125
E-mail: nknight@munsch.com
Steven A. Harr
  TX Bar No. 09035600
E-Mail: sharr@munsch.com
Munsch Hardt Kopf & Harr, P.C.
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**COUNSEL FOR PLAINTIFF HURON
MOUNTAIN CLUB**