UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

HURON MOUNTAIN CLUB,

        Plaintiff,

   v.                          File No. 2:12-CV-197

UNITED STATES ARMY CORPS OF
ENGINEERS, LIEUTENANT COLONEL
MICHAEL C. DEROSIER, District
Commander, Detroit District,
U.S. Army Corps of Engineers,
UNITED STATES DEPARTMENT OF THE
INTERIOR, KEN SALAZAR, Secretary
of the United States Department
of the Interior, UNITED STATES
FISH AND WILDLIFE SERVICE,
DANIEL M. ASHE, Director of the
United States Fish and Wildlife
Service, and KENNECOTT EAGLE
MINERALS COMPANY,

        Defendants.
_____/


Oral Argument re:
Plaintiff's Motion for Preliminary Injunction

Before

THE HONORABLE ROBERT HOLMES BELL
United States District Judge
June 6, 2012




Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

<u>APPEARANCES</u>


FREDERICK W. ADDISON, III
3800 Lincoln Plz.
500 N. Akard St.
Dallas, TX 75201
Attorney for Plaintiff

PERRY M. ROSEN
MATTHEW M. MARINELLI
GARY SEGREST
LAUREL A. BEDIG
ETHAN EDDY
U.S. Department of Justice
Environment & Natural
Resources Division
P.O. Box 7611
Washington, DC 20044
Attorneys for Federal
Defendants


DANIEL P. ETTINGER
DENNIS J. DONOHUE
CHRISTOPHER J. PREDKO
SCOTT M. WATSON
111 Lyon St., NW, Suite 900
Grand Rapids, MI 49503
Attorneys for Defendant
Kennecott Eagle Minerals Co.

CAROLYN A. ALMASSIAN
Assistant U.S. Attorney
P.O. Box 208
Grand Rapids, MI 49501
Co-Counsel for Federal
Defendants

```
 1                                    Grand Rapids, Michigan
 2                                    June 6, 2012
 3                                    1:00 p.m.
 4                           -    -    -
 5
 6                    P R O C E E D I N G S
 7
 8            THE COURT:  You may be seated.  Good afternoon.
 9   This is the matter of our docket number 2:12-CV-197, Huron
10   Mountain Club v. U.S. Army Corps of Engineers, Department of
11   Interior, U.S. Fish and Wildlife, and Kennecott Eagle Minerals
12   Corporation.  I believe Mr. Addison is here on behalf of the
13   plaintiffs?
14            MR. ADDISON:  Yes, Your Honor.
15            THE COURT:  Okay.  And Mr. Rosen is here on behalf
16   of the three government entities; is that correct?
17            MR. ROSEN:  That's correct, Your Honor.
18            THE COURT:  And you have Mr. Marinelli, Ms.
19   Almassian here?  Yes, there you are, okay.  And Gary Segrest,
20   you're here?
21            MR. SEGREST:  Yes, Your Honor.
22            THE COURT:  Okay.  And Kennecott has Mr. Ettinger?
23            MR. ETTINGER:  Yes, Your Honor.
24            THE COURT:  Okay.  Mr. Predko?
25            MR. PREDKO:  Yes, Your Honor.
```

1          THE COURT:  You've got the full contingent here.

2   Mr. Donohue?

3          MR. DONOHUE:  Yes, Your Honor.

4          THE COURT:  All right.  And Mr. Watson?

5          MR. WATSON:  Yes, Your Honor.

6          THE COURT:  Wow.  All right.  And you are?

7          MS. DYKSTRA:  Nicole Dykstra, Your Honor.

8          THE COURT:  You're counsel or --

9          MR. ETTINGER:  She's assisting with the technology,

10  Your Honor.

11         THE COURT:  Oh, okay.  Normally they don't sit right

12  at the table.

13         This is the plaintiff's motion for injunctive

14  relief.  The plaintiff must clearly establish according to the

15  law here the likelihood of success on the merits in this case.

16         The Court has reviewed the briefing that has come in

17  the last couple days and has the benefit of reviewing a

18  considerable amount of documentation that apparently was

19  generated as part of the state factors, state litigation that

20  has been ongoing in this matter.  This matter was filed

21  approximately a month ago on May 7th, and apparently it's my

22  understanding there will be no testimony offered today

23  substantively.  Is that right, Mr. Knight (sic)?

24         MR. ADDISON:  That's right, Your Honor.  The parties

25  agreed that we would hear this on the record.

1          THE COURT:  Very well.

2          MR. ADDISON:  And the papers.

3          THE COURT:  Okay.  Mr. Rosen, that's agreeable with

4    you?

5          MR. ROSEN:  Yes, it is, Your Honor.

6          THE COURT:  Mr. Ettinger?

7          MR. ETTINGER:  Yes, Your Honor.

8          THE COURT:  All right.  You may proceed, then, Mr.

9    Addison.

10          MR. ADDISON:  May it please the Court, Rick Addison

11   and hopefully soon Nolan Knight will be here on behalf of the

12   plaintiff, Huron Mountain Club, Munsch Hardt firm, Dallas,

13   Texas.  We appreciate the opportunity to appear in the Western

14   District and be admitted to it.

15          Section 10 of the Rivers and Harbors Act

16   specifically requires a rivers and harbors permit if a party

17   is going to excavate, fill, or in any manner alter or modify

18   the course, location, condition, or capacity of any lake or

19   the channel of any navigable water of the U.S. unless

20   recommended by the Chief of Engineers and the Secretary of

21   War.  Really here we have not one, but two water -- navigable

22   waters under the Rivers and Harbors Act that will be affected

23   by the defendants' conduct, and those two are the Salmon Trout

24   River and Lake Superior.

25          In looking at the issue, our lawsuit begins with a

1   suit under the APA, and I think this Court has handled at

2   least a couple of those and is familiar with the fact --

3               THE COURT:  Lots of them.

4               MR. ADDISON:  Or many of them.

5               THE COURT:  Many of them.

6               MR. ADDISON:  And is familiar with the fact that an

7   APA challenge can be brought --

8               THE COURT:  I've been here 25 years as a federal

9   judge, before that as a state judge, and I'm very familiar

10  with the Upper Peninsula.  Never been to the Huron Mountain

11  Club, but I'm very familiar with the Upper Peninsula, having

12  not only a summer home there, but having done a lot of

13  litigation up there.  In fact, there was a time I was the only

14  Article III judge going to the U.P., so I know your geography

15  up there.

16              MR. ADDISON:  Great.  And as the Court's also aware,

17  I think, because it's heard APA cases, it's not uncommon for a

18  plaintiff to complain about the federal government under the

19  APA when they make a decision that constitutes final agency

20  action.  And under that statute, of course, final agency

21  action in 5 U.S.C. 551(13) is defined to not only be

22  affirmative acts, but the decision to take no action.  So we

23  would start by saying I guess in the analysis, Has there been

24  final agency act in this case?

25              THE COURT:  Well, what is the plaintiff's

1    jurisdiction to bring suit against an entity of the government

2    that has as its responsibility under Section 10 granting or

3    denying permits?  What is your standing?  I mean, you say the

4    Court has the innate authority and innate powers and all that,

5    but what is your specific authority here?

6           MR. ADDISON:  To sue the government or to enjoin

7    Kennecott, Your Honor?  I apologize.

8           THE COURT:  To sue -- to sue the government for the

9    government's inaction.

10          MR. ADDISON:  All right.  Thank you, Your Honor.

11          Two points.  Number one, under the Administrative

12   Procedures Act, agency action includes inaction.  If the

13   federal defendants have a mandatory duty to administer the RHA

14   program as we say they have, then they have violated that duty

15   by not performing it if we're correct by requiring that the

16   applicant, who would be the applicant Kennecott, submit to the

17   permitting program.

18          THE COURT:  Well, why are we having this discussion

19   in mid-2012 when as I recall this matter has been before the

20   state since 2006 and there was notice given to the entire

21   Upper Peninsula community via advocacy for and against sulfide

22   mining for years?  Why are we only lately coming before the

23   federal court?

24          MR. ADDISON:  Well, I'm going to answer that two

25   ways.

1          THE COURT:  You have to answer a lot of ways.

2          MR. ADDISON:  Maybe more than two ways, yes, Your

3     Honor.  One of them is with respect to this claim, I was

4     retained in March and --

5          THE COURT:  Oh, yeah.

6          MR. ADDISON:  -- we brought it in May.  Number two,

7     the issue the Court raises sort of bears on the topic of

8     laches and whether or not we brought it soon enough, and there

9     are several points I would mention in connection with that.

10    Number one, this is a no-permit case.  A no-permit case is a

11    violation of the law every day that construction occurs

12    without a permit, so laches doesn't run.  The statute of

13    limitations doesn't run.

14          Number two, with respect to the mine, the evidence

15    we submitted to the Court indicates that they didn't go

16    underground until September of 2011.  Just as they argue, just

17    as Kennecott argues in its pleadings, they allude to laches

18    and they also raise ripeness.  We would have a ripeness issue

19    until they either begin violating our procedural rights or

20    they begin the process of construction underground.  That

21    occurred some seven months ago.

22          In addition to that, Your Honor, despite the fact

23    that it's been four, five, six years, there's a general

24    disfavoring of the laches defense that the Sixth Circuit has

25    noted on numerous occasions because even if a party is tardy

1    in bringing their lawsuit, when it's an environmental lawsuit

2    of this type the public has an interest, and therefore, laches

3    is rarely applied.

4              THE COURT:  Didn't your client participate in the

5    state litigation?

6              MR. ADDISON:  Fully, in the mining permit

7    litigation, yes, Your Honor.

8              THE COURT:  The longest, I believe, administrative

9    hearing ever held in the state of Michigan.  Your client was

10   part of that?

11             MR. ADDISON:  They were.  Yes, they were, Your

12   Honor.

13             THE COURT:  And your client was offering up the same

14   positions that it's offering up now?

15             MR. ADDISON:  I'm not sure about that, candidly,

16   Your Honor, of course, because all of these causes of

17   action --

18             THE COURT:  Well, I say positions.

19             MR. ADDISON:  Substantive positions?

20             THE COURT:  Right.

21             MR. ADDISON:  I think we did offer up the

22   substantive positions in trying to demonstrate various aspects

23   of impacts from this facility, but they certainly weren't

24   translated into federal causes of action.  They were in the

25   context of the mining permit hearing only.

```
 1              And I would note also, of course, Your Honor,
 2     there's quite a bit of law all over the country that would
 3     stand for the proposition that proceeding in a state
 4     administrative agency is not a substitute for causes of action
 5     where federal courts have exclusive jurisdiction.  So while my
 6     clients definitely knew some of the substantive issues
 7     involving impacts on the river, endangered species and the
 8     like, we would submit to the Court that we're not late to the
 9     point of laches.
10              THE COURT:  But you don't have exclusive -- but the
11     federal government doesn't have exclusive jurisdiction.
12              MR. ADDISON:  Well, in the Clean Water Act, NEPA,
13     ESA --
14              THE COURT:  Hasn't the Clean Water Act in Michigan
15     been undertaken by the state?
16              MR. ADDISON:  Well, under 1344(g) and (h) there's
17     been a delegation to the state of all waters other than the
18     navigable waters because the statute only allows a delegation
19     of basically intrastate non-navigable waters.  Here we're
20     arguing that we have a navigable water under both RHA and a
21     water of the U.S. under the Clean Water Act.
22              Now, in connection with that, Your Honor, I'm sure
23     as this Court's aware, since Sierra Club v. Hodel it has been
24     common that an APA action can be brought even where there's no
25     private right of action under the underlying statute.  With
```

 1    respect to the Corps' mandatory duty that we say they failed

 2    to perform either because they did not act or because as the

 3    affidavit of the defendants -- or rather, the declaration of

 4    the defendants that was submitted as a part of this case

 5    demonstrates, in September 2005 the U.S. EPA and the Corps had

 6    a conference call, and in that call they decided not to take

 7    action according to the affidavit.  That is final action under

 8    the APA, gives us jurisdiction to bring this lawsuit.  Whether

 9    they did it by inaction or by their decision to take no action

10    is a distinction without a difference.

11         With respect to the RHA claims, Your Honor, the

12    mandatory duty is set forth in the statute, and it's even more

13    clearly set forth in the Corps' own regs.  At 33 C.F.R.

14    322.3(c) the Corps states:  "Congress has delegated to the

15    Secretary of the Army in Section 10 of the RHA the duty to

16    authorize or prohibit certain work or structures in navigable

17    waters of the U.S. upon recommendation of the Chief of

18    Engineers."

19         Now, there are other sections that also describe

20    that mandatory duty as required and the like, and some

21    examples of those, 33 C.F.R. 322.1, special regs to be

22    followed in connection with the RHA:  "A DA" -- Department of

23    the Army -- "permit will also be required for structures

24    and/or work affecting navigable waters under 33 C.F.R.

25    322.3(a).  If an activity is not exempt, an individual Section

1    10 permit is required."  And then in addition to that, 33

2    C.F.R. 322.5:  "Department Army permits are required for

3    structures or work in or affecting navigable waters of the

4    U.S."  So we would suggest to the Court, number one, APA suit

5    properly brought, appropriately brought, can bring it whether

6    there's a private right of action or not, and I might add the

7    entire NEPA body of case law is involving a statute where

8    there's no private right of action in the underlying statute

9    of NEPA.

10            So you get to the next point:  Is there a mandatory

11   duty?  The Corps and the statute establish the mandatory duty

12   that the Corps is overseeing and must administer this program,

13   and it is their duty to authorize or prohibit.  They did

14   neither.

15            In addition to that, as the Court looks at the

16   issue, we'd also refer then to the Kirkland Masonry case, 614

17   F.2d 532 (534), Fifth Circuit, 1980, where an agency is

18   required to follow its own regulations.  And in fact there is

19   a line of cases that says if an agency doesn't follow those

20   regulations, that a party has standing that affects their due

21   process rights.

22            Now, if there's a mandatory duty and if the

23   lawsuit's been properly brought, we then have to actually take

24   up, Judge, a couple of other issues.  The first one is the

25   jurisdiction of the Corps, whether or not -- and we're talking

```
1    strictly now about the RHA, the Rivers and Harbors Act of

2    1899 -- whether or not there is a navigable water involved

3    with respect to the Salmon Trout River.

4              Now, the federal defendants have responded to our

5    claims that the Salmon Trout River is navigable by saying it's

6    only navigable two miles upstream from Lake Superior because

7    of some calculation of Lake Superior's interaction with the

8    Salmon Trout River.  And while we agree those two miles are

9    navigable, there are several other tests that are used to

10   determine navigability of a water body, and they include

11   whether or not the water body has ever been used for

12   commercial purposes.  And as the evidence we submitted both in

13   our latest filing last night or today and before demonstrates,

14   there was logging on the Salmon Trout River for a number of

15   years, and in fact in the state proceeding the Kennecott

16   lawyer specifically addressed that topic in an effort to show

17   the mining area wasn't pristine by presenting one of our

18   experts with a photograph that showed there was actually

19   mining at the site.

20             Evidence we put in also to the record, Your Honor,

21   as part of it demonstrates that that mining went back to

22   1880.  We also showed there was a photograph -- I'm sorry,

23   mining, that logging went back to 1880.  We also showed other

24   evidence of use of the Salmon Trout River, including

25   recreational and recreational commercial use.  In the filing
```

1   we put forward last night, it amplified on that topic because

2   there's a map that's included that shows the put-in point for

3   this activity is at a place called County Road 550, which is

4   approximately a mile from the mine site.

5            So we argue that on those bases this river, the

6   Salmon Trout River, is navigable.  In addition, in the Corps'

7   own regs when they talk about what intrastate bodies of water

8   are deemed navigable, one of the examples they give is a

9   tributary of the Great Lakes, and we would submit to the Court

10  the Salmon Trout River is a tributary of the Great Lakes.

11           Now, we can assume a number of different things,

12  Your Honor, but it's our position that the entire Salmon Trout

13  River is navigable either because of the tests that are set

14  forth in the regulations or because as a part of Section

15  329.11 it states that a body is navigable -- let me just get

16  that, Your Honor.  A body of water is navigable and includes

17  all the land and waters below the ordinary high water mark.

18  Jurisdiction thus extends to the edge of all waterbodies, even

19  such waterbodies that may be extremely shallow or obstructed

20  by shoals, vegetation or other barriers.  And then it

21  concludes by saying marshlands and similar areas are thus

22  considered navigable in law, but only so far as the area is

23  subject to the inundation of the ordinary high waters.  That

24  same regulation, and this goes to the underground mine, says

25  Rivers and Harbors jurisdiction extends laterally to the

1    entire water surface and bed, and that includes all the lands

2    and water under it, below the ordinary high water mark.

3              So we argue as our initial position the Salmon Trout

4    River is navigable because it's used for recreational and

5    commercial traffic.  It's navigable in that respect up to at

6    least County Road 550 approximately one mile from the site.

7    We also argue the headwaters, which are these wetlands that

8    are up above the mine, are also navigable waters under Section

9    403 because another of the proscriptions found in that statute

10   is that it is not lawful to build or commence the building of

11   any wharf, pier, or other structure in any port, roadstead,

12   haven, harbor, canal, navigable river, and then here's the key

13   phrase, or other water of the United States.

14             Even if the headwaters are not navigable by one of

15   those definitions, we would submit to the Court that they're

16   navigable as another water of the United States.  Now, why?

17   The reason for that is, number one, they're one of the

18   marshlands included in that definition I just read.  Number

19   two, and even more importantly, because the headwaters are the

20   source of the river, you cannot impact the headwaters without

21   impacting the river.  Every bit of it.  Their experts say as

22   much.

23             Now, talking about navigability a little bit more,

24   that's the position, and then the issue would become what

25   impact is happening to this river in its navigable area,

1    wherever we define that to be?  Because if we don't have an

2    impact altering it, modifying it, or affecting it, then there

3    may be no cause of action in any event.  So let's look at that

4    for just a moment.

5            Kennecott has some excellent consultants and one of

6    them is called Golder, and I happened to use them myself in

7    some cases in Pennsylvania, and they ran a number of studies

8    on what the drawdown is from these wetlands, and I want to

9    take just a half second to discuss that.  What occurs when you

10   mine is we've got a river, we've got wetlands, we've got a

11   mine down here under it, and as you extract and remove rock

12   and other materials to create the mine and to extract the ore,

13   there's a drawdown of that water.  Golder measured that

14   drawdown, and they came up with several different potential

15   scenarios:  60 gallons per minute, 75 gallons per minute, 80

16   gallons per minute, 210 gallons per minute.  That drawdown is

17   actually measured as part of the groundwater, but it also has

18   that effect of drawing down from the wetlands.

19           They went to model that to see what its effect would

20   be.  A guy named Council came in.  He was supposed to perform

21   peer review.  All he looked at was the impact from the 60

22   gallons per minute.

23           Now, let's talk about that impact.  That impact he

24   concluded would reduce the flow of the Salmon River by 3.3

25   percent.  Well, a 60-gallon-per-minute drawdown may equal 3.3

1    percent diminished flow in the river during some seasons, but

2    that 60 gallons per minute is going to be drawn down every

3    season of the year both when the river's running full from

4    snowmelt and when it's running shallow in the summer.

5              So that's going to be a -- that is an impact.  That

6    does affect the capacity of it.  The extent of that is for the

7    Corps to determine during the permitting.  All we have to show

8    is an effect on the capacity.  Also, the evidence shows this

9    activity's going to affect the temperature.  That affects the

10   condition of that waterbody as well.

11             Second point which is also important.  Though Golder

12   ran these numbers on the gallons per minute that would be

13   drawn down and the impact that would have on the Salmon Trout

14   River, they only did it for the 60 gallons per minute.  And as

15   their witness Council testified, and this is all in the

16   materials we filed, he said, I wasn't hired to do a worst-case

17   scenario.  I was hired to determine what the drawdown and the

18   effect would be if we operated the mine as it's supposed to

19   be.

20             Well, that's not the standard.  Under the NEPA regs,

21   the Council of Environmental Quality, 40 C.F.R., the 1500

22   regs, you have to look at all impacts:  indirect, direct,

23   potential.  These impacts that would come from a greater

24   drawdown have never been studied.  By way of example, though

25   the calculations may not be exactly linear, if we look at 210

1    gallons per minute and compare it to 60, that's 3.5 times

2    greater.  If you multiply 3.5 times 3.3 percent, you get an

3    impact on the river of 11.55 percent rather than three, and

4    while we don't have to demonstrate anything other than that it

5    affects it, which it clearly does and they've admitted it,

6    it's important to know the scope of that impact.

7            Another important factor, they didn't study anything

8    downriver.  They stopped studying after the wetlands around

9    the site and at the confluence of the west fork with the main

10   branch.  So they have no data on what was affected anywhere

11   further downstream than that.  They didn't run the model on

12   all the drawdown.  They didn't run the model on a cone of

13   influence that would affect all of the area they were drawing

14   down from, and they come up with these figures that are not

15   representative of the potential impacts.

16           That is a violation of the Rivers and Harbors Act.

17   They are affecting a navigable water of the U.S. by changing

18   its capacity through excavation, and it doesn't matter if

19   they're in the river, next to the river, or on top of the

20   river.  If it affects it, it's a violation, and that is our

21   initial position with respect to the RHA.  In the Moretti

22   decision way long time ago in the Fifth Circuit, they declared

23   and determined that any work below the ordinary high water

24   mark without a permit is illegal, and the Court's jurisdiction

25   extends that far.  Now, I might add why does the Court's --

1    I'm sorry, the Court's jurisdiction extends that far, the

2    Corps' jurisdiction extends that far.

3           There are a couple of other elements that also tell

4    us why the Corps' jurisdiction extends that far.  Under 33

5    322.1, which is the section that is entitled Department of

6    Army Permits Required For Work, the last sentence of that says

7    if there's an underground structure or a tunnel that is under

8    a navigable water, a permit is required, and it's assumed to

9    affect capacity.  Now, that issue will turn candidly on

10   whether or not this Court finds navigability all the way to

11   the headwaters because that's where the mine is under it.  But

12   what it does demonstrate is despite the fact that they are 200

13   yards, 300 yards, 87 meters, whatever it is below the river,

14   there's still Corps jurisdiction.  And by that definition I

15   mentioned to you in the Corps' regs that said the navigable

16   water extends from the water to the bed to all the land under

17   it, it includes the area where Kennecott is building its

18   mine.  So we would suggest with respect to the RHA, Your

19   Honor, the Administrative Procedure Act's properly brought,

20   RHA violation because the defendant has admitted they are

21   affecting the capacity of this river.

22          Now, a couple of other points on that.  They're

23   going to get up and say, Oh, we're going to stick some more

24   water in there.  It's going to come out of our treatment,

25   storage, something, waterworks.  And the fact of that matter

1   is that's just another change to the capacity.  It doesn't

2   solve the earlier diminishment.  It just injects different

3   analyses into what the next effect on the capacity will be.

4           Their lead witness, Mr. Council, was questioned

5   repeatedly on this, and he admitted that the water budget, the

6   water balance, if you will, between the surface water, the

7   groundwater, and the treatment water coming in was something

8   that they had very little confidence in, and the reason why is

9   they haven't measured all those effects.  They haven't looked

10  at the right gallons-per-minute drawdown.  They haven't

11  analyzed the effect of injecting more water as well as taking

12  other water out.

13          Third point we're going to hear from them, Oh, it

14  all gets washed out downstream and it doesn't matter.  Well,

15  number one, they didn't study downstream, so they don't know

16  that.  But --

17          THE COURT:  Wasn't this all brought up at the state

18  hearing?

19          MR. ADDISON:  Most of this evidence comes out of the

20  mining hearing, yes, Your Honor.

21          THE COURT:  What did the administrative law judge do

22  with it?

23          MR. ADDISON:  Well, they -- frankly, they ignored

24  it.

25          THE COURT:  They screwed up?

```
 1              MR. ADDISON:  Well, that's certainly our position.
 2              THE COURT:  Yeah.
 3              MR. ADDISON:  Yeah, exactly, Your Honor.
 4              THE COURT:  Okay.
 5              MR. ADDISON:  But once again, respectfully, I don't
 6  think that changes our cause of action here, we would suggest.
 7              Now, also I might add these impacts weren't measured
 8  because they didn't run the studies, so we don't know what's
 9  going to happen downstream.  We don't know what's going to
10  happen with all the wetlands.
11              Now, in addition to the RHA, Your Honor, we've also
12  brought an Endangered Species Act claim through the APA, and
13  of course under the Endangered Species Act the Fish and
14  Wildlife Service and the Corps in this instance have a duty
15  under Section 7 to engage in what's called a procedural
16  consultation.  And that's a getting together and it's a more
17  informal process where they are required to determine whether
18  there are endangered species at the site and whether or not
19  those endangered species are going to be affected by the
20  project that is proposed.
21              In connection with that particular inquiry, and I'll
22  talk about the remaining portions of it, the witnesses for
23  Kennecott have testified to the following.  They saw a great
24  gray owl's remains, Page 5413 of the transcript, at the site.
25  They have witnessed the spruce goose, another species that is
```

1    endangered or threatened, according to Page 5421 at the site.

2    The Kirtland's warblers, there were a handful of them

3    observed, 5437, at the site.  And Kennecott's expert, Mr.

4    Tilton, admitted that the narrow-leaved gentian, which is also

5    an endangered species, but a plant, is present on the site in

6    the wetlands, Page 5486.  Tilton also noted that there were

7    another couple of endangered species on-site, including the

8    narrow-leaved gentian we've discussed and the small-leaved or

9    yellow-ponded water lily.

10            Now, what does all that mean?  Well, when there are

11   endangered species at the site and either they or their

12   habitat may be affected by a project, there is a mandatory

13   duty for the Corps to get together with Fish and Wildlife and

14   engage in this consultation.  As a part of that consultation,

15   they have to and are supposed to determine whether or not,

16   one, there are endangered species present.  Well, that's been

17   admitted.  Number two, what are the effects?  That hasn't been

18   determined because they didn't perform their duty.  What are

19   the adverse effects to these species and will any of these

20   species be jeopardized?  So --

21            THE COURT:  That was not addressed below in the

22   state hearing?

23            MR. ADDISON:  No, those issues, all of that

24   evidence, all of this evidence comes from the state hearing,

25   Your Honor.

1          THE COURT:  But was it addressed?

2          MR. ADDISON:  Well, they don't really address the

3    endangered species in a conclusion.  They grant the permit and

4    give a bunch of grounds, but they basically wave that off, or

5    it wasn't emphasized.

6          THE COURT:  Well, was a conclusion reached, it would

7    or it wouldn't?

8          MR. ADDISON:  I don't think there was any conclusion

9    reached.  Only the presence was noted because there was no

10   evidence to conclude that because the studies hadn't been run

11   and the government had not performed their task.

12         Now, once again, this is an APA claim at this point

13   against Fish and Wildlife and the Army Corps, not against

14   Kennecott, and it's to require them to engage in this

15   consultation.  Now, once they find out through the procedural

16   consultation that there are endangered species at the site,

17   they then have to go to the next level, which is a biological

18   assessment and maybe a biological opinion because they have to

19   determine whether or not these activities will affect these

20   endangered species that are present.

21         Now, both of these laws -- oh, I might add also, and

22   this is important, the evidence is undisputed from Mr.

23   Brockman, Kennecott's witness, that the investigation that was

24   done at the state level, the EIA is what they call it,

25   environmental impact assessment, only addressed the 92 acres

1   of the site.  Under federal law, under the Endangered Species

2   Act, under NEPA, they have to address the affected area, and

3   the affected area for an endangered species is not governed by

4   where the mine's built.  It's governed by where it is found,

5   and we have endangered species found in this area, and the

6   affected area has not yet been determined.  And so that is a

7   critical portion of the inadequate investigation that occurred

8   during the state process because they only looked at this

9   narrow truncated area.  And that was Mr. Maki, rather, of the

10  DEQ who said the EIA was only 95 acres.  And so that has not

11  been performed in any fashion and in any way.

12          Third law briefly, Your Honor, NEPA.  When you have

13  major federal action, as this Court knows, NEPA is invoked.

14  When you have endangered species in the project area, that is

15  substantial federal action that requires a NEPA analysis, as

16  does a Rivers and Harbors permit.  And I might add also with

17  respect to the Rivers and Harbors permit, Mr. Blake, one of

18  the DEQ representatives at the mining hearing, testified that

19  even though they were going to increase this area called the

20  crown pillar, which is the material that's left between the

21  riverbed and the top of excavation, he was still concerned,

22  even at that time when they increased it to 87.5 or something

23  meters, he was still concerned that the Salmon Trout River

24  might be totally destroyed at the headwaters because of either

25  stress fractures, faults, or horizontal pressures on the crown

1    pillar.  His testimony was that needs to be studied.  Well,

2    that did need to be studied and it should have been studied as

3    a part of the NEPA process in conjunction with the RHA permit

4    and the ESA requirements.

5              Now, as a part of that NEPA study, Judge, you know,

6    they have to go look at a variety of impacts, both water and

7    the like, and the real take-home point I think in this

8    instance, Judge, is --

9              THE COURT:  Excuse me.  It's "Your Honor" if you

10   want to refer to me.

11             MR. ADDISON:  I apologize, Your Honor.

12             THE COURT:  It's "Judge" if you're in front of an

13   administrative law judge, okay?  Go ahead.

14             MR. ADDISON:  Your Honor, the real take-home point

15   with respect to that is found in the NEPA regulations over at

16   40 C.F.R. 1506.1, and this gets to why Kennecott should be

17   enjoined and has to be enjoined.  And the answer to that is

18   during the time the NEPA process is going on, that section

19   reads as follows:  "Until an agency issues a record of

20   decision as provided in 1505.2, no action concerning a

21   proposal shall be taken which would, one, have an adverse

22   impact on the environment; or two, limit the choice of

23   alternatives."

24             Now, when you look at the case law on NEPA, we're

25   going to go back to when Justice Breyer was on the First

1    Circuit, and he wrote an opinion there called the <u>Marsh</u>

2    decision.  And in the <u>Marsh</u> decision he says the reason this

3    NEPA provision is in effect is if you allow someone -- if

4    someone goes out there and builds without a permit without

5    waiting for the NEPA process, then they are doing what's

6    called steamrolling, and they reach a point where the

7    bureaucratic momentum and the money spent is difficult to

8    defeat, and he says that's something you have to take into

9    account because they're not allowed to do it.

10           THE COURT:  But the question --

11           MR. ADDISON:  Yes, sir.

12           THE COURT:  The question still comes back to me --

13   maybe it's too practical.  The question still comes back, you

14   were involved at the state level in this matter.

15           MR. ADDISON:  My client was, yes, sir.

16           THE COURT:  Your client was.

17           MR. ADDISON:  Yes, sir.  Yes, Your Honor.

18           THE COURT:  Why didn't your client raise the flag

19   and start sprinting toward the federal courthouse at some

20   point?

21           MR. ADDISON:  I'll try to answer that.  They didn't

22   know and their lawyers didn't know.

23           THE COURT:  Oh, come on.

24           MR. ADDISON:  Well, then, Your Honor, let me posit

25   this question.  We may be late, but we're the first ones to

1   the dance.  The people who should know are sitting over at

2   this table.

3             THE COURT:  No, that isn't --

4             MR. ADDISON:  They didn't go apply for the permit.

5             THE COURT:  No, that doesn't answer my question.  My

6   question was if this grievous thing took place and NEPA

7   studies should have been going on and the agency should have

8   been enjoined, which is what you say now -- this is a

9   sophisticated plaintiff, no question about it -- why wasn't

10  this plaintiff screaming, Get the Army Corps of Engineers in?

11  Why wasn't this court, which has its doors unlocked Monday

12  through Friday, why wasn't this courthouse besieged?

13            MR. ADDISON:  The only answer I can give you to

14  that, Your Honor, is that at least when I came to the dance,

15  they'd never heard this.  And candidly --

16            THE COURT:  Is there a reason why they might not

17  have heard this?

18            MR. ADDISON:  Well, yes, there is.

19            THE COURT:  Why is that?

20            MR. ADDISON:  It's because we're underground here,

21  and it doesn't immediately occur to most people that building

22  something a hundred meters below a river is going to implicate

23  an obscure law from 1899 called the Rivers and Harbors Act.

24            THE COURT:  But it concerned everyone enough that we

25  had 40,000 pages of transcript taken before an administrative

1    law judge.  If it did that, then someone would have found the

2    federal courthouse.  Believe me, people find the federal

3    courthouse in all kinds of ways.  Why didn't they?

4              MR. ADDISON:  I -- Your Honor, I don't know why they

5    didn't do it earlier.  All I know is we found it when we did.

6              THE COURT:  Yeah, yeah.

7              MR. ADDISON:  And I know the Court -- that concerns

8    the Court.

9              THE COURT:  It does.  It does.

10             MR. ADDISON:  But I think when it looks at the Sixth

11   Circuit law on it and it looks at the issues involving what

12   bars a claim, you're going to find out that our claim is not

13   barred by laches or any other doctrine because it's a federal

14   claim and the mining issues don't really directly raise it.

15             THE COURT:  Could this have been a strategic

16   decision on your client's part?  We'll try the state.  If we

17   lose at the state, we'll start all over again with the

18   federal, and that will really end the whole mining project

19   because the mine would have run out of money.  They couldn't

20   defend themselves after they've spent so much money and so

21   much time has gone by.

22             MR. ADDISON:  I've got to say candidly to the Court

23   at least I haven't seen any of that, and everything that I

24   have seen indicates that people just didn't think of this

25   claim.  And I realize there's a lot of testimony out there.

1              THE COURT:  Yeah.

2              MR. ADDISON:  But, you know, Judge, I've got -- Your

3       Honor, I apologize, I just have to come back to one other

4       point.  The burden to get the permit is on the applicant.  Are

5       we to believe with all the experts they had on water and the

6       like that they didn't discover they needed this permit?  Are

7       we to believe that the Army Corps who commented on the

8       building of this new road and took up that issue didn't think

9       a permit was needed here?  It just seems to me that while my

10      client --

11             THE COURT:  Don't they have discretion?

12             MR. ADDISON:  Pardon me?

13             THE COURT:  There is some discretion given the

14      governmental authorities here, isn't there, as to what they

15      can issue permits for and what they can't?

16             MR. ADDISON:  Well, I think there's some discretion

17      on how they issue permits, but there's no discretion on their

18      obligation to perform the mandatory duty of the process.

19             THE COURT:  If they believe that they have

20      jurisdiction over it.

21             MR. ADDISON:  If they believe they have

22      jurisdiction, that's right, Your Honor.  And we quarrel on

23      that, no question about it.  We disagree on that point.

24             THE COURT:  If you quarrel on it, though --

25             MR. ADDISON:  We disagree on that point, whether or

1    not it's navigable.

2         THE COURT:  Excuse me.  If you disagree, then what

3    am I to do, what's the Court to do with the government taking

4    one position and a litigant taking another position as to

5    whether or not the government has jurisdiction?  What's the

6    law on that?

7         MR. ADDISON:  The law on that, interestingly, Your

8    Honor, and we agree, is contained in a statement that's made

9    in the declaration by the Army Corps in this case, and it says

10   that despite whatever we say, we acknowledge that the

11   jurisdictional determination is to be made by the Judge.  And

12   it's also in their regulations as well as their affidavit, and

13   the fact of the matter is, Your Honor, they've put forth one

14   of several tests they think establish jurisdiction and

15   navigability, and we've sought to satisfy several tests.  They

16   claim jurisdictional waters only exist two miles inward, and

17   that's why we've put on the evidence of logging and the like,

18   to show how far jurisdiction does exist.

19        THE COURT:  Aren't they entitled as a matter of law

20   to determine their own jurisdiction within that context?

21        MR. ADDISON:  Well, no, Your Honor.  Actually the

22   reg says that you are the person who determines that.

23        THE COURT:  Well, but doesn't the Court give

24   deference to what they determine their jurisdiction is,

25   particularly where they have choices?

 1             MR. ADDISON:  Well, I agree with you there's a

 2     deference rule that an agency is entitled to deference over

 3     its interpretation of the environmental laws that it

 4     oversees.  But that doesn't go to the jurisdictional

 5     determination because that's in the Court's hands according to

 6     the criteria the Corps sets out, once again remembering

 7     they've got to follow their own regs.  These are -- all of

 8     these positions, I might add, are either in their own

 9     regulations or in the evidence that's been admitted by

10     Kennecott.

11             And so I think when the Court -- I appreciate its

12     concern about laches because we're sitting here six years

13     after part of this proceeding, and maybe seven.  I think when

14     the Court looks at the law on that, it's going to see that

15     that's not really the determining factor.  What the

16     determining factor is is whether the statute has run and

17     whether or not there's a continuing or daily violation.

18             THE COURT:  Okay.  I interrupted you.  Excuse me.

19     Go back to NEPA.

20             MR. ADDISON:  Yes, Your Honor.

21             THE COURT:  Excuse me.

22             MR. ADDISON:  I'm sorry.  Did the Court want me to

23     go back to a point?

24             THE COURT:  No, you were on NEPA and I interrupted

25     you.

1           MR. ADDISON:  Oh, thank you, Your Honor.  I believe

2    I was talking at one point about the Endangered Species Act,

3    and so we would submit to the Court mandatory duty under

4    Section 7 because of the presence, undisputed presence of

5    endangered species to engage in a Section 7 consultation.

6    That consultation if it was performed would show there are

7    endangered species at the site, which would give rise to a

8    biological assessment.  That biological assessment would have

9    to determine that the endangered species or its habitat is

10   going to be affected or harmed because of both the drawdown to

11   its habitat and the potential harm during the nature of the

12   project, and none of that has been done.  And so we would

13   suggest to the Court that it also has jurisdiction to enjoin

14   both Kennecott and require the Corps to perform those

15   mandatory duties under its responsibility and authority.

16           In addition to the points I've raised, Judge, there

17   are a couple of other -- Your Honor, there are a couple of

18   others that I'd like to touch on briefly.  The defendants

19   raise a number of issues like laches that we have discussed

20   briefly, and I'd like to at least take a couple of those

21   others up.

22           Number one, you mentioned the state administrative

23   proceedings.  There are a number of authorities we cite in

24   document number 4 at Page 20 that the state proceedings are

25   not a substitute for the federal action.  With respect to NEPA

1    in particular, that EIA would never satisfy NEPA and can't act

2    as a substitute for it because it never took up the affected

3    area.

4              In the same manner all of these federal laws have

5    exclusive jurisdiction in federal court, and so none of our

6    rights are waived or lost through a state administrative

7    proceeding.  In case the Court was wondering, agency inaction

8    under ESA is actionable through the APA, Bennett v. Spear, 520

9    U.S. 154 (175).

10             I want to talk briefly about the relief against

11   Kennecott.  We are not seeking APA relief against Kennecott.

12   When the Court looks at the various cases that address how

13   these issues are handled, it will see that in bringing an APA

14   claim, that claim is only against the federal government,

15   can't be brought against the state or the private entity.  But

16   both the Sixth Circuit and other circuits have recognized that

17   through the All Writs Act or this Court's inherent powers, it

18   can enjoin the private party.  And I might add the most recent

19   pronouncement of that comes in the Southwest Williamson County

20   matter out of the Sixth Circuit, 243 F.3d 270 at 277, where

21   they state:  "If we conclude that the project constitutes

22   major federal action, then we have the authority to instruct

23   the District Court to enjoin the third party" -- Kennecott --

24   "from further construction."

25             Now, Kennecott argues that we should have brought a

1    Clean Water Act suit instead of an APA suit, and that's pretty
2    simple.  We can't sue the government under the Clean Water Act
3    because, number one, the Corps is not violating an effluent
4    limitation under 1365(a)(1), and the suit against the federal
5    government under 1365(a)(2) can only be brought against the
6    administrator rather than the Corps.  So we don't have another
7    remedy with respect to the Army Corps.  The Army Corps remedy
8    is for their arbitrary and capricious acts not in accordance
9    with law.

10          Last couple of points I want to mention again, I
11   guess, Your Honor, because it obviously is of concern to the
12   Court is this issue of laches, and we would want to refer the
13   Court to 468 F.2d 1164 at 1182-83.  The Sixth Circuit
14   addressed in Environmental Defense Fund v. Tennessee Valley
15   Authority the fact that laches is disfavored, rarely applied
16   because of the public interest involved in these environmental
17   lawsuits.  In accordance with that is Sierra Club v. Pena, 915
18   F.Supp 1381 (1394) from the Northern District of Ohio in 1996.

19          Also, there's a strong presumption that plaintiff's
20   delay is reasonable so long as the relevant statute of
21   limitations has not elapsed.  And as I mentioned to the Court
22   earlier, the reason the statute of limitations has not lapsed
23   is that it hasn't begun to run, and we have a variety of
24   failures that constitute not having a permit.  It's not like
25   they had a permit and they thought they had the authority to

1    go forward.  Laches may be more appropriate in that instance.

2    Here they have no permit.  They have no authority.  They

3    violate the law every day if we're correct, and therefore, the

4    statute of limitations hasn't run.  They're violating the law

5    today and laches is not appropriate.

6              As the Court mentioned, there are four elements for

7    the test for injunctive relief.  The first one is likelihood

8    of success on the merits.  We think we've demonstrated for the

9    RHA that we're going to succeed on that claim because they

10   have affected the capacity, the condition of a water of the

11   U.S. and a navigable water.

12             We think we will -- we have demonstrated likelihood

13   of success under the ESA portion of the claim because they

14   have not engaged in the mandatory consultations and activities

15   required when there's an endangered species not just in the

16   area, but these witnesses testified on the mining site.

17             With respect to NEPA, they haven't even begun to

18   satisfy NEPA because they haven't been in the federal system.

19   The EIA they did in Michigan was truncated and inadequate.  It

20   definitely does not satisfy the standards of 40 C.F.R. 1500.

21             I'm going to mention briefly the National Historic

22   Preservation Act also with respect to those claims, Your

23   Honor.  As this Court I'm sure is well aware, there is a

24   native place of worship called Eagle Rock.

25             THE COURT:  You contend in your pleadings here that

1   the defendant is going to blow it up.

2          MR. ADDISON:  Well --

3          THE COURT:  Where did that come from?

4          MR. ADDISON:  Well, at one point in time -- maybe

5   not blow it up.  At one point in time --

6          THE COURT:  Those were your exact words.

7          MR. ADDISON:  Well, they planned to enter through

8   the rock, through Eagle Rock itself, and I don't know the

9   status of their plans and I know they're tunneling from the

10  side.  But in the press and other areas they have not yet said

11  that they're not going to affect Eagle Rock by destroying it.

12  But that's not the test.  The test is what they're doing to it

13  now, and it's --

14         THE COURT:  Well, but --

15         MR. ADDISON:  Yes, sir.

16         THE COURT:  You're an officer of the Court.

17         MR. ADDISON:  Yes, sir.

18         THE COURT:  When you tell me they're going to blow

19  it up, I look at it and I say, What in the world?  I want to

20  hear more about that.

21         MR. ADDISON:  Well, I would like to hear more about

22  it too and whether or not they --

23         THE COURT:  No, you made that statement to me.

24         MR. ADDISON:  And that statement has been made by

25  Kennecott, and my understanding, Your Honor, as an officer of

1    the Court is that's still a possibility.  They may end up

2    blowing it up.

3              THE COURT:  I will put them on the seat for that.

4              MR. ADDISON:  Pardon me?

5              THE COURT:  I will put them on the chair for that.

6              MR. ADDISON:  Well, I would like to know the exact

7    answer to that, too, Your Honor, because it's cryptic.

8              THE COURT:  Who said it?  Where did they say it?  I

9    can't believe anyone would say that.

10             MR. ADDISON:  Well, they said it for an extended

11   period of time and then they changed part of their location.

12             THE COURT:  That they were going to blow it up?

13             MR. ADDISON:  Well, that they would destroy it or

14   they would have to enter the mine through there, blast through

15   it to get to the ore.  I know they've changed that to some

16   extent, but I don't know exactly why, and the testimony at the

17   mining hearing seemed to indicate it had not yet been

18   determined that they would not do that.  But if we learn they

19   are not doing that, then we will --

20             THE COURT:  Yeah, but -- I'm going to be hard on

21   them too if they do the same thing.  As an officer of the

22   Court, particularly in an abbreviated preliminary hearing,

23   you've got to lay it straight out to me.  If they're going to

24   blow it up and you have evidence of it, I take what you say at

25   face value.  I can't say, Well, that was just hyperbole, can

```
 1   I?
 2              MR. ADDISON:  No, and I don't think it's hyperbole,
 3   Your Honor.  I think what we're going to find is that
 4   possibility still exists and that's what we understand.
 5              THE COURT:  That they will blow it up?
 6              MR. ADDISON:  That they're going to at some point --
 7   there's still the possibility they will enter through Eagle
 8   Rock through blasting.  That's what we understand.  And if
 9   that's wrong, then I will be corrected, but --
10              THE COURT:  Who's they?
11              MR. ADDISON:  Well, this is what we read in the
12   press, and that is what -- I'll also pull it out of the mining
13   hearing.  But they don't say categorically that they will not
14   do that.  And if they tell me that today, then that would be
15   new, Your Honor.
16              THE COURT:  What did they say at the hearings?
17              MR. ADDISON:  Well, at the hearings they address it
18   only cryptically.
19              THE COURT:  Well, they were under oath when they
20   said, We have a fence around it, didn't they?
21              MR. ADDISON:  Yeah, they said they had a fence.
22              THE COURT:  And they allowed people to come and
23   worship there.
24              MR. ADDISON:  Well, on a restricted basis they allow
25   people to come and worship there.
```

1          THE COURT:  Well, I didn't say restricted.  I just

2    said they allowed people to worship there.  Isn't that what

3    they said?

4          MR. ADDISON:  That's what they said at the hearing,

5    Your Honor.

6          THE COURT:  Isn't that what's occurring?  Do you

7    have any reason to believe that's not occurring?  In these

8    preliminary injunction hearings you've got to be right square

9    with me.

10          MR. ADDISON:  Well, I am, Your Honor.  I'm not going

11    to be anything but square with you, and this is what we read

12    when we saw what they claimed to do in their application, in

13    their other materials where they say that's still -- they

14    haven't said that's not a possibility.  That's all.  That's

15    all I've heard of it.

16          THE COURT:  I'll have fun with Mr. Ettinger on that

17    one.

18          MR. ADDISON:  In addition to -- I want to go back to

19    Eagle Rock, Your Honor, because let's assume for purposes of

20    argument they're not blowing it up, and what they're doing is

21    they've surrounded it with a fence, and while they still let

22    people worship there in some way, they're still desecrating

23    that place of worship.  If someone were to put a fence around

24    and restrict access to a church or a synagogue on a mosque and

25    that was a historical preservation or a historically

1    registered building, then they have to go investigate that,

2    and there's been no investigation of that.  There's both the

3    tribe's historical preservation officer who would be involved

4    and the state's.

5              And so in reality, Judge, we will establish whether

6    or not it's going to be blasted or not still even though

7    they've said it's a possibility.  But even if they don't blast

8    into it, they're required to engage in this process under the

9    National Historic Preservation Act.

10             The other three requirements for an injunction are,

11   of course, irreparable harm and that it is likely we will

12   suffer irrevocable harm, and of course we're suffering

13   irreparable harm now.  If you look at the SWEPCO case, for

14   example, out of the Eighth Circuit, it addresses in some

15   detail what's known as procedural harm.  And as an entity that

16   has standing, we're entitled to have the proper procedures

17   followed under these various laws, and if not, that's

18   procedural harm which courts have determined to be

19   irreparable.

20             In addition to that, environmental harm is generally

21   described as irreparable because it is so difficult to repair

22   if you can repair it at all, and so there is irreparable harm

23   occurring.  It is occurring to my client at this time, and we

24   would suggest we've demonstrated that prong.

25             The balancing of harms we would suggest does not

1    favor Kennecott or the state.  With respect to Kennecott, any

2    harm that they claim is self-inflicted, and the reason it's

3    self-inflicted is that they began construction without the

4    necessary permits.

5              THE COURT:  But --

6              MR. ADDISON:  Yes, sir.

7              THE COURT:  They had the permits, didn't they, from

8    the state?

9              MR. ADDISON:  Well, they -- they cer -- well, I

10   don't know whether they had the state permit when they began

11   construction, but --

12             THE COURT:  That's what they alleged.

13             MR. ADDISON:  They certainly didn't have the federal

14   permits that we're saying they had to have.

15             THE COURT:  That's the question.

16             MR. ADDISON:  Well, they didn't have all of them,

17   and they didn't have any of the federal ones.  But in that

18   instance when the issue of harm has been analyzed, courts have

19   looked to see whether or not, like Judge Breyer raises, the

20   steamrolling issue and jump the gun.  In the same way in

21   analyzing the harm issue, there's a question of whether or not

22   that harm was self-inflicted, and by self-inflicted they mean

23   you spent the money, but you didn't get the permit.  And so in

24   balancing harms --

25             THE COURT:  But can't you turn that around and say

1    Huron Mountain Club could have begun this lawsuit two or three
2    years ago, couldn't they?
3           MR. ADDISON:  Yes, Your Honor.
4           THE COURT:  Do they get to wait until the state is
5    all finished and do they get to wait until construction has
6    been, from their perspective, $130 million worth of
7    construction has been undertaken, and then you file a
8    lawsuit?
9           MR. ADDISON:  Yes, sir.
10          THE COURT:  And then you say, Tough luck.  Harm is
11   against you.
12          MR. ADDISON:  Yes, sir.  Yes, Your Honor.
13          THE COURT:  How do I balace that?
14          MR. ADDISON:  Pardon me?
15          THE COURT:  How do I balance that?
16          MR. ADDISON:  Well, once again, this is a no-permit
17   case, and if the Court finds they had to have these permits,
18   then the balance of harm way favors us because they have been
19   in construction without them.
20          THE COURT:  What's the public interest here?
21          MR. ADDISON:  Well, the public interest lies with
22   enforcing the environmental laws which the government should
23   be in favor of and us.  Kennecott has no public interest.
24   They have a private interest.  Their private interest is that
25   they'll make money off of this mine.

1            Now, they raised the issue of jobs and taxes and

2    those public types of issues, and we would suggest to the

3    Court, Your Honor, that those benefits, those interests of the

4    public are not harmed by making them get the permits.   In

5    fact, they're enhanced, and they will be back to having jobs.

6    They will be back to having taxes that are paid once they get

7    the correct permits, and they can go ahead and complete their

8    mine if they can do that.   But until that time the public

9    interest lies far with our side because of the nature of the

10   environmental laws and the public interest that's built into

11   those.

12           And once again, Kennecott's interest is private.

13   It's a private company for profit.   I know they've assembled

14   these statements and affidavits from various members of the

15   public trying to generate a public interest, but that's not

16   Kennecott's interest, and that interest is not harmed by their

17   getting these permits or going through this process that says

18   you don't need a permit.   Then they're back to construction.

19           And in answer to the Court's question a moment

20   before, even though we waited three years or six years, even

21   though they've spent all this money, that does not

22   counterbalance and outweigh the public interest in enforcing

23   the environmental laws and that pulls in the laches doctrine

24   again and the issue of whether we're timely.   And I appreciate

25   again the fact that, you know, the Court's looking at me and

1    saying six years, five years, seven years, and I can't change

2    that.  But I would respectfully direct the Court to these

3    authorities that explain why that doesn't bar our claim.

4              And then lastly -- we talked about public interest.

5    The last issue if we were to get to it would be relief.  And

6    the appropriate relief in this case, Your Honor, is that

7    Kennecott be enjoined, and that after they're enjoined from

8    any further activity, this Court remand this matter to the

9    Army Corps for its proper permitting, its proper consultation,

10   its proper NEPA process.

11             In connection with that, if the Court saw fit to

12   enter an injunction, we would have to take up the issue

13   perhaps of a bond, and of course Rule 65(c) of the Federal

14   Rules of Civil Procedure, if you're seeking an injunction

15   through that rule, requires a bond.  If this Court sees fit to

16   enter an injunction either based on its inherent powers or the

17   All Writs Act, no bond is required.  If it's under Rule 65(c),

18   there are a number of doctrines that say any bond my clients

19   should have to post should be minimal, and the reasons for

20   that are, number one, they're an entity that is a nonprofit

21   organization under Section (7), 503(c)(7), and as a part of

22   their charter, which is also in evidence, they have committed

23   to the preservation and conservation of these areas that they

24   impact or own.

25             So there's a number of doctrines out there, but one

1    of them is that if you're a nonprofit and you're seeking to

2    preserve the environment or conserve it, then you should

3    either have a very small bond or no bond at all.  There's also

4    the doctrine, of course, that a bond should not be so high

5    that it in essence prevents litigation of the case.

6              And so we would suggest to the Court that since

7    we're seeking the injunction not under 65, it's not

8    applicable, if a bond is to be posted, we would suggest it

9    should not be more than a -- maybe more than a nominal

10   amount.  And then once again going into the bond analysis, we

11   would refer the Court to those cases that show that the harm

12   Kennecott might suffer, if any, would be self-inflicted and

13   we're not required to bond their self-inflicted harm.

14             I think, Your Honor, while I'd like the opportunity

15   to respond, that concludes my opening remarks.

16             THE COURT:  Very well.  You will have an opportunity

17   to respond.

18             Let's take a few-minute break and then we'll

19   proceed.  Ready to proceed after we take a break?  Okay.  Very

20   well, Mr. Rosen.

21   (Proceedings recessed at 2:02 p.m.; reconvened at 2:17 p.m.)

22             THE COURT:  You may proceed, Mr. Rosen.

23             MR. ROSEN:  Thank you, Your Honor.  And just to fill

24   out our team here, on the phone we have Laurel Bedig and Ethan

25   Eddy because this case involves a number of different statutes

1    and involves a number of different attorneys from the U.S.

2    Department of Justice, but I hopefully will be able to handle

3    it all for you.

4           THE COURT:  Very well.

5           MR. ROSEN:  But if you have specific questions, I

6    may refer to them.

7           I think there are two matters that are not in

8    dispute here based on what Mr. Addison has gone through on

9    this.  One is that the three environmental review statutes are

10   wholly dependent and derivative on showing that there's some

11   permit requirement under either the Clean Water Act or the

12   Rivers and Harbors Act.  And the second is that in order for

13   this Court to have jurisdiction over an APA claim, there must

14   be a mandatory duty for the Corps of Engineers to act to

15   either demand or require a Clean Water Act permit or demand or

16   require a Rivers and Harbors Act permit.

17          Let me start with the Clean Water Act first.

18   Section 404, which is the only section allegedly violated

19   according to the complaint, is a statute that deals just with

20   discharge of dredge and fill material into waters of the

21   United States.  It allows one -- Section 301 of the Clean

22   Water Act prohibits any party from discharging any pollutant,

23   including dredge and fill material, into waters of the United

24   States and subjects that person to both civil penalties and

25   potential criminal penalties and injunctive relief if they

1    take such action absent a permit.  Section 404 allows them to

2    go seek a permit from the Army Corps of Engineers.

3           That provision says that the Army Corps of Engineers

4    may issue a 404 permit.  There's nothing in that provision

5    that requires the Army Corps of Engineers to issue a permit.

6    There's nothing in that provision that requires the Army Corps

7    of Engineers to go out and seek a permit from a party, to

8    demand that a party submit a permit.  It is wholly within the

9    discretion of the actor of the project proponent to determine

10   on their own in their mind whether a permit is required to

11   avoid violating Section 301 of the Act, and they make that

12   determination at their own peril.

13          There is in fact -- again, the language of the

14   statute says only that the Corps may issue a permit.  The

15   Administrative Procedure Act makes it very clear that it

16   simply does not cover discretionary acts of any federal

17   agency, and there is nothing mandatory about Section 404 which

18   requires the Corps to demand a permit.

19          In the end, what the plaintiffs are really doing is

20   seeking to have the Corps of Engineers enforce the penalty

21   provisions of the Clean Water Act.  First of all, that is not

22   really even the position of the Army Corps of Engineers.

23   That's the position of the Environmental Protection Agency for

24   the most part, which is not even a defendant in this case.

25   That is a pure enforcement discretionary decision.

1    Both the determination of whether to even ask a

2    party to seek -- to require a permit or submit its own

3    application for a permit and a decision that a 301 violation

4    may have occurred, and therefore, action should be taken

5    either through a cease and desist order or the filing of a

6    civil action or the filing of a criminal action are all

7    quintessential discretionary actions which are not mandatory

8    duties.  As both -- the SUWA case has made clear that 404 does

9    not cover discretionary actions, and the Heckler line of cases

10   of the Supreme Court has made clear that whatever the

11   circumstances, the Corps could even believe that there is a

12   violation occurring, it is still within the Corps' discretion,

13   and to be, you know, more accurate, within EPA's discretion to

14   make a determination whether to allocate its enforcement

15   resources to go after that party.  So there is no mandatory

16   duty and therefore no jurisdiction under the APA for the Clean

17   Water Act case.

18        Beyond that there is the citizen suit provision

19   within the Clean Water Act which expressly says that if EPA

20   does not decide to bring an enforcement action, the party, in

21   this case Huron Mountain Club, can sue the party they believe

22   is the offending party, in this case Kennecott, for the exact

23   same violation they say is occurring here.  The Clean Water

24   Act provision makes it very clear that if they believe a 301

25   violation is occurring, which means that they're depositing

1    dredge and fill material into waters of the United States

2    without a permit, they can bring their own direct action.  In

3    fact, the cases we cited make clear that that only proves even

4    more that --

5        THE COURT:  Want to pull that microphone over a

6    little closer?

7        MR. ROSEN:  Oh, sorry.  That only proves even more

8    that a private litigant cannot commandeer the federal

9    enforcement authority, but they can supplement it.  If the EPA

10   or the Corps chooses not to pursue an action, then they can

11   supplement it.

12       Now, we don't get into the bases for the EPA or the

13   Corps' decision here.  I submit that this may be one case

14   where it would be very easy to see why the EPA or Corps hasn't

15   done anything.  It's been the subject of a massive amount of

16   analysis and review by state authorities, and you would say

17   that this is a pretty good case no matter what's going on out

18   there that you would not devote those types of resources when

19   this has already been reviewed there.

20       Beyond that, beyond the lack of any mandatory duty,

21   which is again absolutely required for an APA case, in this

22   case even if there was some mandatory duty, the Corps of

23   Engineers has no statutory ability to issue or demand a 404

24   permit in this case because Michigan is one of the two states

25   where the entire 404 program has been assumed by the State of

1    Michigan.  And under Section 404(j), once that occurs, and it

2    occurred -- we submitted Mr. Konik's affidavit which laid out

3    the memorandum of agreements in 1983, in 1984, and 2011.

4    Under those agreements, once that is approved by EPA, which is

5    what was approved in 1983, the ability of the Corps to issue a

6    permit is suspended by statute.  So they have no statutory

7    ability to even issue a permit here even if Kennecott came to

8    it.  What they'd have to do is refer them to the state.

9            Finally, if we got beyond all those jurisdictional

10   defenses, and it's really impossible to get beyond those in

11   this case, we don't know a great deal about the facts of this

12   case.  We only know what we read in the same types of

13   documents that you read because we haven't spent five or six

14   years with this case.  But based just on the plaintiff's

15   allegations, there is no 404 violation here.

16           A 404 violation requires the discharge of dredge or

17   fill material into waters of the United States, which in this

18   case would generally be the Salmon Trout River, associated

19   wetlands, and any other similar waters.  There's no allegation

20   in the complaint that that's going to occur.  404 applies to

21   the surface waters of the United States.  Their entire case is

22   based on subsurface activity.

23           Now, they say that this may result in drawdowns of

24   the water in the river.  It may affect certain other aspects

25   of the river.  But none of that is a discharge of waters --

1    into surface waters of the United States.  So it doesn't even

2    come within the ambit of a Section 404 permit even if the

3    Corps had jurisdiction in Michigan and even if it had a

4    mandatory duty to require that.  And at least at this stage in

5    a preliminary injunction hearing where the plaintiffs have to

6    establish a high likelihood of success on the merits, if we

7    got past all those jurisdictional defenses, based on their own

8    pleadings it's pretty much impossible for them to have

9    established that in this case.

10           Turning to the second statute and the only other

11   basis to then kick in the environmental reviews is a permit

12   required under the Rivers and Harbors Act.  Now, unlike the

13   Clean Water Act, which has very expansive jurisdiction in the

14   waters that it covers -- it covers lots of waters and even

15   wetlands connected to waters which may not be navigable on its

16   own.  The Rivers and Harbors Act of 1899 has a very different

17   purpose, and as the cases we've cited from the Supreme Court

18   in our brief made clear, the term "navigability" is determined

19   differently for different statutes.  The purpose of the

20   Rivers and Harbors Act was for the Corps to be allowed to keep

21   the channels of interstate commerce open.

22           Now, again, in order for the plaintiffs to have a

23   claim, there must be a mandatory duty under that statute for

24   the Corps to issue a permit.  They cite Section 403.  That's

25   what they rely on.  The word "permit" doesn't even appear in

1    that statute.  What that statute says is that a party cannot

2    place an obstruction in a navigable portion of a waterway,

3    what they call a Section 10 waterway under Section 10 of the

4    Rivers and Harbors Act, that interferes with the flow of

5    interstate commerce without approval of the Corps.

6            But once again, if they do not do that, they are

7    subject to enforcement by the Corps of Engineers, more

8    specifically in this case by the Attorney General of the

9    United States.  If a violation occurs, for instance, if in a

10   navigable portion, let's say we all agree that the last two

11   miles of the Salmon Trout River is navigable, and a project

12   occurs where fill and dredge material is filled in there that

13   interferes with the navigable portions of that, there is still

14   no mandatory duty whatsoever for the Corps to demand that

15   party to obtain a permit.  They may write a letter to them and

16   say, You know, we think you might be violating this statute

17   and you ought to get a permit.  But there is no duty to

18   require a permit.

19           What happens is, just as under the Clean Water Act,

20   the federal government can use its enforcement procedures to

21   stop that, to seek fines.  In fact, it's a criminal violation

22   under the Rivers and Harbors Act.  It's a misdemeanor to

23   violate that act by putting fill and dredge material into the

24   navigable portion of the river.  But again, there is no

25   obligation on the part of the Corps to require a permit.  Just

1    like with the Clean Water Act, that's the obligation of the

2    individual defendant to determine whether they believe the act

3    is required and therefore make a determination at their own

4    risk whether they go forward with a permit or without a

5    permit.

6            Okay.  Even beyond that --

7            THE COURT:  But if they're -- if actions take place,

8    using this two-mile limit, which is I think it's part of the

9    agency determination, two miles of the Salmon River --

10           MR. ROSEN:  Right.

11           THE COURT:  If actions take place upriver which

12   determinatively affect the last two miles, for instance, of

13   this river, the Army Corps of Engineers would then become

14   involved, correct?

15           MR. ROSEN:  Their jurisdiction is limited to the

16   navigable portions of the river, and if it's close enough

17   where it has some immediate and significant impact, it might

18   be possible that it might stretch beyond two miles.  But as a

19   general matter --

20           THE COURT:  But it has to come into the two miles is

21   what you're saying in order to be actionable?

22           MR. ROSEN:  Absolutely.  Absolutely.

23           THE COURT:  Okay.

24           MR. ROSEN:  Beyond that, now, let's assume we get

25   past the mandatory duty obligation, which again we can't get

1    past here because it is not in the statute, it's not in the

2    regulations, it's not anywhere, under the Rivers and Harbors

3    Act there's no private right of action.  There's just no

4    private cause of action.

5              Congress has written a multitude of statutes on all

6    kinds of subjects, and many of them, if not most of them,

7    provide some rights because they're geared towards effecting

8    certain actions that affect certain parties.  But there are a

9    core of actions where Congress just decided an agency is given

10   power, and even if they violate that power or make a mistake

11   under that authority --

12             THE COURT:  Or abuse it.

13             MR. ROSEN:  Or abuse it.  Or abuse it, they are not

14   subject to a private right of action.  And the cases that we

15   cited like the Sierra Club v. Corps of Engineers, an action

16   brought under the APA where the District Court found that they

17   thought the Corps made a mistake and that the action was

18   within the navigable waters and should be stopped, and the

19   Court of Appeals said, That may be the case, but as the

20   Supreme Court has made clear, there's simply no private right

21   of action under the Rivers and Harbors Act.  So there is no

22   opportunity for the plaintiff to obtain redress on that.

23             Now, there is under the Clean Water Act.  They can.

24   They can go directly against Kennecott under the citizen suit

25   provision.  And we don't know why they haven't done that in

1    this case because I think Mr. Addison said something about the

2    effluent limitation.  We've set out in our brief it's very

3    clear that the exact claim they're making here under the Clean

4    Water Act, dredge and fill material into waters of the United

5    States, that's a Clean Water Act violation, is subject to a

6    citizen suit claim.  They can go directly against Kennecott.

7    We even gave an example of a recent case where an

8    environmental group sued a developer for discharging deposit

9    and fill into waters of the United States under the Clean

10   Water Act without a permit and they got an injunction against

11   the developer.  That's their opportunity under that act.

12              Finally, I will address what Mr. Addison addressed

13   for a good portion of his discussion, which is that again,

14   even if you pass all of these jurisdictional hurdles, and you

15   don't, and we intend to file a file a motion to dismiss this

16   case based on those jurisdictional defenses because with all

17   due respect, we don't believe the Court has the authority to

18   issue an injunction when it has no jurisdiction to issue those

19   orders, and the cases again we've cited made that clear.  I

20   think we had quotes that the Court has no choice but to

21   dismiss the case in the absence of, for instance, a mandatory

22   duty or in the absence of a private right of action.

23              But if we get to down the road the navigability

24   issue, Mr. Addison is right, there are certain actions which

25   can occur under a river which may impact navigability, but

1    only where the river is deemed to be navigable.  And in this

2    case since 1983 it's been clear that only the last two miles

3    of this river, which is 21 miles downstream from this project,

4    is navigable.  So no matter what the action is, they could be

5    coming in and, you know, building a bridge, building a dock,

6    building anything, if it's not in a navigable portion of the

7    river, it's not subject to the jurisdiction under that act.

8            Now, they may have some dispute about that and they

9    may have the right to challenge that if it's not already

10   barred by the statute of limitations because the Corps made

11   this determination originally in 1983.  They made it again in

12   2012 as to what portion of the river is navigable or not.  But

13   let's say you even get beyond that and they want to dispute

14   that fact.  We're here on a preliminary injunction.  They have

15   to show a high likelihood of success on the merits that the

16   actions that they are referring to, which the state court has

17   already rejected as interfering with navigability, in fact

18   interfere with a navigable portion of the river.  And under

19   those determinations, I submit that there is no way they can

20   show a likelihood of success on the merits at this stage, and

21   for the last three decades the Corps of Engineers has made

22   clear that only the last two miles of the river are navigable.

23           As I stated at the beginning again, and again, my

24   colleagues are here to answer any questions you want on the

25   other statutes, but the other statutes, and plaintiffs admit

1    this essentially in their brief, they're all contingent on a

2    duty, on a mandatory duty under NEPA, the National Historic

3    Preservation Act, and the Endangered Species Act of having a

4    duty.  They all require a federal action, a federal license or

5    federal financial involvement, and none of that is involved

6    here.  And the fact that the Corps or EPA could have

7    discretion to act doesn't change that fact.  There has to be

8    an affirmative federal action.  And so none of those statutes

9    are triggered in this case.

10              Just to then briefly go to the other preliminary

11   injunction factors, I think the Court has recognized this, but

12   there clearly is nothing irreparable or imminent that's going

13   to occur here, and it has to be both of those.  There's

14   nothing imminent that any harm that's alleged that's going to

15   occur can't await final resolution of this case, and there's

16   nothing irreparable either.  If the Court had jurisdiction

17   under these statutes, it could require mitigation and

18   restoration of any damage that's done.  And in fact that's how

19   it almost always works because the way these statutes work is

20   if a violation occurs, it gets referred to my office, to the

21   Attorney General.  The Corps makes a determination that we

22   think a violation of Section 301 or Section 403 of the Rivers

23   and Harbors Act has occurred.  Something needs to be done to

24   stop this.  Go into court and get an injunction and get

25   restoration and mitigation.

1          So those are the remedies that are available, and

2     the plaintiffs have made no showing that whatever damage that

3     may occur cannot be resolved through restoration and

4     mitigation as occurs at least on the Clean Water Act side in

5     almost every Clean Water Act case.  That's part of the process

6     there.

7          In fact, if you look at the relief they seek, what

8     they're seeking is for us to turn to Kennecott and say, Get a

9     permit.  Well, that's not going to stop any project.  They

10    very well admit in their reply brief that they filed this

11    morning that they can't tell us how to decide that.  All

12    they're asking is that we tell Kennecott to go ahead and take

13    those actions.  But we can write a letter and say, Get a

14    permit, please get a permit, we think you need a permit, we

15    require you to get a permit, and that's not going to stop the

16    construction that's going on there.

17         So the relief they seek against us is not going to

18    address the damage that they say is going to occur even if we

19    issued a cease and desist order.  Happens all the time.  The

20    Corps determines based on whatever evidence and makes a

21    determination it wants to pursue a potential violation, it

22    issues a cease and desist order, and the parties may have a

23    disagreement and they go ahead and they ignore the cease and

24    desist order.  The only thing that would get the relief that

25    plaintiffs require is if we brought an action to your court or

1   to a similar court seeking to enjoin that action.  But that is

2   totally within our discretion.  That is not a mandatory

3   review.  That is not something that they can require us to do.

4           THE COURT:  So in other words, what you're kind of

5   hinting about is even if this Court said, You tell Kennecott

6   to go get a license or go get a permit, if this Court told

7   you, you would still have the discretion, even though the

8   Court was telling you that, you would still have the

9   discretion as to whether to do it or not.

10          MR. ROSEN:  That's absolutely correct.

11          THE COURT:  By statute.  That's what you're

12   contending?

13          MR. ROSEN:  Yes, yes.  And if you read the brief

14   this morning again filed by Huron, they say the same thing.

15   They say we're not asking or requiring that the agency make a

16   specific decision, just make a decision.

17          And finally, on the public interest, there's an

18   important public interest involved here, and I won't get into

19   the weighing of the harms and the economic harms.  I think

20   Kennecott's counsel will do that.  But as the Supreme Court

21   said in the Oakland case, there's an important public interest

22   in making sure statutes are administered the way Congress

23   designed them to be administered.

24          In the case of the Clean Water Act, the assumption,

25   one of the things Congress did is say that we're going to have

1    some division of responsibility and we're going to have some

2    responsibility to states who are willing to take those

3    responsibilities and follow the rules.  And under those rules

4    we're going to suspend the ability of the Corps of Engineers

5    to address that as long as Michigan complies with the basic

6    requirements, and Michigan has been complying with the basic

7    requirements.  And plaintiffs would like us to turn that

8    completely upside down, completely usurp Michigan's authority

9    which it has agreed to under this structure that Congress

10   established.

11        And then more generally, Congress established a

12   process under both the Clean Water Act and the Rivers and

13   Harbors Act that if someone believes on their own

14   determination they're going to potentially violate those

15   provisions and subject themselves to civil and criminal

16   liability and significant penalties, there's a way around

17   that.  They can come to the Corps of Engineers and seek a

18   permit.  But that's their choice.

19        What Congress set up is that individuals -- you

20   know, I mean, there's going to be lots of situations where if

21   you can force the Corps to go demand and require a permit for

22   every project where somebody thinks somebody's doing something

23   wrong, you're going to have two neighbors who are fighting

24   over one person thinks it's a puddle and one person thinks

25   it's a wetland and they're going to be going into court and

1    going to the Corps of Engineers and saying, You have to do an

2    investigation because we think there's a Clean Water Act

3    violation because that's interference and filling and

4    dredging.  This guy put a barrel of dirt into this puddle and

5    we think that's filling a wetland in violation of the act.

6           That is at the discretion of the Corps of

7    Engineers.  Even that homeowner can address that on his own if

8    he isn't satisfied by the reaction of the Corps of Engineers

9    through the citizen suit provision.  So that's the important

10   structure that Congress established and that's the public

11   policy that gets upheld by following that structure.

12          If the Court has no other questions?

13          THE COURT:  Thank you.

14          MR. ROSEN:  Thank you.

15          THE COURT:  Thank you.

16          Mr. Ettinger on behalf of Kennecott.

17          MR. ETTINGER:  Good afternoon, Your Honor.

18          I must say that when this lawsuit first came across

19   my desk, it reminded me of the old Yogi Berra quote:  "It's

20   like deja vu all over again."  And having lived this for the

21   past six years, it truly is.

22          As we noted in our papers, this is the Club's ninth

23   challenge to Kennecott's underground mine over the past six

24   years.  The Club's challenged everything from the

25   administrative completeness decision of the State of Michigan

1   regarding its mine permit application to its state surface

2   lease issued by the state to every single state permit that

3   Kennecott has ever been issued, and clearly the Club is

4   desperately trying to block the project and they're looking

5   for any excuse to cause that delay.  And with all due respect

6   to the Huron Mountain Club, this challenge truly may be the

7   most outrageous and cynical of all.

8          We're talking now six years after Kennecott filed

9   its mining permit application with the state, four years after

10  the Club participated in a 42-day contested case hearing in

11  which it litigated and lost the very issues that are at play

12  here, two years after Kennecott began construction under its

13  state permits, and eight months now after Kennecott began

14  underground construction.  The Club claims for the first time,

15  and literally out of the blue, Your Honor, we had no idea this

16  was coming, hadn't heard anything about this, totally out of

17  the blue, that Kennecott should be forced to get federal

18  permits under the Clean Water Act and the Rivers and Harbors

19  Act for the underground work it started eight months ago and

20  it must immediately shut down its operations indefinitely

21  until it applies for and gets those permits regardless of the

22  tremendous impacts that will have.

23          THE COURT:  As an officer of this Court, your

24  opposing counsel here, with all due respect, said that this

25  never dawned on the client or apparently this is the first

1   time, having come to him, he said, What about federal?  Do you

2   have information to the contrary?

3           MR. ETTINGER:  I have no idea whether it's ever come

4   to the light of the Huron Mountain Club as to these particular

5   claims.  But the factual issues that are in play and even the

6   notion that it might impede the flow of the Salmon Trout

7   River, our mine, or might impact wetlands, those are issues

8   that the Huron Mountain Club has been litigating for six

9   years.  As we submitted in our papers, they've made extensive

10  comments with their co-litigants, MWF and the Keweenaw Bay

11  Indian Community, talking about these very issues, talking

12  about additional state and federal permits, including federal

13  permits that they didn't litigate.

14          THE COURT:  That was my point.  Was reference made

15  in those hearings to federal permits?

16          MR. ETTINGER:  Never, Your Honor.  I mean, we

17  literally -- this is -- well, federal permits were mentioned

18  in the comment period.

19          THE COURT:  That's what I meant.

20          MR. ETTINGER:  Yes.  But when they actually filed

21  their contested case petition in December of 2007, there was

22  never any mention of federal permits under the Clean Water Act

23  or the Rivers and Harbors Act.  What they did do, though, is

24  demand and suggest that Kennecott needed to get what I would

25  call the state analogues of those permits.  One is really not

1    an analogue.  As Mr. Rosen alluded to, it's the delegated 404

2    permit which is Part 303 of NREPA which deals with wetlands.

3    With respect to inland lakes and streams, which is Part 301 of

4    NREPA, they claimed that we needed to get a permit and could

5    not proceed with our mine until we did in part because it was

6    going to impede the flow of, under the Inland Lakes and

7    Streams Act, a stream, which they called the Salmon Trout

8    River.

9            So no, it was not the federal claim.  It was the

10   state analogue.  And all of these issues were litigated

11   thoroughly would really be an understatement here, Your Honor.

12           THE COURT:  What about this blowing up of the Indian

13   tribal -- that struck me today as being something kind of

14   new.  I think I've gone through everything before that.

15   What's the story on that?

16           MR. ETTINGER:  Your Honor, I confess that this is a

17   source of a bit of frustration.  With all due respect to Mr.

18   Addison, he knows that we're not going to do that if he read

19   our papers because Paragraphs 16 and 17 of the affidavit --

20   excuse me, the declaration of Adam Burley, who is the

21   president of Kennecott Eagle Minerals Company, confirmed what

22   the Club has already known to be true, Your Honor, because

23   they've been involved in this from the start, and that is that

24   under our surface lease and under our mining permit it was

25   understood between Kennecott and the state that our portal

1    would start to the west of the outcrop and that it would be

2    drilled underneath the outcrop, not through the outcrop.

3    There would be no destruction of the outcrop.

4           As a matter of fact, the surface lease that we

5    entered into with the state -- and I'll even get you the

6    provision, Your Honor, because I think this is an important

7    point.  It's Section 4(b)(6) of our surface lease, and it

8    actually is attached to our papers because it was an exhibit

9    to the claim of appeal and complaint that the Club and their

10   co-litigants filed against our surface lease.  4(b)(6)

11   prohibits mining operations on the outcrop and prohibits any

12   disturbance of the surface of the outcrop.

13          And so lest there be any doubt, Mr. Burley clarified

14   in his declaration that no, we are not going to violate our

15   lease.  No, we are not going to violate our state permit.  We

16   are not going to disturb the surface of the outcrop.  And we

17   will not disturb the surface of the outcrop, Your Honor.  I

18   don't know where the Club's information is coming from.

19          THE COURT:  If I went there today, I could find it?

20          MR. ETTINGER:  You could find it and you could point

21   to it.  Actually I'll show you a few pictures that would

22   corroborate that in a second, Your Honor.  It's there.  It

23   will remain there.  It is fenced off to deal with MSHA

24   regulations, so yes, it is fenced off.  And so no, we have not

25   provided -- there was an allusion that we have not provided

1    unlimited access to the tribe, and that's correct, Your Honor.

2    We will provide reasonable access to the tribe.  We have in

3    the past and we will in the future.

4         THE COURT:  What does that mean?

5         MR. ETTINGER:  Well, we need some sort of

6    notification.  You know, there are certain protocols.  But

7    we're not going to just deny people and say, No, this is our

8    mine and you can't show up here.  So the tribe members have

9    been afforded access to the outcrop.  We have to go through a

10   safety protocol to make sure that we're complying with health

11   and safety regulations, but they're pretty minimal.

12        THE COURT:  Is it -- I gather, I think I saw

13   somewhere, maybe on the map here, I gather it's part of that

14   92-acre area that's being used as the tunnel?

15        MR. ETTINGER:  Correct, and maybe I can actually

16   pull up a picture that would actually show that, and that

17   would probably be Exhibit 4.  Exhibit 4.  Let's see if I can

18   do this right.  There's the outcrop, Your Honor.  There's the

19   outcrop.

20        THE COURT:  So the path of decline goes right down

21   beside it?

22        MR. ETTINGER:  It goes underneath it.  It does not

23   go into it.  Part of what we agreed to with the state, and in

24   part this was because of input from the tribe, is that we

25   would go underneath it; that we would not affect the surface

1    of it at all.  So we agreed to go underneath it, and we did.

2    We did this back in September.

3              THE COURT:  And never destabilized it?

4              MR. ETTINGER:  No, no.  And there was testimony

5    actually during -- this issue came up during the contested

6    case hearing, and this was actually -- this was the subject of

7    the last time I was trying to defend against an injunction of

8    underground construction which was before Judge Manderfield in

9    the Ingham County Circuit Court last September and this issue

10   came up, and the claim was made then by Huron Mountain Club's

11   other counsel and KBIC's counsel that you're going to

12   destabilize and blow up the rock.  All of the -- Tracy Arlo

13   was the name of the witness at the contested case hearing, and

14   she testified unequivocally without rebuttal that we were not

15   going to destabilize the rock.

16             Mind you, it's done now.  We have created the

17   portal.  We're now going down the decline past where the

18   outcrop is, and it has not been destabilized in the least and

19   tribe members have been provided access, and again, will

20   continue to be provided access since the portal was created,

21   since the area has been fenced off.  And that is corroborated

22   by Paragraphs 16 and 17 of the declaration of Adam Burley.

23             THE COURT:  I take the fencing is in part because

24   you have trucking and you have some heavy equipment in the

25   area and you don't want anybody -- you have liability for

1    anybody hurt in the course of that trucking.

2              MR. ETTINGER:  Correct.  Correct, Your Honor, and

3    that's why when I say reasonable access, we need to be able to

4    do a safety induction and things like that, which, you know,

5    Kennecott and Rio Tinto, its parent company, take extremely

6    seriously.  So we have to address those things.  We've

7    actually -- within the bounds, we've tried to make the

8    restrictions as minimal as possible.  We respect the tribe's

9    concerns and we've tried to address those concerns as best we

10   can.

11             THE COURT:  Okay.

12             MR. ETTINGER:  And so, yeah, I appreciate Your Honor

13   giving me the opportunity to address that issue.  Your Honor,

14   frankly, I don't know where their information is coming from

15   on this secondary explosion or secondary portal.  It just

16   doesn't exist.  It's not going to happen, Your Honor.

17             You know, the Club doesn't want Kennecott to

18   actually engage in the conduct they say Kennecott needs

19   permits for.  They want to force Kennecott to apply for

20   permits that they don't need, mind you, to add more process

21   that will delay the project.  And I do want to show Your Honor

22   just a few pictures to provide some context.

23             Let's go to Exhibit 1, Nicole, please, just to

24   provide a bit of context, and I won't belabor these pictures.

25   This first exhibit just shows -- and this is one attachment to

1    the NHPA assessment that we provided to the Court with our

2    papers.   This shows where the project is, and you can see the

3    proximity to Marquette as well as to Lake Superior.

4              THE COURT:  There's a little town about two miles

5    north.  What is it called?

6              MR. ETTINGER:  Dodge City.

7              THE COURT:  Dodge City.  Is there a town there or is

8    it just the name of a --

9              MR. ETTINGER:  I've been up to the -- I confess I've

10   been to the project site many times, and if Dodge City is a

11   town, I missed it.

12             THE COURT:  A lot of the U.P. is like that.  But as

13   I understand it, it's two miles directly south?

14             MR. ETTINGER:  Yeah, and I have usually come from

15   the other direction from the Triple A Road, Big Bay being

16   really the closest town of any --

17             THE COURT:  Well, I note in the last -- I've got a

18   very detailed state map with counties and pretty well

19   outlined, and that last one, it has the river in question here

20   as coming up toward that area but stopping, oh, about a

21   quarter of a mile or a half a mile to the juncture of exactly

22   two miles south of Dodge City.  But it shows it, but it

23   doesn't come up that far.

24             MR. ETTINGER:  That doesn't surprise me, Your Honor,

25   because I mean essentially you're talking about what's some

1    swampland at this point.  We attached some pictures with the

2    affidavit of -- excuse me, the declaration of Dan Wiitala.

3         THE COURT:  I couldn't gain anything from those

4    pictures.  It looked like a rose garden or one of those

5    floating things that people have in their front yard.  It

6    didn't look like much.  I didn't get any perspective on it.

7         MR. ETTINGER:  It certainly doesn't look like a

8    river, and it's because it's about, you know, half a foot

9    deep.  It's a few feet wide.  I mean, it's nothing much, and

10   that may explain -- I'm only speculating at this point, Your

11   Honor, but it may explain why the map doesn't look to extend

12   it down that far.  These are essentially a little bit of

13   swampland and some wetlands at this point.

14        THE COURT:  But you agree it's the headwater?

15        MR. ETTINGER:  It's the headwaters, correct.

16   Correct, but we don't believe it's navigable.

17        THE COURT:  How far on the back side of the -- we're

18   looking at the front side toward Huron Mountain Club.  How far

19   behind us does the headwater extend?

20        MR. ETTINGER:  Honestly, Your Honor, I don't know.

21   I believe that we are in river miles I think about four river

22   miles from the nearest Huron Mountain Club property.

23        THE COURT:  I think I saw 3.8 miles somewhere.

24        MR. ETTINGER:  Okay, so close to that.  And my

25   understanding is that from the headwaters, and there are a few

1   other tributaries, from the headwaters all the way to Lake

2   Superior is approximately 22 river miles.  Again, it's not --

3   as the crow flies it's not 22 miles, but river miles it's

4   approximately 22.

5          We can move to the next picture, Nicole, please.

6   Oh, I'm sorry.  That would be the March photo, the earlier

7   one.  There, thank you.  This is again to give some

8   perspective.  This was from the contested case hearing.  This

9   was one of the exhibits.

10         THE COURT:  Is that the Yellow Dog Plain, that large

11   football there?

12         MR. ETTINGER:  Correct.  That is the Yellow Dog

13   Plains.  And what distinguishes it is far from the sort of

14   pristine wonderland that the Huron Mountain Club has portrayed

15   in its papers not just today, but as I have lived this case

16   for the past six years.  What this area has been used for

17   primarily for the past hundred-plus years is logging.  That is

18   correct.  And where that little yellow -- it may be hard to

19   spot, Your Honor, but that little yellow dot there in the

20   middle is where the ore body is.

21         And so we would agree that there has been logging

22   activity, and it's even better shown from the next picture,

23   Nicole, please.  Thank you.  And again, the ore body would be

24   over around this area there.  This is the Triple A Road that

25   comes up, and then the outcrop is there.  This is now where

1    the surface facilities are, all around here, and the portal is

2    over here just to the west.  So it's kind of where -- I guess

3    north would be off that way.

4                    THE COURT:  So where is the headwater?  The

5    headwater is where you've got the left circle?

6                    MR. ETTINGER:  They're kind of over here and they

7    kind meander up and there's some wetlands around there.  But

8    as you can see even actively, this area as you can see is

9    still a checkerboard of logging activity.  I don't want to

10   belabor this point because I don't think it's integral to this

11   particular motion, maybe for some motion sometime down the

12   line, but one thing I would take issue is I notice Mr. Addison

13   talks about the fact that the area has been used for logging.

14   We don't disagree with that.  But there's no evidence that

15   that aspect of the Salmon Trout River has ever been used to

16   float logs, which is a much different issue.

17                   THE COURT:  I think there's -- as I recall, this

18   Reinholdt, the historian, Rein --

19                   MR. ETTINGER:  Dr. Greenwald?

20                   THE COURT:  No, Rein -- the fellow that just died.

21   He was a historian in Marquette.

22                   MR. ETTINGER:  Oh, Fred Rydholm.

23                   THE COURT:  Frederick?

24                   MR. ETTINGER:  Fred Rydholm, yes.  Rydholm I believe

25   is his last name if I'm pronouncing it correctly.

1          THE COURT:  Rydholm.  He suggests -- because I read

2     pretty much all his stuff when I was first appointed and he

3     was writing.  In fact, he autographed a couple of them for me

4     and I read them.  He suggested that there was a lot of

5     railroad activity, narrow-gauge railroad activity up through

6     this area at one time and the logging was largely done through

7     railroad.  That was his historical reference, except for when

8     you get down closer to the lakes.  That was his reference as I

9     recall.

10          MR. ETTINGER:  And that would make sense to me, Your

11    Honor.  I have not seen any references in the historical

12    literature or otherwise.  I'm certainly not testifying here

13    today, but I --

14          THE COURT:  No, I'm just making --

15          MR. ETTINGER:  But I don't -- I'm not aware of any

16    floating of logs or using the river for that purpose, which is

17    different from the issue of whether the area was logged.

18    Unquestionably that area has been logged and continues to be

19    logged.  That's the main industry in that area.

20          THE COURT:  But this whole plain, Yellow Dog Plain,

21    is primarily state and paper company and other agriculture,

22    timber-creating lands, are they not?

23          MR. ETTINGER:  That's correct.  There's a lot of

24    state land here.  And again, one of the reasons we had to get

25    a lease was because that area where our surface facilities

1    are and where the outcrop is is state land and continues to be

2    state land.

3              THE COURT:  Wasn't that part of the McCormick tract

4    at one time, some of this?

5              MR. ETTINGER:  I think it's close by.  I don't think

6    it's actually part of the tract, but it's pretty close by.

7    There's a McCormick Road in this area, that's correct, Your

8    Honor.

9              THE COURT:  And what I understand is this area

10   largely -- in this White Dog Plains is largely -- how do I

11   want to say this and be respectful?  The ground is not

12   particularly blessed with having a lot of nutrients in it.

13   It's rather light sand and apparently light stuff.

14             MR. ETTINGER:  Well, it's interesting that you

15   mention that, Your Honor.  Again, just adding some context to

16   this, at the contested case hearing one of the naturalists, I

17   think his name was Kerry Woods, that the Huron Mountain Club

18   had testify, he talked about Aldo Leopold, who was the

19   naturalist that the Club hired back in I think it was the '30s

20   to come up with a plan that's part of their complaint and

21   their preliminary injunction papers.  And this is on Page 7

22   actually of the administrative law judge's decision where he

23   references Aldo Leopold's consideration of the Yellow Dog

24   Plains, and he described the mine area as, quote, "slashed and

25   destroyed," close quote, to such an extent so as to, open

1    quote, "destroy its value as a natural area for scientific

2    study," close quote.  So that was Aldo Leopold back at about

3    the same time that he's working with the Huron Mountain Club.

4              THE COURT:  That was almost a hundred years ago?

5              MR. ETTINGER:  This would have been, yeah, about 80

6    years ago.  I think it was back in the '30s or '40s that he

7    talked about that.

8              THE COURT:  Why hasn't this been reseeded?  I mean,

9    why hasn't this been --

10             MR. ETTINGER:  I don't know, Your Honor.  I

11   honestly don't know.  I think there are a lot of areas around

12   there -- I think part of it has to do with the nature of the

13   land and the geological formations that are in that area.

14   It's a natural plains area.  What's striking to me is that

15   that orthograph that I just showed, I mean, you go to Google

16   Earth, I mean, it's striking how different that area is from

17   the surrounding areas in terms of its features and in terms of

18   how it's been used historically.  It's very different, Your

19   Honor.

20             THE COURT:  But you would be of the belief based

21   upon the previous picture you showed me that this is on the

22   corner of it or it's up in the northern corner of the plains?

23             MR. ETTINGER:  Actually I think it's pretty much --

24   can we go back to that picture real quick, Nicole?  In some

25   ways it's kind of --

1          THE COURT:  Well, no, it isn't.

2          MR. ETTINGER:  -- right in the middle.

3          THE COURT:  Almost in the middle.

4          MR. ETTINGER:  Yeah.  It's right in the middle of

5     it.

6          THE COURT:  In the middle of it, okay.

7          MR. ETTINGER:  And again, my only caveat is that

8     this picture is seven years old, so there will be different,

9     you know, logging activity going on.  The patchwork might look

10    a little bit different today than it did seven years ago.

11         THE COURT:  And the plain is about 15 miles long and

12    about three or four miles wide?

13         MR. ETTINGER:  I think that's about right, Your

14    Honor, correct.  Correct.

15         Just to give the Court some idea of what we've been

16    doing over the past six years, if we go to I think it's

17    Exhibit 4, that's April of 2012, Your Honor, and we showed

18    this picture.  It shows our surface facilities.  We began

19    constructing those facilities after we received our state

20    permits.  We received those permits finally in January of 2010

21    after the contested case hearing, after a final decision and

22    order from the MDEQ.  Four months later, because as you know

23    you can't break ground in January in the Yellow Dog Plains, we

24    broke ground in April, and that's where the surface facilities

25    are now, Your Honor.  That's the state of things.

1            THE COURT:  Where the ore is to be melted is not

2     here; it's offsite?

3            MR. ETTINGER:  It's going to be in Humboldt, Your

4     Honor.  The Humboldt Mill is where it's going to --

5            THE COURT:  How far is that?

6            MR. ETTINGER:  Your Honor, honestly I believe 20 or

7     25 miles, but I could be incorrect about that.  That's I

8     believe to the south, Your Honor.

9            THE COURT:  And that has its own shares of concern

10    because of the nature of the refining process?

11           MR. ETTINGER:  Well, I suppose so, although what

12    we're doing is this is a site that we're rehabilitating that

13    there's been some concern about in the past.  So we've been

14    cleaning it up and then we're going to essentially rebuild

15    it.  And as noted from one of the declarations that we

16    attached from the Humboldt Township super -- I thik it was the

17    clerk, Your Honor, it's going to be quite a boon to that

18    township as well.

19           Nicole, could you please go to the next picture?

20    This just shows -- this was, what, two weeks ago.  This is

21    what we've been doing for the past eight months, Your Honor,

22    after we constructed the portal.  It's not the greatest

23    lighting in the world, but we're underground.  We've been

24    drilling the portal.

25           And if we could just go quickly to the next picture,

1    and this is the sketch that was Exhibit B to the declaration

2    of Adam Burley.  Here's where we were, circling it, in

3    September of 2011 after Judge Manderfield denied the Club's

4    last motion for injunctive relief to stay the construction

5    underground, and then the decline.  We've gone and we're right

6    here, Point 2, as of May 23rd, the date of that picture.

7    We're about 800 linear meters down the decline.  We drilled

8    approximately a thousand linear meters, and the reason for

9    that discrepancy is there's some little outposts here for

10   safety reasons so if there's an issue or something like that

11   in terms of health or safety, we've got these little outposts

12   here.  So we've drilled a few little extra outposts for

13   turnarounds and things like that.  So we are about 800 meters

14   or so down the decline, and that's where we are as of -- that

15   was as of May 23rd.

16           And again, I show these by way of context and I'll

17   refer to them in a few minutes some more, Your Honor, in

18   particular the one that is still up on the screen, and I'm

19   going to try very hard not to repeat anything that Mr. Rosen

20   has already covered.  There are numerous problems with the

21   Club's lawsuit and this preliminary injunction, Your Honor,

22   and I'll try again and rest in large part on our papers.

23           The first point that Mr. Rosen has alluded to in

24   considerable detail is that the Club's pursuing truly

25   unprecedented legal claims.  The second is that the underlying

1    issues here have already been litigated extensively between

2    Kennecott and the Club, and in the reply papers that I was

3    able to review briefly this morning, the Club makes note of

4    the fact that none of the federal defendants were involved in

5    all that litigation.  I'm sure they're very happy about that

6    as well, but the Club was and Kennecott was, and they're

7    trying to stop our project and they're trying to use the very

8    same issues that they've used for the past six years that were

9    already litigated.  And the issues that were already litigated

10   include the issues related to this preliminary injunction

11   motion, Your Honor.

12            As I referred to you a few minutes ago, Your Honor,

13   the Club moved to enjoin underground construction in state

14   court last fall, and it was based in part on concerns about

15   the alleged collapse of the crown pillar of the mine and the

16   alleged impact on surface waters.  And they lost on every

17   injunction factor in circuit court, and we did attach for Your

18   Honor the ruling part of the hearing transcript, the September

19   14th, 2011 hearing transcript before the Ingham County Circuit

20   Court.  And they lost on every factor, including the issue of

21   whether the collapse of the crown pillar and impacts on the

22   Salmon Trout River and wetlands would cause irreparable harm

23   and on the issue related to the significant harm that would be

24   caused to the public if the underground work was stayed.

25            And we've already noted that this has been going on

1    for eight months.  The Club says that these permits are

2    absolute preconditions.  That's mentioned numerous times in

3    their complaint that these permits are absolute preconditions

4    to Kennecott's ability to legally construct or operate the

5    mine.  But another problem -- and Mr. Addison is focusing on

6    laches.  I think we have a valid laches defense, Your Honor,

7    but in some ways for purposes of this motion we can call it

8    laches or we can consider it as part of the four factors that

9    the burden -- that the Club has the burden of proving in this

10   case, that either way there's simply no explanation for their

11   delay in filing this suit.

12          I understand Mr. Addison did not get involved till

13   March, but the Club's been involved from day one, before day

14   one.  They were involved -- Mr. Power, who is one of the

15   affiants in this case, Mr. Power was part of the stakeholder

16   group that actually came up with Part 632, which is the

17   nonferrous metallic mining statute that's been in play that

18   was adopted in 2004.  He was part of that work group and he

19   endorsed the statute that we have gotten permits under, and I

20   think we've referred to some quotes of him in our papers.

21          The fourth problem is a preliminary injunction would

22   cost Kennecott and the local community jobs and millions of

23   dollars.  There's really no dispute about this.  Mr. Addison

24   tries to dispute the significance of that, but you can't

25   dispute the fact of it.  It's going to have a huge negative

1    impact on the Marquette community.

2            I'm just going to try and address a few issues on

3    each prong very briefly, Your Honor.  On the merits, again,

4    I'm not going to address the issue of subject matter

5    jurisdiction.  I think Mr. Rosen has made it quite clear that

6    there's no mandatory duty on the part of the Army Corps to

7    require Kennecott to obtain permits.  Those are discretionary

8    acts, like prosecutorial discretion, I think, as the Heckler

9    v. Chaney Supreme Court case mentions, and there's no legal

10   precedent to support what the Club is suggesting here.

11           I do want to emphasize, and it was actually a point

12   that Mr. Addison made, Kennecott is a private party.  The

13   burden is on us in the sense that if we think we need a

14   permit, the burden is on us to apply for it or not apply for

15   it.  That's up to us.  And if we don't apply for it and

16   somebody thinks we need it, if it's the Army Corps, they can

17   take enforcement action.  They can do all sorts of bad things

18   that Mr. Rosen has already talked about today and in his

19   papers.  But it's not incumbent upon us to ever apply for a

20   permit.  That's true under the Rivers and Harbors Act and

21   that's true under the Clean Water Act.

22           Under the Clean Water Act, again, we don't have to

23   apply for a permit.  And we didn't, by the way, we didn't

24   apply for these permits, Your Honor, because we didn't think

25   we needed them, and I think the contested case has validated

1    the fact we didn't need them.  And I would also like to

2    observe that we certainly didn't keep this a secret that we

3    were not applying for these permits.  Part 632, while it's

4    only dealing with state permits, has a provision in terms of

5    the application that you need to disclose all permits that

6    you're going to seek, state and federal, whether they're under

7    the jurisdiction of MDEQ or not, and we listed all of the

8    permits that we thought we needed.  This was back in February

9    of 2006 in our 10,000-page mining permit application, and we

10   never mentioned a Clean Water Act permit and we never

11   mentioned a Rivers and Harbors Act permit.

12          By the way, we also didn't mention a permit under

13   Part 303 of NREPA, which would be the delegated wetlands

14   permit.  None of those were mentioned.  The entire world,

15   including the Huron Mountain Club, was on notice that we have

16   no intention of seeking those permits.

17          THE COURT:  And your reason?

18          MR. ETTINGER:  Any reason that we didn't think we

19   needed them?

20          THE COURT:  The reason you didn't think you'd need

21   them.

22          MR. ETTINGER:  Because we did not believe that we

23   were going to be impacting -- among others, and there are

24   numerous reasons, but among others would be that we didn't

25   believe that we were going to be impacting the Salmon Trout

1   River or the wetlands that would be far above where the
2   underground mine is going to be.  And again, we believe that
3   was validated by the 42-day contested case hearing.

4          THE COURT:  You had reason to believe at some point
5   that the outflow of the river above would be affected by the
6   excavation below, did you not?  But you concluded as I recall
7   that the ultimate sanitized water treatment water that would
8   be then ingested into the stream would more than make up for
9   what was being lost down.

10         MR. ETTINGER:  That's true, Your Honor, although the
11  numbers that we're talking about are de minimis at best.  So
12  what the administrative law judge found was that the modeling
13  that we did, and we did modeling back in 2006 and then we had
14  it peer-reviewed for purposes of the contested case hearing,
15  and what the modeling predicted was a reduction of six
16  one-hundredths of a foot in stream levels near -- that's right
17  near the ore body, and that's during low flow conditions.  And
18  that's correct that even those de minimis impacts, that would
19  be made up for with the injection of purified water,
20  essentially.

21         THE COURT:  But plaintiff's counsel makes a cogent
22  point.  He makes a point did you not pick the lowest in order
23  to see the least harm done?

24         MR. ETTINGER:  No, we -- actually, I'm glad Your
25  Honor raised this issue.  This again was litigated at the

1    contested case hearing.   Where your --

2         THE COURT:  Was Huron Mountain Club taking the

3    position there was more water coming in than needed?

4         MR. ETTINGER:  They did take that position, and we

5    took the position that the numbers we were using were

6    conservative and reasonable and that the numbers in terms of

7    predicted flow, inflow were ridiculously unreasonable.  And

8    what the administrative law judge ruled on Pages 115 and 116

9    of its decision were that:  "The record establishes, however,

10   that these assumptions," and I could really go on on this, but

11   "that these assumptions to support petitioners'," including

12   the Club, "alternative hypotheses of much higher inflows are

13   not supported by the actual data developed in the field by

14   Kennecott's investigations, and so I find as a matter

15   of fact."  So I understand that that's their claim and that's

16   their allegation, but it's been litigated and they lost, and

17   then they lost again before the circuit who had a chance to

18   review that as well.

19        I'd like to -- again, just going back to the subject

20   matter jurisdiction, I do want to echo a point that was made

21   by Mr. Rosen, which is really because they don't have any EPA

22   claims, there is no subject matter jurisdiction.  And for

23   purposes of this motion, really that should be the end of the

24   matter because, of course, as Your Honor knows, the Court must

25   be satisfied that there is subject matter jurisdiction before

1    issuing a preliminary injunction and for that matter taking

2    any further action.

3         But beyond that I would like to address an issue

4    that's sort of uniquely within my purview relative to the

5    federal government, and it's something that we've already

6    alluded to, and that is that the merits of this lawsuit and

7    this motion have already been litigated over the past six

8    years, and the Huron Mountain Club hasn't just lost once or

9    twice.  They've lost every time.  And I understand that they

10   are saying they have federal claims, and we're not claiming

11   claim preclusion, Your Honor.  What we're talking about are

12   the issues.

13        They're trying to relitigate these same issues under

14   the guise of new federal claims, and essentially what they

15   want to do is pretend that there's a blank slate for purposes

16   of this motion.  We're just going to look at it all over

17   again.  And they can't do that.  It's not about a battle of

18   the experts anymore where they pick out a few folks and we

19   pick out a few folks and say, Here's what they say, here's

20   what they say.  You know, they cherrypick some stuff and say,

21   Well, this is clear that there's a problem here.

22        At the end of the day we have an administrative law

23   judge who, after 42 days of testimony, after a two-day site

24   visit including at the Huron Mountain Club's insistence going

25   to look at the Huron Mountain Club as part of this, that was

1    all part of his ultimate decision was even going up to the

2    site for two days.  After reviewing the record, after

3    determining credibility issues, after reviewing over 500

4    exhibits that were admitted, 60 witnesses, over 1,000 pages of

5    briefing, Your Honor, after doing all of that, he issued a

6    decision and said that Kennecott's mine was going to be

7    protective of the environment, and that was ultimately

8    affirmed in the final decision and order of the Michigan

9    Department of Environmental Quality.

10            But it didn't end there because the Huron Mountain

11   Club and their co-litigants, they appealed that to the Ingham

12   County Circuit Court and Judge Manderfield, and she heard, I

13   think this is a pretty conservative estimate, about seven

14   hours of oral argument on the appeals, which makes her

15   extremely patient, and after that she issued a 100-plus-page

16   decision affirming our Part 632 permit and affirming the ALJ's

17   decision.  So that's the record we have, Your Honor, and I

18   would say at the very least these decisions indicate that the

19   Club is highly unlikely, highly unlikely to succeed on the

20   merits of its claims.  But beyond that, we do think that these

21   rulings collaterally estop the Club from relitigating issues

22   that it's already litigated with Kennecott and lost at the

23   agency and state circuit court levels.

24            And again on the key issues, not to belabor this,

25   but on the issue of the mine not collapsing, the proposal for

1    decision of the ALJ spent 23 pages dealing with that issue,

2    Pages 29 through 52 of the administrative law judge's proposal

3    for decision dealing with that, and the circuit court, Pages

4    10 through 16 of its decision where it said that Kennecott and

5    the Michigan Department of Environmental Quality experts

6    nullified the concerns of petitioners' experts on the issue of

7    whether the mine has a potential to collapse.  And they all

8    ruled that an 87.5-meter crown pillar is stable, safe, and

9    protective of the environment.

10           That's very conservative, Your Honor, because that

11   doesn't even consider -- all the testimony that you've heard

12   about from the Club or you've heard described by the Club

13   doesn't even take into consideration that there's not going to

14   be this open void below the surface because Kennecott is

15   planning to engage in serious tight backfill of the stopes

16   where they're mining the ore body, so it's not going to be

17   some open void.  So that 87.5-meter number and the safety that

18   was considered there doesn't even consider the tight backfill

19   issue.  So that was saying it's safe even if there is an open

20   void.

21           And by the way, there's this notion that this is

22   somehow unprecedented, Your Honor.  I haven't been to the

23   mine, but my understanding is Cliffs has a mine in Ishpeming

24   and that the entire city of Ishpeming is on top of, including

25   several lakes as I understand it, is on top of an underground

1   mine, which by the way as I understand it has not been

2   backfilled.  So the notion that this sort of thing is

3   unprecedented truly doesn't withstand scrutiny, Your Honor.

4          The second issue, the mine won't adversely affect

5   wetlands or the flow of the Salmon Trout River.  Again, just

6   for the record, Your Honor, the proposal for decision, Pages

7   94 through 116 of the ALJ's proposal for decision dealt with

8   that issue and said no impact on wetlands, essentially no

9   impacts on the Salmon Trout River near the ore body,

10  negligible as we just talked about, Your Honor.

11         Pages 29 through 39 of the circuit court opinion,

12  same thing, saying that Kennecott and MDEQ, their experts

13  nullified the petitioners' concerns.  This is all in the

14  record.

15         And then I've already mentioned, Your Honor, again

16  we're not claiming claim preclusion here, but I think it is

17  important to understand that they asked us -- they told us

18  that we needed these state permits under Part 301 and Part

19  303, the state analogues of the RHA and the Clean Water Act,

20  and it was definitively ruled again by the ALJ, by MDEQ, and

21  by the circuit court that these were not necessary.

22         One thing I wanted to correct for the record, and

23  Mr. Addison may just not have been aware of this, on the issue

24  of flora and fauna, endangered species, Your Honor, that was

25  dealt with at Pages 116 through 148 of the proposal for

1   decision that was prepared by the ALJ.  I'm just going to

2   quote two sentences on Page 148 just to make sure the record

3   is clear:  "Accordingly, I find as a matter of fact that no

4   rare, threatened, or endangered species will be significantly

5   affected by the proposed mine.  To the contrary, the record

6   demonstrates that construction and operation of the mine will

7   not significantly affect any species."

8          So the Club tacitly concedes the importance of the

9   state proceedings by relying on them in support of this

10  motion.  But again, it wants to pick and choose and it wants

11  to avoid the ultimate decisions that we believe decisively

12  undercut the Club's assertion that Kennecott needs these

13  permits, and that's beyond the jurisdictional issue, Your

14  Honor.

15          I'm going to rely on our papers as well as the

16  government's argument and the government's papers on the

17  issues of navigability except to say that I truly think what

18  the Huron Mountain Club is proposing here is truly

19  unprecented.  The reason that their clients may not have

20  thought about it is because in their heart of hearts they

21  understand this is unprecedented too.  We're going to be -- we

22  start mining the ore body in 2014.  We're going to be a

23  thousand feet below the surface.  A thousand feet, Your

24  Honor.  And somehow when we start excavating and when we put

25  in backfill a thousand feet below the surface into that

1    bedrock, bedrock like the bedrock that you saw in one of those

2    pictures, the one from May 23rd, that somehow is a discharge

3    into a wetland.

4            I don't want to belabor the point, Your Honor, but

5    these are radical, radical theories that would really turn the

6    underground mining industry and the mining industry as a whole

7    on its head if these theories were ever adopted, and they're

8    unprecedented.  There's no legal support for it.

9            THE COURT:  Well, you start at a thousand, but you

10   come up to about 380, don't you?

11           MR. ETTINGER:  We go up to about a football field

12   length crown pillar, Your Honor, exactly.  That will be at its

13   highest point under the permit we have.

14           I do want to note one irony that may have been lost,

15   which is that the Part 632 permit again that we attached to

16   our papers that Kennecott has actually will provide more

17   protection through the very strict monitoring requirements and

18   mitigation measures that are required than probably will be

19   required under Section 10 of the Rivers and Harbors Act or

20   Section 404 of the Clean Waters Act, and I think the permit

21   speaks for itself on that.

22           With respect to the irreparable harm issue, Your

23   Honor, just four major problems briefly.  One, again, they're

24   really relying on procedural harm at this point, but this harm

25   should be ignored because it's tied to nonexistent federal

```
 1    actions.  And I do want to note I understand that the state
 2    process cannot technically replace NEPA if that were truly at
 3    issue, but I do find their position of procedural harm, if
 4    nothing else, somewhat ironic in light of the process that the
 5    Club and its co-litigants have had over the past six years.
 6              Of course, that procedural injury is not enough in a
 7    vacuum.  It does need to be tied to environmental harm, and
 8    those harms simply are not going to occur for the reasons
 9    we've just discussed.  It's already been ruled that they're
10    not going to occur.  Not just not imminently, ever.  That's
11    what the DEQ ruled and that's what the circuit court has
12    ruled.  So to say it's anything more than speculative would be
13    generous.
14         THE COURT:  Tell me about the monitoring and
15    mitigation requirements that the State places upon the
16    defendants.
17         MR. ETTINGER:  With respect to -- I can refer the --
18    I confess I don't have the permit in front of me, but I can
19    reference a few of them.  With respect to the wetlands issue,
20    conditions L-3 through L-7 are designed to prevent impacts by
21    requiring close monitoring for drawdown and possible
22    mitigation.  There are lots of things you can do to mitigate
23    if you do have drawdown.  Grouting was one example that was
24    mentioned during the contested case hearing.
25              With respect to the issue of subsidence, I would
```

1  refer Your Honor to permit condition E-8 and permit condition

2  L-17.  The permit requires continuous subsidence monitoring

3  once mining begins and the stopes are created, and if this

4  monitoring shows even the possibility of subsidence, Kennecott

5  has to stop at that point.  They have to stop.

6      And again, there are, and the record is replete with

7  this and I apologize for providing the Court with a thumb

8  drive, but in the thumb drive would be the administrative

9  record from the contested case, but it's replete with

10  references that there again, there are common mitigation

11  measures to stabilize rock even under the sort of worse-case

12  scenario that's been posited by the Huron Mountain Club.  Rock

13  bolting is one; use of screens; use of something called

14  shotcrete, which hopefully you won't ask me to describe

15  because I probably couldn't do a very good job of it.  So

16  there are mitigation measures that are possible.

17      With respect to the imminence of the harm -- and

18  Nicole, could you put up the last -- the sketch, please,

19  again?  Again, even if we were take Huron Mountain Club's

20  bombastic factual allegations about the environmental harms

21  that the mine will cause, and back in September when we had

22  the same sort of hearing, the analogy was drawn to BP.  This

23  was going to be the next BP, the next Fukushima.  And

24  nothing's going to happen that hasn't been happening for a

25  long time for a long time.  Again, we're eight months in now

1    and, you know, we're here 800 feet in in terms of our

2    decline.  We're not even going to hit a point where we can

3    begin our secondary egress shaft and our ventilation shaft

4    until the fourth quarter of this year, and that's Point 3 on

5    the sketch.  We're not going to -- and then we're going to

6    spend the next year and a half, essentially, working on again

7    the decline, those shafts, the access ramps to the ore body,

8    and the mill.

9            And so we're not going to be accessing the ore body

10   or mining ore until, as we estimate right now, Point 5, the

11   first quarter of 2014.  So whatever irreparable harm the Club

12   thinks is going to occur, and again, let's credit everything

13   they say for sake of argument, it's not imminent, and

14   certainly this case could be resolved by hopefully the first

15   quarter of 2014.

16           Another issue that I wanted to raise, and again,

17   whether we want to call it laches or just a consideration for

18   this Court as part of the irreparable harm factor is really

19   the stunning delay in seeking the relief that they're sought.

20   There are numerous points over the past six years where the

21   Club could and should have raised these claims if they were

22   serious and they believed that irreparable harm was going to

23   occur, whether it was to their procedural rights or whether it

24   was to the environment.  And as I've thought about this, not

25   only have they not filed a lawsuit, as I understand it I don't

1    think they even called the Corps.  I don't think they did

2    anything with it.

3           So even during the several months that Huron

4    Mountain Club's new counsel has been on the case, nobody

5    called anybody to say, We've got a big problem here.  And

6    meanwhile we continue to spend money, hire people, invest

7    money, invest money in the community.  All of that's going on,

8    and it's just inexplicable, Your Honor.

9           You know, we've mentioned some of those what I would

10   call jump-off points that it would have been logical for them

11   to have raised this sort of claim.  February of 2006 would

12   have been one logical point when we filed our mining permit

13   application and we had to list all the permits that we had to

14   get and we didn't mention those permits.  You know, it was

15   mentioned I believe in the Corps' declaration that they had

16   informed one of the Huron Mountain Club's co-litigants, the

17   Keweenaw Bay Indian Community, that the Corps didn't believe

18   that they had jurisdiction over this matter.

19          Now, I don't know whether or not Keweenaw Bay Indian

20   Community ever communicated that to the Club.  But I do know

21   that they have submitted comments jointly, they have litigated

22   jointly, they have shared counsel.  They have done everything

23   together.  It is mind-boggling to me, Your Honor, that if that

24   was in the thoughts and mind of the Keweenaw Bay Indian

25   Community and their counsel back in 2005, that somebody else

```
 1    couldn't have thought of it and expressed that concern as

 2    well.  January -- April of 2010 would have been another nice

 3    point when we started our above-ground construction.

 4              THE COURT:  Tell me, did Huron Mountain Club have

 5    lawyers representing them in opposition to your client?  Is

 6    that correct?

 7              MR. ETTINGER:  Correct.  It was --

 8              THE COURT:  Were these lawyers environmental

 9    lawyers?

10              MR. ETTINGER:  Yes.  It was Bruce Wallace of Hooper

11    Hathaway.

12              THE COURT:  That's all I need to know.

13              MR. ETTINGER:  Yeah.  April 2010 is when we started

14    our surface facilities.  We're beginning construction of a

15    mine.  We're hiring more people.  That would have been a

16    logical point.

17              June 2011 at the hearing on the Part 632 appeal

18    before Judge Manderfield, it was asked of us by petitioners,

19    When are you planning to start underground construction?

20    We're concerned about that.  Please tell us when.  And I told

21    the Court that we plan to begin underground construction

22    probably around mid-September of 2011.  So at the very least

23    one would have thought, well, that's probably a good time to

24    run into court.  Now we know.  We've got a date.  We've got a

25    date coming.
```

1           September 2011 would have been another good point.

2    They filed a state motion.  When they lost, they didn't

3    file -- when they lost their motion for stay before Judge

4    Manderfield, they didn't seek an interlocutory appeal in the

5    Court of Appeals.  Again, they didn't run into federal court.

6    They didn't talk to the Corps.  They didn't do anything.  They

7    let us begin our underground construction.  They let us invest

8    another $114 million in the project and in the community, and

9    they waited another eight months.

10           There's been discussion of status quo as being one

11   of the requirements, you want to maintain the status quo.

12   Kennecott's underground construction is the status quo in this

13   lawsuit, Your Honor.  Again, we've done a substantial amount

14   of work, and again, $114 million spent since September, a

15   thousand linear miles of drilling.  And if the Club thought

16   this underground work would cause irreparable harm, it sure

17   didn't act like it, Your Honor.

18           I'm not going to spend a lot of time on the balance

19   of the harms.  I do want to note that there was a reference

20   that somehow because they're not bringing APA claims against

21   us and they're trying to exercise jurisdiction against us

22   under the All Writs Act, that somehow the harm to Kennecott

23   doesn't come into play.  We've cited to one case on Page 23 of

24   our brief a 2012 case that suggests that's not the case.

25   There are others, Your Honor, Schiavo ex rel. Schindler v.

1  <u>Schiavo</u>, 403 F.3d 1223, Eleventh Circuit, 2005, that

2  essentially when you're seeking what is basically injunctive

3  relief, that you follow Rule 65, and we believe they need to

4  follow Rule 65 and that the harm to Kennecott when you're

5  seeking this sort of relief is relevant.

6          I'll rely primarily on the tremendous harm that

7  would be caused to Kennecott to the declaration of Adam

8  Burley, in particular Paragraphs 8 through 14, 8 through 14,

9  as well as the declaration of one of its contractors, Mark

10  Immonen, at Paragraphs 6 through 8.  I've already talked about

11  the money that's been invested.  I mentioned $114 million over

12  the past eight months, but thus far total, Kennecott -- and

13  for the U.P., I mean, this is truly just a huge deal, $331

14  million Kennecott has invested in this project.  Three hundred

15  people are working on this project right now, most of them

16  local.

17          A preliminary injunction is going to trigger all

18  sorts of delays, whether it's short or long, that will require

19  Kennecott to lay people off, demobilize equipment, and

20  terminate contracts.  We're talking millions and millions of

21  dollars.  And again, I'm not going to go through the

22  specifics, but I think we've shown from the declarations in

23  our papers that even a minimal delay throws the entire mine

24  schedule, including the Humboldt Mill, into disarray.  Things

25  need to happen on an orderly basis.

1           With respect to the public harm, in addition to the

2     harm that the federal government has already mentioned in

3     terms of how they administer their resources and determine

4     what to enforce and what not to enforce, I think the harm to

5     the public is really unrebutted.  Mr. Addison's trying to

6     diminish it and say kind of these are folks that they've

7     suggested that we've hunted out and, you know, twisted their

8     arm to have them sign these declarations.  These are not

9     people that need to have their arms twisted, Your Honor.

10    These are the people that are going to be affected if this is

11    shut down and they lose their jobs and these people don't come

12    into their businesses anymore and they don't patronize these

13    places.  People are going to get laid off.  People are going

14    to lose money.

15          And that's just in terms of the direct impacts, the

16    capital investment, the jobs.  We don't even get to the local

17    tax revenue, the revenue for state parks that will come from

18    the $60 to $90 million in royalties that come to the state

19    through the State Park Endowment Fund once we're mining the

20    ore body.  These are all significant harms to the public, to

21    the local community, and to the state.

22          So we believe that all of the factors weigh clearly

23    in favor of denying a preliminary injunction and respectfully

24    request that Your Honor do so.  Unless Your Honor has any

25    questions?

1                  THE COURT:   Thank you.   Thank you.

2                  Let's take a brief recess and then we'll proceed.

3     Anything else from the defendants' counsel?   Okay.   We'll come

4     back in a few minutes and proceed.

5                  MR. ADDISON:   Thank you, Your Honor.

6     (Proceedings recessed at 3:37 p.m.; reconvened at 3:52 p.m.)

7                  THE COURT:   You may proceed in this matter, Mr.

8     Addison.

9                  MR. ADDISON:   Thank you, Your Honor.

10                 A couple of quick points off the top.   The

11    government argues that enforcement is discretionary, and

12    that's absolutely correct.   The regs themselves, 33 C.F.R.

13    326, at the start of that says that nothing in this part 326

14    on enforcement is non-discretionary and that enforcement is

15    discretionary.   Of course, we aren't seeking enforcement.   We

16    reference 326 nowhere because we're not seeking enforcement,

17    and once again, what we're seeking is for the Corps to perform

18    its mandatory duty under Section 403 of the Rivers and Harbors

19    Act and its own regulations that say Congress delegated the

20    Corps the duty to authorize or permit activities that would be

21    in conjunction with the Rivers and Harbors Act.

22                 As I mentioned before, Your Honor, during our

23    earlier presentation that particular statement, quote,

24    "Congress has delegated to the Secretary of the Army in

25    Section 10 of the Rivers and Harbors Act the duty to authorize

1    or prohibit certain work or structures in navigable waters of

2    the U.S. upon recommendation of the Chief of Engineers."  We

3    don't disagree with the government that we only have

4    jurisdiction if there's a mandatory duty.  We just disagree

5    over whether they have that mandatory duty.  And the

6    determining factor is not the interpretation of me or counsel

7    for any other party.  It's what these regs say, and they

8    establish along with Section 403 a mandatory duty.

9            Now, that is distinguishable from enforcement.  When

10   you go to the Corps' site, enforcement, regulatory, the

11   permitting process is regulatory, and so it's not

12   enforcement.  And we would suggest to the Court that that is a

13   mandatory duty.

14           The government also argued and Kennecott apparently

15   argued that in the Clean Water Act context we don't really

16   have an APA claim because of the citizen suit provision.  And

17   I've already noted, of course, that we do not have a Clean

18   Water Act claim against the government because they have not

19   violated an effluent limitation under 1365(a)(1) and they are

20   not the administrator under 1365(a)(2).  The Southern District

21   of Ohio took up this exact same issue and found that there was

22   the mandatory duty and that it would justify injunctive relief

23   against the private party.

24           One other point.  As recently as March the 21st the

25   Supreme Court issued the Sackett decision.  In that decision

```
 1   they were fighting over a puddle, and Sackett said this isn't
 2   jurisdictional and the government issued them an order saying
 3   you can't fill these wetlands, and the Court, the Supreme
 4   Court once again endorsed that the proper vehicle for
 5   challenging what a party believes to be arbitrary, capricious,
 6   or conduct not in accordance with law by an agency is the APA,
 7   and that's Sackett v. EPA.  I only have the slip opinion, but
 8   it's number 10-1062.
 9           THE COURT:  That isn't the Southern District of Ohio
10   case?
11           MR. ADDISON:  No, this is the U.S. Supreme Court
12   case.
13           THE COURT:  Which is the Southern District of Ohio
14   case?
15           MR. ADDISON:  Sir?
16           THE COURT:  Which is the Southern District of Ohio
17   case?
18           MR. ADDISON:  The Southern District of Ohio, Western
19   Division, is the Sayler Park Village case, which is at a
20   Westlaw site, Your Honor, 2003 Westlaw 22423202.  And then
21   the Sackett decision, the completion of that was it's case
22   number 10-1062 decided March 21st.
23           THE COURT:  Okay.
24           MR. ADDISON:  And so we do have a cause of action.
25           Now, we admit the issue of navigability is a
```

1    complicated one that has cross-currents, so to speak, going

2    every direction.  And here's where we see it come out just so

3    I want to be sure the Court is clear of our position.

4            Number one, the first two miles upstream from Lake

5    Superior have been admitted to be navigable.  That's number

6    one.

7            Number two, are there other areas further upstream

8    that are navigable?  And that's where the evidence we've put

9    forward to the Court particularly concerning commercial or

10   recreational craft putting in at the Dodge City Road 550 point

11   is one of the indicators of navigability.  So we argue, we

12   argue it's navigable all the way to the headwaters because

13   they have to be protected under this phrase "other waters" in

14   Section 403.  But if it doesn't extend that far, how far it

15   extends is important because if they affect a water of the

16   U.S. -- I'm sorry, if they affect a navigable water, its

17   capacity, its course, or its location, that's a violation.

18   That's actionable.

19           So even though Mr. Brockman -- I'm sorry, Mr.

20   Brockman, Mr. Workman, Kennecott's expert, testifies water

21   that starts up in the headwaters eventually ends up in Lake

22   Superior, once again this is Mr. Workman, their expert, Page

23   5675-5676 of the hearing transcript, he acknowledges the

24   waters that start there will end up in Lake Superior.  Now, so

25   where that navigability ends is of importance because it could

1    play a factor in whether or not a navigable water is affected.

2    However, all we have to demonstrate here is whether or not

3    that water has been affected, and frankly, Your Honor, when

4    they drain the headwaters and they change the flow, the

5    capacity and the condition are affected.  That is a violation

6    without a permit no matter what else they do.

7            Now, they're not just affecting it that way, but

8    they're affecting it by adding this other water.  No evidence

9    of when, how much, how often, or its impact on species, the

10   river itself.  So we argue that's a violation.

11           Next point, Judge -- Your Honor, and with all due

12   respect, everyone who participated throughout these state

13   proceedings, while the facts adduced in those proceedings are

14   relevant, the decisions that were made are not.  And the

15   reason why is that that is not a federal proceeding under the

16   Clean Water Act, the Rivers and Harbors Act, NEPA, the

17   Endangered Species Act.  There is no jurisdiction in state

18   court to determine those issues.  If they were evaluated in

19   any other context than the federal statute and the federal

20   court's jurisdiction, they have no impact as far as the

21   decision.

22           It's not collateral estoppel because we didn't

23   litigate the issue.  We didn't litigate violation of the

24   Endangered Species Act.  They litigated something having to do

25   with a mining permit and endangered species.  To determine

1    based on the rulings in the state court decision that there

2    are no impacts and the like would be to usurp our cause of

3    action in federal court, and that is inappropriate and should

4    not be done.

5         Now, everybody's criticizing us because they're

6    saying we're extreme and radical and the like in how we've

7    determined jurisdiction.  And first off, as we discussed

8    earlier for the RHA, you've got this kind of scenario.  I

9    apologize for the crude drawing.  You theoretically have an

10   ordinary high water mark here.  You have an ordinary high

11   water mark here.  This is the Salmon Trout River.

12   Theoretically this is the mine, and all that distance is

13   between here.

14        Under the RHA, it specifically says in the Corps'

15   reg that they declined to follow that everything including the

16   bed, the water, and all the land below it is jurisdictional

17   vertically.  It may be different horizontally with respect to

18   this navigability, but for purposes of vertical jurisdiction,

19   and this is where this comment came in our brief, RHA is

20   coextensive with the Clean Water Act.  That's how it's phrased

21   here.

22        Now, one other point.  There was some discussion of

23   exactly where the mine ore is located in connection with the

24   Salmon Trout River, and I've got a visual of it that I may be

25   able to find, Your Honor, I do, and can put it up on the Elmo,

1    and when it warms up, we'll come back to it.  But the point I

2    want to make, Your Honor, is that according to the drawing

3    produced by Kennecott Eagle Minerals which is now up on our

4    screen, we have the Salmon Trout River and its wetlands, and

5    you'll see down below they are in blue, and we have the ore

6    body which is that red circle.  The ore body is under --

7    partially under the Salmon Trout River according to this and

8    totally under the wetlands associated with it, which are the

9    headwaters for the Salmon Trout River, and that's important

10   because it actually is under those waters if the Court finds

11   they're navigable.

12          Now, I mentioned the jurisdiction under the RHA, and

13   that's in the regulation we had referred the Court to earlier,

14   and it's really not any different under the Clean Water Act.

15   And the reason for that is with the same drawing, ordinary

16   high water mark, ordinary high water mark, the Clean Water Act

17   vertical jurisdiction says the Corps has jurisdiction on

18   everything under the ordinary high water mark.  It does not

19   address the land below it.  It just says that.

20          However, there are other reasons why there's

21   jurisdiction down that far under the Clean Water Act, and

22   they're twofold.  One is interstate commerce is going on down

23   here, and jurisdiction under the Clean Water Act follows

24   interstate commerce.  Number two, they've admitted what

25   they're doing down here is going to affect these wetlands up

 1       here and this water of the U.S. by the drawdown.

 2              In addition to that, 1344 says specifically:  "Any

 3       discharge of dredged or fill material into the navigable

 4       waters incidental to any activity having as its purpose

 5       bringing an area of the waters into a use to which it has not

 6       been previously subject, where the flow or circulation of

 7       navigable waters may be impaired or the reach of such waters

 8       be reduced, shall be required to have a permit."  Now, these

 9       folks on the other side say, There's no dredging going on

10       here.  There's no filling going on down here, and even if it

11       is, it doesn't matter.

12              Well, not right.  Under their regs, the water of the

13       U.S. extends down here.  When they're engaged in activity down

14       here, under their own regs, that is the defined -- that area

15       below the water, it's defined to be a water of the U.S.  So

16       when they excavate -- and by the way, on the Corps' Web site

17       they have a bunch of educational materials, and one of them is

18       on dredging.  And in defining dredging, the very first thing

19       they say, second paragraph, "Underwater excavation is called

20       dredging."

21              Let's talk about dredging a second because filling

22       is easy.  They've admitted they're building these stopes.

23       They've admitted they're putting that material back in here,

24       which is fill.  If this is a water of the U.S., they are

25       filling it.

1          Here's the deal on dredging.  Conventional dredging,

2     of course, Your Honor, everybody's familiar with it.  You've

3     got a waterbody -- whoops.  We're going to look at it

4     horizontally.  We've got a waterbody here, and if you want to

5     have a canal, if you want to have a route to an oil well

6     offsite, you normally go in and you dredge up here at the bed,

7     at the surface, and you normally enter that way.  But that

8     does not mean that dredging isn't underwater excavation that

9     starts here and goes up.  That's also dredging.  Now, why is

10    that also dredging?  Because dredging is underwater

11    excavation, and we are under the water.

12          Another example.  Suppose we got the Big Dig in

13    Boston, something else like that, and they go down and they go

14    down and they go down.  All of that's jurisdictional.  And

15    it's not just because they're going down.  It's because

16    they're in a water of the U.S.  Well, when they dredge and

17    pull all this stuff out, and this is defined by their own regs

18    to be a water of the U.S., that's dredging.  When they stick

19    their stopes back in, that is the redeposit of dredge fill, of

20    dredged fill.

21          It also includes a, quote, "addition of pollutants"

22    because in their materials they say that these rocks that are

23    going to make up most of the stope aren't properly solidified,

24    so they have to add concrete, they have to add lime, Portland

25    cement to it to make it an effective stope.  And so

1    everybody's talking about how unreasonable and wild our suit

2    is and how we define things.  We define them how the Corps

3    wrote them.  They're not following their regs.  They have a

4    duty to follow their regs.

5            Now, the rubber does meet the road on navigability.

6    But what we're going to find is under the Rivers and Harbors

7    Act, because the water gets all the way to Lake Superior, that

8    it is affected by this drawdown and by the contribution of

9    water they plan to make that they don't even define.  There's

10   no evidence that gets perfectly offset.  There's no evidence

11   those two activities don't change the capacity and the

12   condition of the part of the river that is navigable, and

13   we've demonstrated that does.

14           Now, in addition to that, Judge, they wave off

15   everything as de minimis, and maybe it's 60 gallons per

16   minute, and in the winter it is.  Who knows?  I don't.  We

17   don't have to show that.  We only have to show it affects it.

18   When they don't study what happens with 210 gallons or some

19   larger amount, we don't know the answer.  Their own experts

20   say that's a possibility.  They had to look at it.

21           The more they draw down, the greater the effect, and

22   they don't look at the potential effects.  What we do know is

23   they admit that even at 60 gallons per minute, it's going to

24   diminish the flow in the Salmon Trout River by 3.3 percent.

25   The notion, by the way, that there is some Saint Salmon River

1    perched over the river that's going to add that contribution

2    they removed back in is just inaccurate.  Whatever is

3    occurring downstream is occurring downstream whether they pull

4    the water out or not unless it affects it so much that it

5    changes it, which proves our point.

6         But the notion that it all gets mixed really doesn't

7    make any sense because if you remove it from the headwaters,

8    it affects the entire river by definition.  Has to.  The fact

9    that they do something here or there can be debated, should be

10   studied as a part of the permit process, but it doesn't

11   diminish the fact that their conduct is affecting a water, a

12   navigable water, whatever part of that river is navigable.  We

13   say it extends all the way to the headwaters if not to Dodge

14   City, I guess if not to the two-mile point.

15        When you look at the Corps' regs, they clearly

16   contemplate that at the end of these rivers are marshlands as

17   they say in their reg.  There are marshlands and other bodies

18   that do not -- that are not technically navigable, but we're

19   going to determine they're navigable by law because we have to

20   protect them, and that's our position.  If we're wrong, then

21   we can be told.  But when you look at the regs, this all falls

22   within them.

23        A couple of times our opponents suggested that we

24   are telling Kennecott to go get a permit.  We are not telling

25   anybody to get a permit.  We are saying that the Corps has to

1    administer the permit program that they have a mandatory duty

2    to administer.

3          What happens within that program is in the

4    discretion of the Corps, whether they grant the permit,

5    whether they issue the permit.  But it is clear from the

6    regulations they have to administer that program.  If they

7    didn't have that mandatory -- Congress gave them that

8    mandatory duty, and if they didn't have it, we would have no

9    one -- we would have no permitting program because it would be

10   discretionary.

11         And I might add also a number of these cases suggest

12   that that mandatory duty should be determined in light of the

13   Act's purpose to protect the biological diversity and the like

14   of waters of the U.S. around the country.  And so we would

15   suggest to the Court with respect to that that they have the

16   mandatory duty.

17         Once again, and I think the Court has heard this,

18   but I just have got to raise it once more, this is a no-permit

19   case.  That's really different from a permit case.  You know,

20   if they had gone through the process, we would be here

21   claiming, if it were true, that they failed in that process.

22   But they didn't go through it.  And so the balancing of the

23   harms in all these no-permit cases is very different from that

24   described by my opponents.  And the reason why is when you

25   jump the gun and you work without a permit that's required,

1    then it's your burden.  That's self-inflicted harm.  We don't

2    have to bond it and we don't have to balance it because it's

3    their harm.

4         A lot has been said about laches, and I do want to

5    mention the Sixth Circuit case again, <u>Environmental Defense</u>

6    <u>Fund v. Tennessee Valley Authority</u>, 468 F.2d 1164 at 1182, a

7    1972 case.  This has been the law in the Sixth Circuit on

8    laches.  "Consideration of the public interest also requires

9    us to reject the defense of laches.  The strong policy

10   embodied in NEPA concerning the importance of agency

11   consideration of environmental values militates against

12   barring this suit on the ground of unreasonable delay."

13        It then cites the <u>Volpe</u> decision, 458 F.2d at

14   1329-1330.  That's 458 F.2d at 1329-1330, "although the delay

15   undoubtedly will affect the ultimate decision whether to

16   proceed with the project as planned.  There is also the public

17   interest in requiring public officials to obey statutory

18   mandates:  'The tardiness of the parties in raising the issue

19   cannot excuse compliance with NEPA; primary responsibility

20   under the Act rests with the agency,'" citing <u>City of New York</u>

21   <u>v. U.S</u>.  The Sixth Circuit went on to say:  "These

22   considerations may in part explain why courts have not been

23   receptive to foreclosing litigation on the issues raised in

24   this appeal on the ground of plaintiffs' delay in bringing

25   suit."

 1          As I mentioned, Your Honor, we may be late, but

 2     everyone else is later.  We don't have the duty to get a

 3     permit.  We don't have a duty to administer a program.  And we

 4     will find that our case is not subject to the doctrine of

 5     laches, the statute of limitations, because once again, they

 6     violate the law every day.

 7          The public interest.  Counsel for the government

 8     mentioned the public interest also has an interest in

 9     following statutes, and we certainly agree with that and we're

10     encouraging the government to follow it here.  And it also has

11     an interest in following the regs as outlined, and that public

12     interest favors Huron Mountain Club rather than defeats it.

13          Oh, one other point and then I'll close, Your

14     Honor.  The other side didn't spend much time talking about

15     endangered species, but an APA claim raising the Endangered

16     Species Act, like the Rivers and Harbors Act, like the Clean

17     Water Act, is a valid claim.  And regardless of the state

18     court's finding about endangered species, there has never been

19     the proper mandatory required procedural consultation,

20     biological assessment, and ultimately biological opinion

21     because of the numerous endangered species that Kennecott's

22     witnesses admit are on the site.

23          And in connection with that, the investigation under

24     NEPA has to apply to the affected area.  Not to the plant

25     site, not to some pretextual area that's been determined based

1    on anything other than how these species are affected.  That

2    study has also never been performed.

3            So in closing, it is Huron Mountain Club's position,

4    Your Honor, that our APA claim is perfectly valid and

5    legitimate.  It can be brought, goodness knows, without a

6    private right of action under NEPA or under the RHA.  It can

7    be brought even though there's a citizen suit provision under

8    the Clean Water Act.

9            Part of the Salmon Trout River at the least is

10   navigable.  That portion that is navigable, whether it's the

11   entire reach or whether it's a portion of that reach or

12   whether it's two miles, is being affected by the structure

13   that's being built by Kennecott.  It doesn't matter if it's 20

14   feet away or 22 miles away.  If their structure is affecting

15   that water, that's a violation.  The Corps had a duty to

16   either authorize or prohibit that structure in that location

17   if it's going to affect it.

18           If this Court finds that -- oh, and one other

19   point.  Once again, Judge, under 1344, this delegation to the

20   state is not of the entire river.  It's not of the entire

21   Salmon Trout River.  It only extends to those portions that

22   are not navigable waters.  And the exact language of that

23   under 1344 is found in Paragraph (g) where it says:  "The

24   Governor of any State desiring to administer its own

25   individual and general permit program for the discharge of

1    dredged or fill material into the navigable waters (other than

2    those waters which are presently used, or are susceptible to

3    use in their natural condition or by reasonable improvement as

4    a means to transport interstate or foreign commerce shoreward

5    to their ordinary high water mark, including all waters which

6    are subject to the ebb and flow of the tide shoreward to their

7    mean high water mark, or mean higher high water mark on the

8    west coast, including wetlands adjacent thereto.)"

9            So depending upon this Court's determination of

10   navigability, this entire stream may not be under -- it is

11   not, the two miles definitely are not under the jurisdiction

12   of the State of Michigan, and to the extent navigability

13   extends upstream, neither are those portions.  That does

14   affect our Clean Water Act claim, Your Honor.  We acknowledge

15   that.  If the waters of the U.S. that are navigable do not

16   extend all the way to the headwaters, then those headwaters

17   have been delegated to the state.  But once again, under

18   Section 403 of the Rivers and Harbors Act, it prohibits the

19   building of these structures in a water in a navigable river

20   or other water of the United States.  The other water -- the

21   most important other water of the United States that that

22   could be are headwaters because the tampering with them

23   affects the entire river.

24            If there are no further questions, thank you, Your

25   Honor.

1              THE COURT:  Thank you.  Thank you.  I will get to

2    this matter as soon as I am able to and you will hear from

3    me.

4              If as you return to your respective offices or are

5    trying to get to sleep tonight and a great idea strikes you

6    and you realize you didn't put it forth originally, probably

7    in the next five days or so you can brief me on it if

8    something comes to you all of a sudden, which it always did to

9    me when I was in trial practice.  My best thoughts came the

10   night afterward.  If that occurs, just send them to me and

11   I'll take those up with the rest of this.

12             Thank you.  Thank you, all of you.

13                  (Proceedings concluded at 4:20 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

I do further certify that the foregoing transcript was prepared by me.




/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503