UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


HURON MOUNTAIN CLUB,

       Plaintiff,

                                 File No.  2:12-CV-197

v.

                                 HON. ROBERT HOLMES BELL

UNITED STATES ARMY CORPS OF
ENGINEERS, et al.,

       Defendants.

_____/


**O P I N I O N**

      This action to enjoin Defendant Kennecott Eagle Minerals Company from constructing and operating a nickel and copper mine in Marquette County, Michigan is before the Court on Plaintiff Huron Mountain Club's motion for preliminary injunction. (Dkt. No. 3.)  For the reasons that follow, the motion will be denied.

**I.**

      Plaintiff Huron Mountain Club (the "Club") is a Michigan non-profit corporation founded in 1889 as a family retreat and wildlife preserve. (Compl. ¶¶ 1, 2.) The Club owns approximately 19,000 acres of  property in Marquette County, Michigan, including an eleven-mile stretch of the Salmon Trout River which empties into Lake Superior at the northeast corner of the Club's property.  (Compl. ¶ 47.)

      The Club's property is approximately 3.3 miles downstream of a nickel and copper

mine (the "Eagle Mine") that is being constructed by Defendant Kennecott Eagle Minerals Company ("Kennecott").  Kennecott will use a "longhold stope" method of extraction which involves the removal of ore in vertical sections from the bottom of the ore body upward (from 1000 feet to 350 feet below the surface).  Kennecott will support the mine with a thick crown pillar to prevent collapse of the tunnel, and backfill the mine areas with cemented rock and waste rock.  The Eagle Mine is expected to produce approximately 230 million pounds of nickel, and 230 million pounds of copper.  (Burley Decl. ¶ 3.)  Portions of the Eagle Mine will be located beneath the Salmon Trout River and its corresponding wetlands.

In February 2006 Kennecott submitted applications to the Michigan Department of Environmental Quality ("MDEQ") for nonferrous metallic mining, groundwater discharge, and air use permits.  (Fed. Def. Ex. 1 & Ken. Ex. 18, Op. Aff'g Part 632 Permit 3.)  The Part 632 mine permit application was more than 10,000 pages in length, and included a comprehensive Environmental Impact Assessment ("EIA") pursuant to Mich. Comp. Laws § 324.63205.  (Ken. Ex. 1, Tabs 123-54, Bates pp. 7424-17569.)  On December 14, 2007, after almost two years of review and opportunities for public participation, the MDEQ granted Kennecott a Part 632 permit to engage in the mining of nonferrous metallic minerals. (Ken. Ex. 3, Mining Permit).  The permit includes special conditions requiring Kennecott to monitor water elevations and water quality.  (Ken. Ex. 3.)

Plaintiff, together with the National Wildlife Federation, the Keweenaw Bay Indian Community, and the Yellow Dog Watershed Preserve (the "Petitioners"), petitioned for a

contested case hearing to challenge the mining permit and groundwater discharge permits. (Ken. Ex. 10, Pet. for Contested Case Hr'g.) On August 18, 2009, following 42 days of testimony over a two-year period, an Administrative Law Judge issued a Proposal for Decision in favor of Kennecott, based on his conclusion that the mine would not adversely affect the wetlands or the river, and that the mine was well-protected against collapse. (Ken. Ex. 1, Tab 96.) On January 14, 2010, the MDEQ issued its Final Determination and Order ordering the Part 632 permit to be issued. (Ken. Ex. 1, Tab 118.) The Petitioners appealed the MDEQ's Final Determination and Order to the Ingham County Circuit Court. On November 21, 2011, the Ingham County Circuit Court affirmed the MDEQ's decision to grant Kennecott's Part 632 permit. (Ken. Ex. 18, Op. Aff'g Part 632 Permit 9.)

Kennecott has completed substantial surface operations at the Eagle Mine, including construction of an administrative office building, a water basin, a waste water treatment plant, a treated water infiltration system, a development rock storage area, a portal to the mine, roads, and a parking lot. The surface operations are 3/4 miles to the east of the ore body. On September 18, 2011, Kennecott began underground construction of the mine portal and a decline from the mine portal diagonally west to the ore body. (Burley Decl. ¶ 5.) To date, Kennecott has drilled approximately 1,000 linear meters of the decline. Kennecott will not reach and begin mining the ore body until 2014. (*Id.*) The project currently employs approximately 300 people. (*Id.* at ¶ 6.)

In August 2011, the Petitioners filed a motion in the state court action to enjoin the

underground construction based on their contention that the mine "will likely leak, fail, and collapse, spewing toxic sulfuric acid throughout the Yellow Dog Plains, the Salmon Trout River, and into Lake Superior."  (Ken. Ex. 15, Br. re Mot. for Stay 2.)  On September 14, 2011, the state court denied the Petitioners' motion for stay because there was no showing of imminent irreparable injury to Petitioners based on the crown pillar strength, drilling below the Eagle Rock outcrop, or the discharge of acid rock drainage into the aquifers, and because there would be a significant harm to the public if the stay were granted.  (Ken. Ex. 16, Tr. re Mot. for Stay 94-97.)

Plaintiff filed this federal action on May 6, 2012, against the United States Army Corps of Engineers (the "Corps"), the United States Department of the Interior, and the United State Fish and Wildlife Service (the "Federal Defendants") and against Kennecott. Plaintiff alleges that construction and operation of the Eagle Mine will affect the navigable waters of the Salmon Trout River by drawing down water from the River and wetlands, decreasing the River's flow, changing its temperature, and decreasing the reach of the River and its adjacent wetlands.  Plaintiff contends that Kennecott's subsurface construction implicates permitting requirements under federal law, specifically, the Rivers and Harbors Appropriations Act ("RHA"), 33 U.S.C. § 403, and the Federal Water Pollution Control Act, commonly known as the "Clean Water Act" ("CWA"), 33 U.S.C. § 1344. Plaintiff also contends that any putative permit under the RHA and the CWA constitutes "major federal action" mandating detailed environmental and cultural investigations, consultations, and

4

assessments under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332; the Endangered Species Act ("ESA"), 16 U.S.C. § 1531; and the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470a, which must be completed by federal agencies before an RHA or CWA permit can be issued.

Plaintiff contends that the Corps has abdicated its statutory responsibilities under the RHA, the CWA, and their implementing regulations by failing to require Kennecott to submit to RHA and CWA permitting proceedings. (Compl. ¶¶ 199, 206). Plaintiff seeks preliminary injunctive relief directing the Corps to fulfill its permitting responsibilities under the RHA and the CWA, and prohibiting Kennecott's continued construction of the Eagle Mine without first submitting to permitting procedures mandated by the RHA and the CWA.

## II.

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries [its] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). In deciding whether to grant a preliminary injunction, this Court considers:

> (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief.

*Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010) (quoting *Nightclubs, Inc.*

5

*v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001). Although no one factor is controlling, a finding of no likelihood of success on the merits "is usually fatal." *Abney v. Amgen, Inc*, 443 F.3d 540, 547 (6th Cir. 2006) (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)).

## A. LIKELIHOOD OF SUCCESS ON MERITS – FEDERAL DEFENDANTS

Plaintiff seeks preliminary injunctive relief against the Federal Defendants pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, or, in the alternative, the Mandamus and Venue Act ("Mandamus Act"), 28 U.S.C. § 1361.[1] "When a petitioner seeks both mandamus relief and relief under the APA, courts apply the same principles and standards both to determine jurisdiction and to assess the merits." *Nelson v. United States*, 107 F. App'x 469, 471 (6th Cir. 2004).

The APA authorizes judicial review of agency action, "except to the extent that . . . agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[2] In addition,

---

[1] Although Plaintiff also asserts jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, (Compl. ¶ 41), the Declaratory Judgment Act does not create an independent cause of action and cannot serve as an independent basis for federal subject matter jurisdiction. *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)); *Mich. S'ern R.R. Co. v. Branch & St. Joseph Cntys. Rail Users Ass'n., Inc.*, 287 F.3d 568, 575 (6th Cir. 2002).

[2] The Mandamus Act, like the APA, is available only when a government defendant has failed to perform a nondiscretionary duty. *See Heckler v. Ringer*, 466 U.S. 602, 616
(continued...)

6

to be reviewable, the agency action complained of must be a *final* agency action.  5 U.S.C. § 704.  Plaintiff's claims against the Federal Defendants are based not on their actions, but on their *failure* to act.  *See* 5 U.S.C. § 706 (giving the reviewing court authority to compel agency action unlawfully withheld or unreasonably delayed).  Where a claim is based on an agency's *failure* to act, the suit "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original) (discussing claims under 5 U.S.C. § 706(1)).  "The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ."  *Id.* at 65.

## 1. <u>Permitting Requirement</u>

The Federal Defendants contend that Plaintiff's claims against them cannot proceed because the actions Plaintiff seeks to compel –  that the Federal Defendants demand that Kennecott seek permits under the RHA and the CWA, and that they otherwise enforce the requirements of the federal statutes against Kennecott – are discretionary actions, and neither the APA nor mandamus provide a remedy against a federal agency for failure to perform a discretionary act. [3]

---

[2](...continued)
(1984) ("The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty.").

[3]Defendants have framed their argument in terms of the Court's lack of subject matter jurisdiction. *See Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996) ("[C]ourts (continued...)

Plaintiff contends that because Kennecott's activities will result in the alteration of navigable waters and the discharge of materials into navigable waters, the federal Defendants have a duty to require Department of the Army permits under section 10 of the RHA and section 404 of the CWA. Plaintiff contends that § 10 of the RHA and § 404 of the CWA require the Corps to assert permitting authority and to make a permit decision even when a party has not applied for a permit. (Pl.'s Reply Br. 2-4.)

**a. Permitting Authority under RHA § 10 and CWA § 404[4]**

Plaintiff alleges in its complaint that the RHA and the CWA impose "mandatory duties to initiate preconstruction permitting proceedings" before Kennecott is allowed to engage in regulated work at the Eagle Mine. (Compl. ¶ 73.) According to Plaintiff, the Federal Defendants had a duty to either authorize or prohibit Kennecott's activities, but did neither. Plaintiff requests the Court to instruct the Corps that it cannot ignore its congressionally mandated responsibilities to administer the RHA and CWA permitting programs when the facts prove the Corps' jurisdiction has been triggered. (Dkt. No. 34,

---

[3](...continued)
do not have subject matter jurisdiction to review agency actions that are 'committed to agency discretion by law.'"). In light of Supreme Court cases subsequent to *Madison-Hughes*, it is not clear that the APA's prohibition on judicial review is a matter of subject-matter jurisdiction. *See McCarthy v. Middle Tenn.Elec. Membership Corp.*, 466 F.3d 399, 406 n.9 (6th Cir. 2006).

[4]It is undisputed that Plaintiff's claims under NEPA, ESA and NHPA are derivative of its claims under the RHA and the CWA. Accordingly, the Court begins by analyzing Plaintiff's claims under the RHA and the CWA.

Resp. Br. 4.)

The Court looks to the statutory language to determine the nature of the Corps'

permitting authority. Section 10 of the RHA provides:

> [I]t shall not be lawful to excavate or fill, or in any manner to alter or modify
> the course, location, condition, or capacity of, any port, roadstead, haven,
> harbor, canal, lake, harbor or refuge, or inclosure within the limits of any
> breakwater, or of the channel of any navigable water of the United States,
> unless the work has been recommended by the Chief of Engineers and
> authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403. The authorization required in Section 10 is a permit issued by the Corps.

*See* 33 C.F.R. § 320.2(b) ("The instrument of authorization is designated a permit."); 33

C.F.R. § 322.3(a) ("[P]ermits are required under section 10 for structures and/or work in or

affecting navigable waters."); 33 C.F.R. § 322.5 ("The Secretary of the Army has delegated

to the Chief of Engineers the authority to issue or deny section 10 permits.")

If a permit is not obtained before work subject to § 10 is initiated, the Corps is

authorized to bring an enforcement action. *See* 33 U.S.C. § 406 (providing that violation of

§ 403 of the RHA is a misdemeanor, punishable by a fine or imprisonment, and that removal

of the violating structure may be enforced by an action for injunctive relief).

Section 404 of the Clean Water Act provides:

> The Secretary may issue permits, after notice and opportunity for public
> hearings for the discharge of dredged or fill material into the navigable waters
> at specified disposal sites. Not later than the fifteenth day after the date an
> applicant submits all the information required to complete an application for
> a permit under this subsection, the Secretary shall publish the notice required
> by this subsection.

33 U.S.C. § 1344(a). CWA § 404 permits are also issued by the Corps. *See* 33 C.F.R. § 323.3(a) ("DA [Department of the Army] permits will be required for the discharge of dredged or fill material into waters of the United States."); 33 C.F.R. § 323.6(a) ("The Secretary of the Army has delegated to the Chief of Engineers the authority to issue or deny section 404 permits.").

An individual who discharges without a § 404 permit is subject to the total prohibition expressed in CWA § 301, 33 U.S.C. § 1311. If the discharge is found to be in violation of CWA § 301, the discharger may be subject to administrative, civil, and criminal enforcement proceedings.[5] 33 U.S.C. § 1319; *see also Bravos v. E.P.A.,* 324 F.3d 1166, 1174 (10th Cir. 2003); *Natural Res. Defense Council, Inc. v. Costle*, 568 F.2d 1369, 1375 (D.C. Cir. 1977).

The RHA and CWA's implementing regulations require that the Corps be "available to advise potential applicants," 33 C.F.R. § 325.1(b), that it process applications received, 33 C.F.R. § 325.2, that it give public notice of permit applications, 33 C.F.R. § 325.3, and that it add any necessary conditions to the permit, 33 C.F.R. § 325.4. However, the regulations contain no language authorizing or requiring the Corps to order the filing of a permit application when a private party engages in work subject to RHA § 10 or CWQ § 404.

Under both RHA § 10 and CWA § 404, Congress placed the burden of applying for a permit on the project proponent, who proceeds without a permit at his own risk. Congress has not placed any obligation on the agency to initiate the permit process. Although the

---

[5]The Environmental Protection Agency ("EPA") is the agency primarily tasked with enforcement of CWA violations. *See* 33 U.S.C. §§ 1251(d), 1319.

Corps is required to process permit applications, this duty arises only when a permit application is filed.

Kennecott did not file a permit application under either the RHA or the CWA. Accordingly, the Corps' duty to process a permit application was not triggered. For this reason, Plaintiff's reliance on *Marathon Oil Co. v. Lujan*, 937 F.2d 498(10th Cir. 1991), in support of the preposition that mandamus relief is an appropriate remedy to compel an administrative agency to act where it has failed to perform a nondiscretionary, ministerial duty is misplaced. *See id.* at 500. Marathon had filed an application for an oil shale mining patent, and the court simply ordered the Bureau of Land Management to complete its statutory duty to process that application. *Id.* at 501. Plaintiff's reliance on *Norton Const. Co. v. U.S. Army Corps of Engineers*, 1:03-CV-02257, 2006 WL 3526789 (N.D. Ohio Dec. 6, 2006) , is similarly misplaced because Norton had submitted a completed application for a CWA permit to the Corps, and was merely requesting the Corps to perform its "mandatory duty" to issue or deny the permit in accordance the Corps duties under the CWA. *Id.* at *1-2.

In the absence of an obligation to act, the agency's failure to act does not constitute final agency action subject to judicial review. Because Kennecott has not submitted an RHA section 10 or a CWA section 404 permit application, the Corps has no mandatory permitting obligation that is subject to review under the APA.

Plaintiff contends that "[w]hether or not a person applies for a permit is not relevant to the fundamental principle that an agency has no discretion to choose whether to administer

11

a congressionally mandated program." (Dkt. No. 34, Pl. Resp. 3, n.4.) Plaintiff contends that the only statutory mandate is for the Federal Defendants to "fulfill their permitting and regulatory duties" before Kennecott can engage in any regulated construction activities. (Resp. Br. 15.) Plaintiff does not suggest how the Federal Defendants are to fulfill their permitting and regulatory duties. Plaintiff does not contend that they have a statutory duty to actively seek out persons who might need permits, and then to demand that they apply for permits. (Dkt 34, Resp. Br. 15, 17.)

If Plaintiff is not suggesting that the Corps has a mandatory duty to investigate and to demand permits, it is unclear how Plaintiff contends the Corps should administer the programs, unless Plaintiff is requesting the Court to order the Corps to enforce what Plaintiff believes are the requirements of RHA § 10 and CWA § 404. The Corps' determination as to whether to enforce these provisions against Kennecott, however, falls squarely within the discretionary and enforcement actions of the Agency that this Court has no power to order under the express terms of the APA.

Courts do not have authority to review agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An agency action is committed to agency discretion by law if the statute does not provide a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. The

enforcement decision is generally unsuitable for judicial review because it involves a complicated balancing of factors including "whether a violation has occurred, . . . whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, . . . whether the agency has enough resources to undertake the action at all." *Id.* "[W]hen Congress commits to an agency discretionary authority to perform an act without prescribing meaningful governing standards, that exercise of discretion is placed beyond judicial review by section 701(a)(2) of the Administrative Procedures Act (APA)." *Gor v. Holder*, 607 F.3d 180, 188 (6th Cir. 2010) (citing *Heckler*, 470 U.S. at 830). Judicial review is only available where there are "standards, definitions, or other grants of power [that] deny or require action in given situations. . . ." *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996) (quoting *Diebold v. United States*, 947 F.2d 787, 795 (6th Cir. 1991)).

The language of the RHA clearly leaves enforcement actions to the discretion of the Corps and the Attorney General: "[T]he removal of any structures or parts of structures erected in violation of the provisions of the said sections *may* be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end *may* be instituted under the direction of the Attorney General of the United States." 33 U.S.C. § 406 (emphasis added). The regulations contain enforcement policies applicable to the Corps in addressing unauthorized activities. 33 C.F.R.

§ 326.3.  Those regulations are phrased in terms of what the Corps "should" do, rather than what the Corps "shall" do.  33 C.F.R. § 326.3.  They also expressly state that "[n]othing contained in this Part [326 Enforcement] shall establish a non-discretionary duty on the part of district engineers nor shall deviation from these procedures give rise to a private right of action against a district engineer."  33 C.F.R. § 326.1.

Plaintiff, however, has not requested an enforcement action.  Indeed, Plaintiff recognizes that enforcement actions are discretionary, and has repeatedly insisted that this is not an enforcement action.  (*See* Pl. Resp. Br. 6 ("The structure of the Corps' own regulations therefore belie any suggestion HMC seeks to compel the exercise of 'enforcement' powers.  HMC instead seeks to hold the corps accountable for compliance with its own permitting regulations and statutory mandates."); Pl. Resp. Br.  2 (stating that Defendants' enforcement cases are inapposite).).  Plaintiff has simultaneously asserted, however, that if Defendants' permitting and regulatory functions are within their enforcement discretion, there is only a rebuttable presumption against judicial review, and that presumption must yield where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers. (Resp. Br. 6, citing *Heckler*, 470 U.S. at 832-33).  Plaintiff contends that there are standards providing precise guidance on when an enforcement action must be brought.  The standards Plaintiff points to are standards that outline the nature of work that requires a permit.  The standards define whether a violation has occurred, but they do not address agency's discretionary determination as to whether such violation is worth pursuing.

Courts have concluded that a party cannot maintain an action under the APA or mandamus to require a federal agency to enforce the permitting requirement of the RHA or the CWA. *See*, *e.g.*, *Sierra Club v. Whitman*, 268 F.3d 898, 901 (9th Cir. 2001) (holding that the CWA leaves it to the discretion of the EPA Administrator whether to find violations and to take enforcement action, and that these discretionary decisions are not subject to judicial review under § 1365(a)(2)); *Harmon Cove Condo. Ass'n, Inc. v. Marsh*, 815 F.2d 949, 952-53 (3rd Cir. 1987) ("Section 10 of the RHA does not impose a duty on the Secretary to enforce compliance with the provisions of the permit . . . [and] imposes no duty on the Secretary to make a finding of violation, because it contains no guidelines for the Secretary to follow in choosing to initiate enforcement activity.")

Plaintiff does not have a likelihood of success on its RHA and CWA claims against the Federal Defendants because it has not identified a basis for finding a mandatory duty to exercise permitting authority in the absence of a permit application, and because the enforcement decision is committed to agency discretion.

**b. Transfer of CWA Permitting Authority**

There is an additional barrier to Plaintiff's APA challenge to the Federal Defendants' failure to require a CWA § 404 permit. Congress has authorized the transfer of authority to issue CWA § 404 permits to the states. 33 U.S.C. § 1344(h). Pursuant to this authority, in 1983 the State of Michigan assumed responsibility for administering the CWA with respect to all waters in the state except those presently used or susceptible for use in their natural condition for commerce. *See* 40 C.F.R. § 233.70 (codifying Michigan's assumption of the

§ 404 regulatory program);[6] (Dkt. No. 13, Konik Decl. ¶ 7, App'x 1, MDNR-USEPA Agrmt., App'x 2, Michigan/Corps Agrmt.). The Corps has made a determination that only the last two miles of the Salmon Trout River are navigable, from Lake Superior to the confluence with Sullivan Creek at T52N, R27W, Sec. 31. (Konik Decl. App'x 3, Corps' 2012 List of Navigable Waters.)

When the Corps learned about the Eagle Mine project in 2005, it determined that because the project was located approximately 21 miles upstream from the navigable portion of the Salmon Trout River, it was within the State of Michigan's assumed authority with regard to CWA Section 404 permitting. (Dkt. No. 13, Konik Decl. ¶ 14.)[7] Accordingly, the

_____

[6]Michigan's assumption of authority to issue CWA § 404 permits is codified at 40 C.F.R. § 233.70, which provides in pertinent part:

> The applicable regulatory program for discharges of dredged or fill material into waters of the United States in Michigan that are not presently used, or susceptible for use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to the ordinary high water mark, including wetlands adjacent thereto, except those on Indian lands, is the program administered by the Michigan Department of Natural Resources, approved by EPA, pursuant to Section 404 of the CWA.

40 C.F.R. § 233.70.

[7]Plaintiff claims that the 2005 decision not to exercise jurisdiction over the Eagle Mine project is a final decision that is subject to review under the APA. During a 2005 telephone call, a Corps official stated that the project site was not on a navigable portion of the Salmon Trout River. This opinion merely reflected the Corps' 1984 jurisdictional determination, and was not a final agency action subject to judicial review. Moreover, even if it was a final decision, Plaintiff's action is outside the six year statute of limitations for APA claims. 28 U.S.C. § 2401(a); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir.2010) ("APA claims are subject to a six-year statute of limitations.").

Federal Defendants contend that the federal government does not administer § 404 of the Clean Water Act for the waters at issue in this case.

Plaintiff contends that the Corps cannot delegate its CWA § 404 permitting authority over the waters at issue to Michigan because the portion of the Salmon Trout River and the wetlands above the Eagle Mine are navigable and beyond the scope of waters that are subject to state delegation.

Section 404(g) of the Clean Water Act allows delegation only as to waters that are not "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate . . . commerce." 33 U.S.C. § 1344(g). Even if Plaintiff could show that the Salmon Trout River can be used for interstate commerce above Sullivan Creek, Plaintiff has not presented any persuasive evidence that the waters of the Salmon Trout River in the vicinity of the Eagle Mine are presently used, or are susceptible to use, in their natural condition or by reasonable improvement as a means to transport interstate commerce.

Accordingly, because the Federal Defendants' permitting authority has been transferred to the State of Michigan, Plaintiff does not have a likelihood of success on the merits of her claim that the Federal Defendants failed to take mandatory action under the CWA.

**c. Applicability of the RHA and CWA to Kennecott's Actions**

Even if the review is proper under the APA, Plaintiff has nevertheless failed to show a likelihood of success on the merits of its claims that RHA § 10 and CWA § 404 have any applicability to the Eagle Mine.

1.  Navigable Waters

RHA § 10 prohibits "any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States."  33 U.S.C. § 403.  The term "navigability" has different definitions depending on the purpose for which the concept is invoked under each particular statute.[8]  The term has a more limited meaning under the RHA than it does under the CWA.  *1902 Atlantic Ltd. v. Hudson*, 574 F. Supp. 1381, 1392 (D. C. Va. 1983).[9]  As noted in the regulations:

> The terms "navigable waters of the United States" and "waters of the United States" are used frequently throughout these regulations, and it is important from the outset that the reader understand the difference between the two. "Navigable waters of the United States" are defined in 33 CFR part 329. These are waters that are navigable in the traditional sense where permits are required for certain work or structures pursuant to Sections 9 and 10 of the Rivers and Harbors Act of 1899.  "Waters of the United States" are defined in

---

[8] *See Finneseth v. Carter*, 712 F.2d 1041, 1043 (6th Cir. 1983) (noting that "navigability" is used to delineate boundaries to navigational servitude, to define Congress' authority under the Interstate Commerce Clause, to determine the extent of the Corps' authority under the RHA, and to establish federal court jurisdiction over admiralty and maritime cases).

[9] The *1902 Atlantic* court quoted the following distinction from 33 C.F.R. § 320.1(c):

"Navigable waters of the United States" are defined in 33 CFR Part 329. These are the traditional waters where permits are required for work or structures pursuant to sections 9 and 10 of the River and Harbor Act of 1899. "Waters of the United States" are defined in 33 CFR 323.2(a). These waters include more than navigable waters of the United States and are the waters where permits are required for the discharge of dredged or fill material pursuant to section 404 of the Federal Water Pollution Control Act Amendments of 1972.

574 F. Supp. at 1392.

> 33 CFR part 328. These waters include more than navigable waters of the United States and are the waters where permits are required for the discharge of dredged or fill material pursuant to section 404 of the Clean Water Act.

33 C.F.R. § 320.1.

Because the Corps has determined that only two miles of the Salmon Trout River are navigable, it has also determined that the river is not navigable 20 miles upstream in the vicinity of the Eagle Mine. The Corps' determination of navigability is not binding on the court. *Miami Valley Conservancy Dist.*, 692 F.2d at 451 (finding that the Corps failed to prove that a stretch of the river was navigable as a matter of law); *see also* 33 C.F.R. § 329.3 ("Precise definitions of 'navigable waters of the United States' or 'navigability' are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies."). Nevertheless, the Corps' determination on navigability is generally accorded substantial weight. *See*, *e.g.*, *Wash. Water Power Co. v. FERC*, 775 F.2d 305, 328, 332 (D.D.C. 1985) (holding that Corps' navigability reports carried "particular weight", and that the Commission failed to give them adequate deference); *Loving v. Alexander*, 548 F. Supp. 1079, 1087 (D.C. Va. 1982) ("[T]he Corps' determination of navigability is entitled to substantial weight."); *see also* 33 CFR § 329.14(a) ("Although conclusive determinations of navigability can be made only by federal Courts, those made by federal agencies are nevertheless accorded substantial weight by the courts.").

Under the RHA, "[t]he question of navigability turns on whether the river has ever been or is now used as a water highway for interstate commerce." *Miami Valley*

*Conservancy Dist. v. Alexander*, 692 F.2d 447, 449 (6th Cir. 1982).  "A navigable waterway of the United States must (1) be or have been (2) used or susceptible of use (3) in the customary modes of trade and travel on water (4) as a highway for interstate commerce." *Id.* at 450.

Plaintiff contends that the Salmon Trout River and its associated wetlands in the vicinity of the Eagle Mine ore body are "navigable" within the meaning of RHA § 10 because they fall within the Corps' own definitions of "navigable waters of the United States," and that Kennecott's work "under" those navigable waters triggers the Corps' RHA permitting jurisdiction.  *See* 33 C.F.R. § 329.6 ("[T]ransportation of logs has been a substantial and well-recognized commercial use of many navigable waters of the United States . . . . Similarly, the presence of recreational craft may indicate that a waterbody is capable of bearing some forms of commerce, either presently, in the future, or at a past point in time." ); 33 C.F.R. § 329.7 (providing that a waterbody entirely within a state may still be capable of carrying interstate commerce, especially if it connects with the ocean or one of the Great Lakes); 33 C.F.R. § 322.3(a) ("a tunnel or other structure or work under . . . a navigable water . . . . is considered to have an impact on the navigable capacity . . . .").

In support of its contention that the waters above the ore body are navigable, Plaintiff has presented evidence that there was logging upstream of the mine, and that logs were transported on the River.  (Dkt. No. 5, Pl.'s Ex. B. Boyle Aff. ¶ 17 ) ("[N]ear the site of Kennecott's mine there was once a logging operation. . . . . As a part of the historical

operations, logs were transported by the Salmon Trout River to Lake Superior for commercial sale.").  Plaintiff has also presented evidence of a commercial rafting operation boating, canoeing, kayaking, and fishing on the Salmon Trout River. (Dkt. No. 5, Pl.'s Ex. B, O'Boyle Aff. Ex. 4; Dkt. No. 35, Ex. 2, O'Boyle Aff. ¶ 3; Dkt. No. 5, Pl. Ex. A, Dykema Aff.  ¶ 7, 10;  Dkt. No. 6, Pl.'s Ex. C, Powers Aff. ¶ 7, 10.)

In response, Kennecott has presented evidence that the Salmon Trout Main branch near the area overlying the ore body is the smallest headwater tributary of the Salmon Trout River System, and that transport of goods by vessels on the stream is impossible in this area due to the shallow characteristics, narrow channel widths, and barriers to flow.  (Ken. Ex. 2, Wiitala Decl. ¶¶  2-4, & Ex. 1.)

Contrary to Plaintiff's contentions, the fact that the Salmon Trout River is a tributary of Lake Superior, is not sufficient, in itself, to make the entire stretch of the river navigable. Section § 329.7 does not stand for the proposition that navigable status is automatically assigned to the entire reach of all rivers that are tributaries of a Great Lake.  "The character of a river will, at some point along its length, change from navigable to non-navigable."  33 CFR § 329.11(b).  Plaintiff has not presented any persuasive evidence of recreational use of the waters above the ore body.  The commercial rafting Plaintiff has described begins one mile downstream of the Eagle Mine ore body, and the affidavits pertaining to other recreational activities describe activities downstream of the Eagle Mine, or do not specify where on the river the activities take place.  Although Plaintiff has presented some hearsay

evidence of historic commercial use of the waters in the vicinity of the ore body, the historic evidence is ambiguous at best with respect to whether logs were transported in the Salmon Trout River in the vicinity of the Eagle Mine. The Court is not persuaded that this evidence is sufficient to give Plaintiff a likelihood of success on its claim that the waters are navigable.

Even if the Salmon Trout River is determined not to be navigable above the mine, Plaintiff contends that Kennecott's activities nevertheless are governed by the RHA because the activities, regardless where located, will affect the capacity of a navigable water. *See* 33 C.F.R. § 322.3 ("DA permits are required under section 10 for structures and/or work in or affecting navigable waters of the United States.") Plaintiff contends that as a result of excavation and mining operations, Kennecott will drawdown water in a manner that will lower the water table of the Salmon Trout River and its wetlands, that this action could affect the capacity of the Salmon Trout River further downstream. Plaintiff has presented the testimony of several witnesses from the administrative hearing. Dr. Adamus testified that the mine would lower the water table in the wetlands and would alter and degrade them, and there is a chance of water quality degradation to the wetlands. (Dkt. No. 9, Pl. Ex. R, pp. 1041-1068.) Gregory Council testified that although there would be some drawdown, the impacts are small, about 2 to 4 percent of stream flow, and those impacts would be reduced as one goes down stream because water is put back into the system through the treated water infiltration system. (Pl. Ex. P, Council Test. Tr. 5254.) Dr. Blake testified that he was concerned with the safety of the crown pillar, and that if there was a subsidence or collapse

of the crown pillar, it would cause a drawdown of water and effects far down stream. (Dkt. No. 9, Pl. Ex. Q, Blake Test. 866.)

The implementing regulations provide that structures or work outside of navigable waters are subject to the RHA "if these structures or work affect the course, location, or condition of the waterbody in such a manner as to impact on its navigable capacity." 33 C.F.R. § 322.3(a). Although Plaintiff has presented some evidence to suggest that the Salmon Trout River will be impacted downstream of the mine, Plaintiff has not presented any evidence to show that the mine will affect the Salmon Trout River "in such a manner as to impact on its navigable capacity." *Id.*

## 2. Discharge

Defendants contend that Plaintiff does not have a likelihood of success on its CWA claim because Plaintiff has not alleged a CWA violation.

CWA § 404 prohibits discharges of dredged or fill material into navigable waters without a permit. 33 U.S.C. §§ 1311, 1344. The CWA defines navigable waters as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The regulations generally define the term "waters of the United States" to include waters susceptible to use in interstate commerce, wetlands, waters which can be used for commerce, (including recreation, industrial uses, and extraction of fish and shellfish), tributaries, and wetlands. *See* 33 C.F.R. § 328.3(a). Wetlands are defined as areas inundated with water that support vegetation. 33 C.F.R. § 328.3(b).

23

Defendants contend that, as evidenced by these definitions, CWA § 404 is concerned with discharges of dredge and fill material into surface waters.  Plaintiff has not alleged that Kennecott will discharge dredged or fill material into the Salmon Trout River, its related wetlands, or any other surface waters.  Rather, Plaintiff's CWA § 404 claim is based on Kennecott's expected drawdown of the water table of the Salmon Trout River and related wetlands as a result of its subsurface activities of excavating rock and ore from an underground mine.  (Compl. ¶ 29 ("Kennecott's excavation and re-deposit of subsurface materials underneath the Salmon Trout River and connected wetlands during construction and operation of the Eagle Mine, constitutes 'dredge or fill' activity within the meaning of the CWA.").)  Defendants contend that because Kennecott's mining operations and subsequent backfill will take place well below the water table in the deep bedrock, it does not involve discharges into surface waters and is accordingly beyond the reach of CWA § 404.

This Court has previously held that "Congress did not intend the Clean Water Act to extend federal regulatory and enforcement authority over groundwater contamination." *Kelley ex rel. Mich. v. United States*, 618 F. Supp. 1103, 1107 (W.D. Mich. 1985) (Enslen, J.)  Other courts have held that CWA jurisdiction applies to groundwater, but only if the groundwater has a direct hydrologic connection to surface waters that are waters of the United States.  *See Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*, 2011 WL 1357690, at *17 (M.D. Tenn. April 11, 2011) (citing cases).

24

Even if Plaintiff had an APA claim against the Federal Defendants based on CWA § 404, the Court does not find that Plaintiff has shown a likelihood of success on the merits of its claim that the nature of Kennecott's underground extraction and subsequent backfill will involve the kind of discharges that are subject to the CWA, even under the broader reading of the statute.

## 2. **NEPA, NHPA and ESA Claims**

Plaintiff alleges that the permits required under the RHA and the CWA are federal actions that trigger obligations on the Federal Defendants to conduct evaluations and assessments under NEPA, the NHPA and the ESA.

Absent an order from this court requiring the Corps to take affirmative permitting and enforcement actions, there is no federal action associated with the Eagle Mine project, and accordingly no basis to require the Federal Defendants to conduct environmental reviews under these statutes. Because Plaintiff does not have a strong likelihood of success on its RHA and CWA claims, and because Plaintiff's claims under NEPA, NHPA and ESA are derivative of its claims under the RHA and the CWA, Plaintiff does not have a strong likelihood of success on its claims under these other acts.

## 3. **Likelihood of Success re Claims against Kennecott**

Finally, the Court turns to Plaintiff's claims against Kennecott. Although Plaintiff claims that Kennecott is violating the RHA and the CWA, Plaintiff does not purport to be bringing a private action against Kennecott under the RHA or the CWA. Instead, Plaintiff

seeks injunctive relief against Kennecott pursuant to the All Writs Act, 28 U.S.C. § 1651, or the Court's inherent powers.

The All Writs Act does not provide federal courts with an independent source of jurisdiction to issue writs, but only with the authority to issue writs "in aid of their respective jurisdictions." *Baze v. Parker*, 632 F.3d 338, 345 (6th Cir. 2011) (quoting 28 U.S.C. § 1651).

> [W]hile a party must "state a claim" to obtain a "traditional" injunction, there is no such requirement to obtain an All Writs Act injunction—it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior. The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100-01 (11th Cir. 2004). "[T]he All Writs Act generally should only be used sparingly and only in the most critical and exigent circumstances." *In re Life Investors Ins. Co. of Am.*, 589 F.3d 319, 330 (6th Cir. 2009).

"Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 761 (6th Cir. 1999) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

Because Plaintiff does not have a likelihood of success on its claims against the Federal Defendants under the APA, and because Plaintiff has not shown a likelihood of success on the merits of its claims that Kennecott is violating the RHA or the CWA, the Court is not inclined to grant Plaintiff relief under the All Writs Act or the Court's inherent powers.

The Court concludes that Plaintiff does not have a likelihood of success on any of its claims against either the Federal Defendants or Defendant Kennecott.

## B.  IRREPARABLE HARM TO THE PLAINTIFF

The second factor under the preliminary injunction test is whether the movant will suffer irreparable injury without a preliminary injunction.  To demonstrate irreparable harm, Plaintiff must show that unless a preliminary injunction is entered and the construction of the Eagle Mine is immediately enjoined, Plaintiff will suffer "actual and imminent" harm rather than harm that is "speculative or unsubstantiated."  *Abney v. Amgen, Inc*.  443 F.3d 540, 552 (6th Cir. 2006).  A plaintiff seeking preliminary injunctive relief is required to demonstrate that irreparable injury is not only possible, but that it is "likely" in the absence of an injunction.  *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008).  In order to be irreparable, the harm must be of sufficient immediacy that it cannot await trial on the merits.

Plaintiff contends that the Federal Defendants' failure to conduct required environmental and cultural evaluations before allowing Kennecott to engage in regulated conduct infringes on Plaintiff's procedural rights, and that infringement is, in itself, "irreparable harm."  *See Winter,* 555 U.S. at 7, 23 ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures."); *Sierra Club v. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) ("[T]he failure to comply with NEPA's

requirements causes harm itself, specifically the risk that 'real environmental harm will occur through inadequate foresight and deliberation.'").  Plaintiff also contends that the construction of the mine will lead to environmental impacts that will alter the ecology of the Salmon Trout River watershed by lowering the water table in the River and adjacent wetlands, reducing the reach  of the River and wetlands, reducing the flow of the River, altering the temperature of the River, and excavating and re-depositing materials in the subsurface portions of the River's bed, and potentially causing a catastrophic collapse of the River.

Because Plaintiff has not shown a likelihood that Kennecott's work is subject to the RHA and the CWA, Plaintiff has not shown that irreparable injury from a lack of studies under the NEPA, ESA, and NHPA is "likely."  Moreover, the Eagle Mine has been the subject of extensive review for over six years by State environmental authorities, and has survived multiple state court challenges.  Although the state and federal considerations are not identical, there is no dispute that the findings required under state and federal law are similar, and that the issues raised in this case parallel the issues raised in the state administrative and court cases.  The Ingham County Circuit Court held that the MDEQ's findings that the Eagle Mine is not likely to subside or collapse, and that it would not have any severe adverse impact on the flora and fauna, the wetlands, or the surface or ground water in the region, were supported by competent, material and substantial evidence on the record.  (Ken. Ex. 18, Op. Aff'g Part 632 Permit.)  It held that any effects outside the

boundaries of the mine footprint were de minimus. (*Id.* at 78.) Plaintiff has not shown any likelihood that it would succeed here where it did not succeed in state court. Plaintiff has not shown that the state administrative or judicial processes were flawed, or that it will be able to present material evidence in this action that was not already considered by the MDEQ or the state courts.

Plaintiff's concerns regarding potential harms are also minimized, at least in part, by the terms of Kennecott's state permits. Kennecott's Part 632 permit requires extensive monitoring of surface water, groundwater, and wetlands to prevent pollution, impairment, or destruction of these resources, and require Kennecott to stop all work if the monitoring shows a problem.

Finally, Plaintiff has actively challenged the Eagle Mine since Kennecott submitted its application to the MDEQ in February 2006. The subsurface work that is the subject of this action was contemplated from the beginning of the project. Plaintiff has been fully aware of Kennecott's plans to construct and operate its underground mine without RHA and CWA permits. Plaintiff's failure to pursue these federal claims until 2012, evidences a lack of immediate irreparable harm. *See Quince Orchard Vallely Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) ("Since an application for preliminary injunction is based on an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required.") The timing of this action suggests an obstructive motive, rather than a sincere belief that Plaintiff is being irreparably harmed by Kennecott's failure to comply with federal law.

## C. HARM TO OTHERS

The third factor for consideration in reviewing a motion for a preliminary injunction is whether issuance of the injunction would cause substantial harm to others.

Stopping the construction of the Eagle Mine would cause substantial concrete and immediate harm to Kennecott. Kennecott has already spent over $331 million on the mine, and anticipates investing an addition $1 billion during construction and operation of the mine. (Burley Decl. ¶ 7.)  If the project is stayed for a significant period, Kennecott will incur significant costs due to the idling of specialized equipment, the loss of specialty contractors, and the costs of terminations, lay-offs, and relocation of employees. (*Id.* at ¶¶ 8-13.)  A stay will also negatively impact Kennecott's return on its investment and the economies of the project. (*Id.* at ¶ 14.)

Plaintiff contends that any harm to Kennecott's private interest is self-inflicted because Kennecott failed to obtain a permit. *See* Sierra Club v. U.S. Army Corps of Eng'rs, 645 F.3d 978, 997 (8th Cir. 2011) (noting that any injury to SWEPCO was self inflicted because it invested in plant construction before the § 404 permit was issued and ignored the Corps' warning letter that construction would proceed at its own risk).  However, because Plaintiff has not shown a likelihood of success on the merits of its claim that Kennecott is required to obtain a permit, the harm to Kennecott cannot be dismissed as self-inflicted.

Stopping construction of the Eagle Mine would also cause substantial harm to the local community in terms of lost jobs, lost tax revenue, and lost infusion of capital. (Clickner

Decl.; Corkin Decl.; LaSalle Decl.; Mackey Decl.; Stine Decl.)  The unemployment rate in the Upper Peninsula exceeds the national average.  (Corkin Decl. ¶ 3.)  As of April 2012, Kennecott and its contractors employed 296 individuals, 221 of whom were from the local area.  (Burley Decl. ¶ 6.)  A stay would also cause harm to many businesses in the area that are dependent on Kennecott's business.  (Allie Decl.; O'Dovero Decl.; Swadley Decl.)

### D.  PUBLIC INTEREST

The final consideration in reviewing a motion for preliminary injunction is whether the public interest would be served by granting injunctive relief.

Plaintiff contends that the public has an interest in having federal agencies fulfill their legitimate governmental functions, *see Sierra Club*, 645 F.3d at 997, and in avoiding environmental injury.

 The public interest might outweigh economic concerns if Plaintiff was likely to succeed on the merits of its underlying claim.  *See The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008).  However, the public also has an interest in aiding a struggling local economy and preventing job loss.  *Id.*  Because Plaintiff has little likelihood of success on the merits of its permitting claims, the public interest in injunctive relief is slim, and is outweighed by the public's interest in maintaining jobs, tax revenues, and capital investment in the local economy.

### III.

Upon consideration of all of the relevant factors, the Court concludes that Plaintiff has

not met its heavy burden to show that it should be granted preliminary injunctive relief.

Plaintiff's motion for a preliminary injunction will accordingly be denied.

      An order consistent with this opinion will be entered.


Dated: <u>July 25, 2012</u>           <u>/s/ Robert Holmes Bell</u>
                                        ROBERT HOLMES BELL
                                        UNITED STATES DISTRICT JUDGE